**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARSH & McLENNAN AGENCY LLC, | Case No.: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| ALLIANT INSURANCE SERVICES, INC., ANDREW OLDENBURG, ELIZABETH McKINNEY, KIMBERLY MOORE, and DANIELLE BLACK, | |
| Defendants. | |

Plaintiff Marsh & McLennan Agency LLC ("MMA" or "Plaintiff"), by and through its attorneys, Epstein Becker & Green P.C., as and for its Complaint against Alliant Insurance Services, Inc. ("Alliant"), Andrew Oldenburg ("Oldenburg"), Elizabeth McKinney ("McKinney"), Kimberly Moore ("Moore"), and Danielle Black ("Black," and, together with Alliant, Oldenburg, McKinney, and Moore, "Defendants"), hereby alleges as follows:

## NATURE OF THE ACTION

1.      Before dawn on Monday, July 14, 2025, MMA Sales Executive and producer Oldenburg entered MMA's office in Beaverton, Oregon, where he was based. He was not coming to the office to work. In fact, it would be the last time Oldenburg set foot in the office. But he was not there to say goodbye to his colleagues either. He entered the office in the early morning hours, before anyone had arrived to start the workday, and stayed just long enough to send three emails from his MMA email account: two to MMA clients, and one—his final MMA email—at 6:48 a.m. to his manager, announcing his resignation "effective immediately." Then he walked out, making his final exit from MMA before 7:00 a.m., while the office was still empty.

2.     Oldenburg's resignation was not the end of a chapter—it was the opening move in a coordinated raid. Within hours, two members of Oldenburg's client service team also resigned. By the following morning, the third had followed. None disclosed where he or she was going. But MMA soon learned the answer: all four had joined Alliant—immediately.

3.     The team's rapid defection, however, was not the objective. It was a means to an end. The real goal was the clients. In the days and hours before his sudden exit, Oldenburg had already begun soliciting MMA clients while still on MMA's payroll, lining up transitions in advance so that, by the time he resigned, client defections would already be in motion.  Indeed, within 24 hours of Oldenburg's resignation, one long-standing MMA client—clearly prepped—contacted Alliant to "transition" its account. That was not an isolated incident: in the weeks immediately following Oldenburg's departure, at least fourteen clients representing more than $600,000 in annual renewing revenue for MMA filed broker-of-record letters transferring their business to Alliant. The solicitation campaign remains ongoing, with additional clients at risk absent immediate injunctive relief.

4.     This is the third time in the past year that MMA has been compelled to file suit in this District to challenge Alliant's unlawful raiding schemes. And each time, the pattern has been the same: while still employed by MMA, the producer secretly pre-solicits clients and recruits colleagues; then, without notice, the producer abruptly resigns without notice; the client service team follows close behind; and the pre-solicited clients begin transitioning almost immediately, with solicitation efforts continuing until as much of the book of business as possible is converted—or until MMA secures injunctive relief. The scheme is designed to ensure that by the time MMA even learns of the resignations, much less has any chance to respond, the damage has already been set in motion: key clients have been targeted and the "transition" to Alliant is already underway.

MMA is deprived not merely of the chance to respond quickly, but of any chance to respond at all, because the scheme is executed covertly before MMA even knows there is a threat.

5.       On December 23, 2024, MMA sued Alliant and former MMA producer Johnny Osborne after Osborne resigned "effective immediately" at 8:00 a.m. on a Monday morning—just hours after office surveillance captured him entering MMA's offices over the weekend when no one else was present and removing multiple large boxes. In the days before his resignation, Osborne had printed highly confidential client documents concerning his MMA book of business—including months-ahead renewal data—for which he had no legitimate business need. None of those documents were left behind or otherwise accounted for. His desk was bare. That same day, his entire client service team resigned. All of them immediately began working for Alliant. Within one week, 29 clients from Osborne's MMA book had moved to Alliant due to his solicitation in violation of his non-solicitation agreement. The number later rose to 38. *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc. et al.*, No. 24-cv-09914 (MKV), 2025 WL 304500, at *1 (S.D.N.Y. Jan. 27, 2024) (*"Osborne"*).

6.       On February 14, 2025, MMA sued Alliant and former MMA producer Travis Davis, who also resigned "effective immediately" at 8:48 a.m. on a Monday morning—fewer than 24 hours after a client alerted MMA that Davis had solicited their business over the weekend. The next day, Davis's lead client service team member resigned, followed shortly by the rest of the team. They, too, all joined Alliant immediately. Ultimately, more than 30 MMA clients moved their business to Alliant because of Davis's improper solicitation in breach of his non-solicitation covenants with MMA. *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc. et al.*, No. 25-cv-01260 (JAV) (S.D.N.Y. Feb. 14, 2025).

7.       Different producers. Different teams. Different cities, and, in the case of Osborne,

different states, separated by thousands of miles. Yet somehow, they all followed the same script: resign without notice at the crack of dawn on a Monday morning; bring the entire team along; immediately join Alliant; and begin soliciting clients in breach of non-solicitation covenants. A remarkable coincidence? Hardly. It is a pattern strategy—carefully orchestrated by Alliant with the goal of inflicting maximum disruption before MMA can retain its clients or seek injunctive relief.

8.     Alliant's conduct here—while extraordinary in isolation—is anything but anomalous. It is the product of a business model built on misappropriating the work and investment of others. Alliant has an established pattern of growing its business by targeting producers managing significant books of business at rival firms (to whom Alliant refers euphemistically as "leveraged hires" or, more bluntly, as its "'team lift' strategy"), luring them to Alliant, and inducing them to transfer their former employer's clients, client service personnel, and confidential information to Alliant, in deliberate breach of their common law obligations and the restrictive covenants that are standard in the insurance brokerage industry (including at Alliant). In other words, rather than investing the years of dedicated effort and skill to grow a client base from scratch or acquiring a practice lawfully, Alliant's growth strategy is to simply steal the investment and efforts of its competitors.

9.     Alliant knows that its *modus operandi* is unlawful. This now marks the 72nd lawsuit against Alliant for using intentionally tortious methods to grow its business by raiding competitors. These lawsuits have resulted in multiple injunctions against Alliant and judicial rulings excoriating its disregard for contracts and fair competition. In a particularly scathing rebuke, the Delaware Chancery Court found that Alliant's legal strategy—developed in coordination with its regular outside counsel—was so extreme it potentially fell within the

"crime/fraud exception to the attorney-client privilege."[1] Yet Alliant remained undeterred. Rather than reform its practices, Alliant fled the jurisdiction. Within weeks of the Delaware court issuing a permanent injunction against it, Alliant reincorporated in California and resumed its unlawful practices from a new corporate home, using the same playbook for unlawful conduct that had been exposed in the Delaware litigation.

10.     Nor did the sweeping preliminary injunction entered against Alliant in *Osborne* just six months ago deter its misconduct towards MMA. That order upheld MMA's restrictive covenants as enforceable and barred Alliant from servicing the dozens of clients it had unlawfully solicited and transitioned to Alliant before MMA had been able to obtain emergency injunctive relief. When the parties stipulated to a permanent injunction in *Osborne* barely three months ago, one might have expected Alliant to change course. Instead, it was already plotting its next raid. The ink on the *Osborne* injunction was barely dry when Alliant struck again—its third raid on MMA in one year—this time using Oldenburg as the point of entry.

11.     Oldenburg joined MMA in 2021 as part of MMA's acquisition of his former firm, PayneWest Insurance, Inc. ("PayneWest"), where he was a part-owner and Sales Executive. As part of the sale, MMA purchased Oldenburg's equity and, in return, Oldenburg agreed to a set of restrictive covenants designed to protect the goodwill MMA had paid to acquire. His entire client service team became MMA employees and, like Oldenburg, entered into agreements containing non-solicitation and confidentiality provisions. MMA offered, and Oldenburg among others accepted, bonuses and continued employment in exchange for those commitments.

---

[1] *Mt. W. Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, 2019 WL 2536104, at *17-22 & n.6 (Del. Ch. June 20, 2019).

12.    By 2025, Oldenburg's book of business generated millions in annual recurring revenue—making him an obvious target for Alliant. But rather than compete fairly by respecting Oldenburg's contractual obligations, Alliant induced him to violate those obligations. Indeed, that was the point. Alliant recruited Oldenburg to deliver up his MMA clients. To ensure this result, Alliant also hired Oldenburg's entire client service team, offering them above-market compensation packages to guarantee their agreement and thereby secure their MMA clients. The team's near-simultaneous resignations and immediate reappearance at Alliant reveal the true nature of the scheme: this was no spontaneous departure—it was a calculated raid.

13.    As exposed in the Delaware litigation, this was no isolated event. It was the Alliant playbook in action. Once a producer agrees to join, Alliant instructs him to stay embedded—outwardly loyal—while secretly soliciting clients and colleagues. Then, at a time chosen to inflict maximum harm, Alliant triggers the exit: a Monday morning resignation, timed to blindside the competitor and get a head start before courts can intervene.

14.    Oldenburg followed that script to the letter. After accepting Alliant's offer, he stayed embedded at MMA, secretly laying the groundwork for his departure. He coordinated with his team, covertly solicited clients, and kept MMA in the dark until 6:48 am. on Monday, July 14, 2025, when he walked out the door—never to return—triggering a cascade of coordinated defections and a seamless client handoff to Alliant.

15.    MMA brings this action to stop the latest execution of Alliant's unlawful playbook—to enforce the contractual and fiduciary obligations owed by Oldenburg and his team, to protect its confidential and trade secret information, to safeguard its client relationships and goodwill, and to hold Alliant accountable for the damage it has knowingly caused.

## THE PARTIES

16.     MMA is an insurance brokerage and risk management firm that provides risk management, insurance, and employee benefit support services to its clients. MMA operates brokerage offices and businesses across the United States. MMA is a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business in White Plains, New York. MMA is an indirect subsidiary of Marsh & McLennan Companies, Inc., a publicly held corporation traded on the New York Stock Exchange, which is incorporated in Delaware with its principal place of business in New York, New York.

17.     Oldenburg is an individual who, upon information and belief, is a citizen and resident of the State of Oregon. Oldenburg is a former employee of MMA and a current employee of Alliant.

18.     McKinney is an individual who, upon information and belief, is a citizen and resident of the State of Oregon. McKinney is a former employee of MMA and a current employee of Alliant.

19.     Moore is an individual who, upon information and belief, is a citizen and resident of the State of Washington. Moore is a former employee of MMA and, upon information and belief, is a current employee of Alliant.

20.     Black is an individual who, upon information and belief, is a citizen and resident of the State of Oregon. Black is a former employee of MMA and, upon information and belief, is a current employee of Alliant.

21.     Alliant is a corporation organized and existing under California law, with its

principal place of business in Newport Beach, California.[2] Alliant does business and maintains offices throughout the United States, including in New York, where it is registered to do business, has appointed an agent for service of process, and maintains six offices (including two offices located in New York City). Like MMA, Alliant is in the business of providing insurance brokerage, risk management and employee benefit support services. MMA and Alliant are direct competitors.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 (diversity of citizenship) because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

23.     This Court has personal jurisdiction over Alliant because Alliant conducts business in this District and has committed tortious acts within the State of New York or has directed its tortious conduct toward the State of New York. Alliant knowingly targeted and recruited employees of MMA, which is headquartered in New York, induced them to breach agreements that Alliant knew were governed by New York law and contained New York forum selection clauses, interfered with at least one New York–based client relationship, and caused harm to MMA in New York. Alliant's conduct was intentionally directed at this forum, and the claims arise directly from that conduct.

24.     Alliant is also subject to personal jurisdiction in this Court under the closely related parties doctrine because Alliant intentionally interfered with contracts between MMA and its

---

[2] Until January 2020, Alliant was a Delaware corporation. But after a privilege waiver in a litigation against Alliant in Delaware laid bare the full depth of Alliant's unlawful conduct and resulted in a scathing rebuke by the Delaware Chancery Court, Alliant fled the jurisdiction, dissolving its incorporation in Delaware and re-incorporating in California.

employees, which Alliant knew contained mandatory forum selection clauses designating the courts in New York County or the Southern District of New York as the exclusive forum for resolution of disputes. Alliant's interference with those contracts is the precise conduct giving rise to this action. Because Alliant orchestrated, directed, and benefited from the breaches it induced of contracts it knew contained New York forum selection clauses, it was foreseeable that it would be bound by those forum selection clauses.

25.     Personal jurisdiction exists over Oldenburg, McKinney, Moore, and Black because in the agreements that they executed with MMA, detailed below, they each agreed to the jurisdiction of this Court in connection with any action arising in connection with those agreements or with their employment with MMA. Oldenburg's, McKinney's, Moore's, and Black's breaches of their obligations under those agreements and their breaches of the duty of loyalty during their employment with MMA are the subject of this Complaint.

26.     Venue is proper in this District pursuant to 28 USC §§ 1391(b)(2) and 1391(b)(3) because the agreements signed by Oldenburg, McKinney, Moore, and Black with MMA, which are the subject of the breach of contract claims set forth herein, contain a Governing Law and Choice of Forum provision, designating courts in New York County or the United States District Court for the Southern District of New York as the exclusive venue for resolution of disputes between the parties. Further, MMA maintains its principal place of business in this judicial District.

## FACTUAL ALLEGATIONS

### A.     MMA's Business

27.     As alleged above, MMA is an insurance brokerage and risk management firm that provides risk management, insurance, and employee benefit support services to its clients. These

services include providing advice on insurance needs, negotiating terms and conditions of insurance policies on behalf of clients, and providing employee benefit support and advice.

28.     MMA has invested significant time and resources over many years to develop and to grow its client relationships and to compile confidential and proprietary information concerning its clients, their accounts, and their insurance needs and preferences. In addition, MMA has purchased other insurance agencies, which have similarly made such investments. MMA's purchase of those agencies included the purchase of such agencies' goodwill.

29.     The insurance brokerage and other risk management business are highly competitive. MMA and Alliant are direct competitors.

### B.      MMA Acquires PayneWest Insurance, Inc. and Oldenburg Enters to a Restrictive Covenant Agreement as a Selling Shareholder

30.     Oldenburg is not merely a former employee of MMA. He is also a former owner of PayneWest, a Montana-based insurance brokerage agency, which provided business insurance, surety, employee benefits, and personal insurance services to companies and individuals across the Northwest of the United States through offices across Idaho, Montana, Oregon, and Washington.

31.     Oldenburg worked as a Sales Executive (otherwise known as a "producer") in PayneWest's Beaverton, Oregon office.

32.     At insurance brokerages, producers are the employees who are primarily responsible for developing and maintaining client relationships. They assume the lead, client-facing role and manage other members of their client-service teams. Thus, as a Sales Executive, Oldenburg's job was to sell PayneWest's brokerage services to clients, both in terms of developing new client relationships and maintaining and expanding PayneWest's relationships with existing clients. Oldenburg also oversaw a client service team, which was responsible for the day-to-day

management of the client accounts that he managed. At PayneWest, Oldenburg's client service team was comprised of McKinney, Moore, and Black.

33.     In 2021, MMA acquired PayneWest to expand its national footprint in the Pacific Northwest and gain access to PayneWest's established client base, industry expertise, and goodwill. As part of that acquisition, MMA agreed to purchase Oldenburg's ownership interest in PayneWest, along with the goodwill, client relationships, and enterprise value that he and other PayneWest principals had built over years in the industry.

34.     A significant part of the transaction's value lay not in PayneWest's tangible assets, but in the client relationships and reputation cultivated by its producers, including Oldenburg. To protect that investment, MMA required each PayneWest shareholder to enter into an Acknowledgment and Restrictive Covenant Agreement ("RCA") as a condition of the sale. These covenants were essential: without them, the very individuals whose client relationships formed the core of the purchase could have immediately diverted that business to a competitor, stripping MMA of the benefit of its bargain. Accordingly, the purchase agreement made MMA's acquisition of PayneWest expressly contingent on every shareholder, including Oldenburg, executing the RCA.

35.     This requirement is expressly memorialized in the "WHEREAS" clauses at the outset of the RCA executed by Oldenburg and the other selling shareholders, which state that execution of the agreement was a condition to closing the transaction:

11

WHEREAS, pursuant to the Merger Agreement, among other things, Purchaser shall acquire, directly or indirectly, 100% of the issued and outstanding capital stock of the Company in a reverse subsidiary merger transaction on the terms and subject to the conditions set forth in the Merger Agreement (the "**Contemplated Transactions**");

WHEREAS, as a condition to closing the Contemplated Transactions, the undersigned is required to enter into this Acknowledgement and Restrictive Covenant Agreement in favor of the Purchaser (this "**Agreement**");

WHERAS, pursuant to the Merger Agreement, upon the closing of the Contemplated Transactions the undersigned will be entitled to receive his or her portion of the Base Purchase Price (as such term is defined in the Merger Agreement) to which the undersigned is entitled under the Merger Agreement; and

36.     On March 10, 2021, PayneWest circulated a letter to all shareholders, including Oldenburg, enclosing the RCA and making clear that each selling shareholder's signature was a prerequisite to the transaction.

37.     MMA closed on the acquisition on April 1, 2021 (the "Closing Date"). In connection with the closing, Oldenburg executed his RCA and received substantial consideration for the sale of his ownership interest in PayneWest. (A true and correct copy of Oldenburg's executed RCA is attached hereto as **Exhibit A**.)

38.     In doing so, Oldenburg expressly acknowledged the value of the goodwill and client relationships being transferred to MMA and agreed to reasonable restrictions designed to protect MMA's investment. Unlike a standard employment agreement, the RCA was a bargained-for component of a corporate sale transaction. Oldenburg signed the RCA in his capacity as a selling shareholder, not as a future employee, and agreed that the restrictions were necessary to protect the enterprise value MMA had purchased. These restrictions were an integral part of the deal, ensuring that MMA would receive the full benefit of its bargain—including continuity in client relationships and protection from immediate and/or unfair competition by those who had just profited from the sale.

39.    To that end, the RCA imposed post-closing restrictive covenants specifically crafted to safeguard MMA's investment. Those covenants include five-year restrictions, running from the April 1, 2021 Closing Date, on soliciting, servicing, or accepting business from PayneWest's clients and prospective clients, as well as on soliciting or hiring PayneWest employees who became MMA employees after the sale. These restrictions remain in force through April 1, 2026, and the RCA further provides that the restricted period is tolled during any litigation arising from a breach and runs from the date of first breach.

40.    The five-year client non-solicitation, non-acceptance of business, and non-servicing restrictions, as well as the five-year employee non-solicitation and non-hire restrictions are set forth in Section 3 of the RCA and state in relevant part as follows:

(a)    Non-Solicitation/Non-Acceptance. As a material inducement to Purchaser's consummation of the Contemplated Transactions, including Purchaser's acquisition of the Goodwill, the undersigned shall not, during the five (5) years following the Closing Date, directly or indirectly, without the prior written consent of Purchaser in each instance in its sole discretion:

(i) solicit, accept, call on, divert, take away, influence, induce or attempt to do any of the foregoing with respect to the Active Prospective Clients of the Company or its Subsidiaries as of the Closing Date (wherever located) and the Client Accounts of the Company or its Subsidiaries that are part of the Business;

(ii) service or accept insurance agency brokerage business from any Client Account or Active Prospective Clients of the Company or its Subsidiaries;

(iii) solicit, direct or influence any of the suppliers, vendors, service providers, insurance carriers, brokers, cooperating brokers, agents, personnel and others having business relations with the Company or its Subsidiaries as of the Closing Date, or attempt to do any of the foregoing, for

the purpose or with the intended effect of causing any of the foregoing to adversely modify or terminate any business relationships involving any Client Accounts of the Company or its Subsidiaries; or

(iv)(A) solicit, call on, divert, influence, induce or attempt to do any of the foregoing with respect to any of the employees, Client Facing Persons or independent contractors of the Company or its Subsidiaries on the Closing Date to leave the employ or engagement of Purchaser or any of its Affiliates; (B) hire or attempt to hire any of the employees, Client Facing Persons, sub-brokers, co-brokers or independent contractors of the Company or its Subsidiaries on the Closing Date subsequently employed or engaged by Purchaser or any of its Affiliates or (C) attempt to influence or induce any such employee, Client Facing Person or independent contractor to terminate or modify any Contract, or business arrangement or relationship with Purchaser or any of its Affiliates.

41.    In Section 5 of the RCA, Oldenburg agreed that "[t]he periods of time set forth in this Agreement shall not include, and shall be deemed extended by, any time required for litigation to enforce the relevant covenant periods," and that the "time required for litigation" shall date from his "first breach of the [restrictive covenants in the RCA]."

42.    The RCA defines the "Business" as "the business of [PayneWest] as conducted on the Closing Date" of MMA's acquisition of PayneWest.

43.    The RCA defines "Client" as "any other Person (including any insured, or any sub-producer or insured to whom or which such sub-producer provides insurances services) to whom or which [PayneWest] (or any of their former or current employees or independent producers on behalf of [PayneWest]) have provided any services (on behalf of [PayneWest]) that [PayneWest] provide[s] in the conduct of the Business."

14

44.    The RCA defines "Client Account" as "the business account relationship between [PayneWest], on the one hand, and any Client of [PayneWest], on the other hand, including any Person who or which is provided any services as of the Closing Date by [PayneWest], regardless of whether such services are provided by, or through the licenses of, [PayneWest] or any of its Representatives."

45.    The RCA defines "Client Facing Person" as:

> each officer, employee, independent contractor and other Person employed, engaged, supervised or controlled by [PayneWest], or for whom [PayneWest], or any holder of equity Securities of [PayneWest], has a responsibility to supervise or control under Law or by Contract and any employee or consultant of [PayneWest], or any holder of equity Securities of [PayneWest] (i) who is required by reason of the nature of his or her employment or engagement by [PayneWest] to be registered or licensed as an insurance agent, insurance broker or insurance producer or (ii) who has marketed, sold, negotiated, serviced, administered, managed, provided advice with respect to, underwritten, or had substantive contact with, any Client or any Person who is an Active Prospective Client or otherwise transacted business for [PayneWest].

### C.    The Marsh & McLennan Agency LLC Non-Solicitation and Confidentiality Agreement

46.    In connection with its acquisition of PayneWest, MMA offered employment to all PayneWest employees.

47.    Before commencing employment at MMA, Oldenburg and the members of his client service team at PayneWest (McKinney, Moore, and Black) each executed a Non-Solicitation and Confidentiality Agreement ("NSA") with MMA. (A true and copy of Oldenburg's executed NSA (the "Oldenburg NSA") is attached hereto as **Exhibit B**; a true and correct copy of McKinney's executed NSA (the "McKinney NSA") is attached hereto as **Exhibit C**; a true and correct copy of Moore's executed NSA (the "Moore NSA") is attached hereto as **Exhibit D**; and

a true and correct copy of Black's executed NSA (the "Black NSA") is attached hereto as **Exhibit E**.)

48.    In consideration for their execution of and agreement to the terms of the NSAs, MMA paid Oldenburg, McKinney, Moore, and Black each a cash bonus, and they became employees of MMA upon the closing of MMA's acquisition of PayneWest.

49.    As recited in the NSAs, MMA "acquired, directly or indirectly the issued and outstanding capital stock of PayneWest," and the NSAs were "necessary to protect the goodwill, clients, and prospective clients acquired by [MMA] and the value of the Acquisition."

50.    The NSAs include a two-year post-employment client non-solicitation and non-servicing covenant. Specifically, in Section 1 of the NSAs, entitled "Non-Solicitation of Clients," Oldenburg, McKinney, Moore, and Black agreed that for two years following their separation of employment from MMA, they would not, directly or indirectly:

> (i) solicit clients or prospective clients of [MMA] for the purpose of selling or providing consulting services or projects, or selling products, of the type sold or provided by Employee while employed by [MMA]; (ii) induce clients or prospective clients of [MMA] to terminate, cancel, not renew, or not place business with [MMA], (iii) perform or supervise the provision or performance of services or projects or provision of products of the type sold or provided by Employee while he or she was employed by [MMA] on behalf of any clients or prospective clients of [MMA], or (iv) assist others to do the acts specified in Sections 1(b)(i)-(iii). … Employee shall not engage in any subterfuge to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information and Trade Secrets to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities.

51.    The NSAs also include a two-year post-employment employee non-solicitation covenant. Specifically, in Section 2 of the NSAs, entitled "Non-Solicitation of Employees,"

Oldenburg, McKinney, Moore, and Black agreed that "both during employment with MMA and for a period of two (2) years thereafter," they would not, "directly or indirectly," whether on their

> own account or on behalf of any person, company, corporation, or other entity, … solicit, or endeavor to cause any employee of [MMA] with whom Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets to leave employment with [MMA].

52.    In Section 5 of the NSAs, entitled "Nondisclosure of Confidential Information and Trade Secrets," Oldenburg, McKinney, Moore, and Black each "acknowledge[d] and agree[d] that [MMA] is engaged in a highly competitive business and that its competitive position depends upon its ability to maintain the confidentiality of the Confidential Information and Trade Secrets which were developed, compiled, and acquired by [MMA] at its great effort and expense," and that "disclosing, divulging, revealing, or using of any of the Confidential Information and Trade Secrets, other than in connection with [MMA's] business…, will be highly detrimental to [MMA] and cause it to suffer serious loss of business and pecuniary damage."

53.    Accordingly, in Section 5 of the NSAs, Oldenburg, McKinney, Moore, and Black each agreed that during their employment with MMA and at any time thereafter, they would not, "directly or indirectly, disseminate or disclose to any other person, organization or entity Confidential Information and Trade Secrets," except to the extent required to carry out their duties as MMA employees.

54.    In Section 9 of the NSAs, Oldenburg, McKinney, Moore, and Black each agreed that the restrictions included in the NSAs were "necessary to protect the legitimate business interests of [MMA] and [were] reasonable in view of the benefits and consideration Employee has received or will receive from [MMA]." Oldenburg, McKinney, Moore, and Black also expressly

acknowledged that the restrictions would not prevent them "from obtaining gainful employment in [their] field of expertise or cause [them] undue hardship."

55.     Oldenburg, McKinney, Moore, and Black also agreed in Section 10 of their respective NSAs that MMA would be entitled to recover its attorneys' fees and other costs "incurred by [it] in investigating or seeking to enforce the provisions of th[e] [NSA]."

56.     Section 15 of the NSAs provides that the NSAs shall be governed by New York law, and that "any action or proceeding with respect to the [NSAs] and Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New York County, or in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York, or in any other court of competent jurisdiction in or for the State and County of New York." Oldenburg, McKinney, Moore, and Black each consented to "personal jurisdiction" and "irrevocably waive[d] any objection…to the laying of venue of any such action in the said court(s)" or that "any such action brought in said court(s) has been brought in an inconvenient forum."

**D.    Oldenburg, McKinney, Moore, and Black Commence Employment at MMA**

57.     On the Closing Date of MMA's acquisition of PayneWest, Oldenburg became an employee of MMA. As at PayneWest, at MMA, Oldenburg occupied the position of Sales Executive (or "Producer"), based in Beaverton, Oregon.

58.     On the Closing Date, McKinney, Moore, and Black also became MMA employees in the following positions:

> a.  McKinney: Client Executive – Business Insurance – Specialty Construction;
>
> b.  Moore: Senior Client Manager – Construction Division; and

       c.  Black: Senior Client Manager – Construction Division.

59.    At MMA, as at PayneWest, McKinney, Moore, and Black comprised Oldenburg's client service team. Together, they were responsible for the day-to-day servicing of the MMA clients Oldenburg managed.

60.    In order to perform their jobs in advising clients, placing them with appropriate insurance programs, and generally servicing their accounts, MMA entrusted Oldenburg and the members of his client service team with highly confidential information, including, without limitation, the identity, contact details of and personal information concerning key representatives from each client; clients' insurance needs and preferences, including their risk appetite and pricing and coverage requirements; all details concerning clients' current insurance programs and submissions, including the expiration and renewal dates of their current insurance programs and policies, present premiums, deductibles, and collateral levels; clients' loss history; details concerning prior bargaining and claims settlement negotiations and experiences that each client has had with historical insurers; each client's level of satisfaction or displeasure with particular individual or groups of carriers; contact information for key personnel at insurance carriers; the specific underwriting risk appetites of various insurance carriers; the fee structure (*i.e.*, fee or commission) used by MMA with each client, and the amount of revenue that MMA derived therefrom; clients' level of satisfaction with MMA; which accounts were considered "at risk" by MMA and may be vulnerable to competition and the reasons therefor; and other information necessary for providing optimal service to MMA's clients according to MMA's tailored client service model.

61.    Such information is the product of years of accumulation and distillation by MMA (and its predecessor, PayneWest), and has required the investment of substantial time, effort, and

expense to accumulate. This information has independent economic value. It is not readily available to the public or to competitors and would be greatly beneficial to competitors in soliciting MMA's customers.

62.     Accordingly, MMA maintains this information as confidential and goes to great efforts to maintain its confidentiality, including, but not limited to: limiting the disclosure and use of this information to those who have a specific business need to access it; educating employees who are granted access to it about the requirements and necessity of keeping this information confidential; restricting access to this information by limiting access to computer networks containing this information to employees with a specific business need to know it; and requiring employees authorized to access such information to execute written agreements that protect against the misuse and improper disclosure and post-employment retention of such confidential information.

### F.    Alliant's Unlawful Growth Strategy and Playbook

63.     Rather than invest the time and effort to build a business through superior service or lawful acquisitions, Alliant's growth strategy centers on misappropriating the investment of its competitors. For nearly a decade, Alliant has grown its business by weaponizing competitors' employees to capture competitors' client relationships for Alliant. Alliant's growth strategy is to entice producers overseeing substantial books of business at competing firms to join Alliant on the condition that they bring their former employer's clients and client service personnel with them— in deliberate breach of their common law duties and restrictive covenant obligations to their former employer. Alliant euphemistically refers to these targeted hires as "leveraged hires."[3]

---

[3] *See Mt. W. Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, No. 2019-0226-JTL, Exhibit 1 to Transmittal Affidavit and Corrected Transmittal Affidavit of Jarrett W. Horowitz in Support of Plaintiffs' Opening Brief in Support of Their Motion for a Preliminary Injunction (Del. Ch. July 21, 2022) (internal Alliant email referring to producers with

64.     This tactic is not merely aggressive; it is knowingly unlawful, calculated on the assumption that the financial return on the pilfered client relationships will exceed any legal costs Alliant may incur. Alliant's President has made the calculus clear: when lawsuits arise, the company simply "strike[s] a deal with the competitor that involves buying the producer's book of business for less than full market value."[4] This way, Alliant secures long-term client relationships at a discount—keeping exactly what it values most, while skirting fair market principles (and the law) in the process.

65.     Over the past decade, Alliant's inherently unlawful growth model has triggered at least 72 lawsuits against the company and the producers it has poached—each case involving the same unlawful tactics at issue here. Through this wave of litigation, courts and competitors have repeatedly unmasked Alliant's strategy: a calculated, repeatable method for stealing business under the guise of compliance. The pattern has become so familiar, it has become known in courts across the country as the Alliant "playbook."[5] Raid after raid, the pattern repeats—predictable in its design, with only minor variations in execution.

66.     First, Alliant identifies a producer at a competitor who is perceived to be important to client relationships. In initial discussions with the producer, Alliant investigates the size of the book of business that the producer manages for the competitor. Alliant then offers the producer an

---

[4] existing books of business whom Alliant was recruiting from a competitor firm as "Leveraged Hires"); Declaration of Ned Sander in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, *Armfield Harrison & Thomas, LLC and BRP Colleague Inc. v. Brian King and Alliant Ins. Servs., Inc.*, No. 23-cv-00666, ECF No. 25 at ¶ 18 (W.D. Wash. Sept. 14, 2023).

[4] Declaration of Ned Sander in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, *Armfield Harrison & Thomas, LLC and BRP Colleague Inc. v. Brian King and Alliant Ins. Servs., Inc.*, No. 23-cv-00666, ECF No. 25 at ¶ 19 (W.D. Wash. Sept. 14, 2023).

[5] In 2022, in unsealing the internal Alliant documents that had been revealed in discovery in the *Lockton* litigation, the Delaware Chancery Court noted that "Alliant faces at least forty-one lawsuits in at least twenty-five jurisdictions in which competitors have asserted similar claims" related to Alliant's strategy, and documents revealed in that litigation "provide insight into Alliant's *modus operandi*." *See* Ex. D, at ¶ 20(a).

inflated compensation package—including a cash sign-on bonus and equity in the company—to join Alliant based on the book of business that the producer manages for the competitor. These inflated compensation packages are expressly contingent on the producer violating his or her contractual obligations and other duties to his or her employer by leaving without notice, poaching clients, soliciting colleagues to join Alliant in coordinated departures, and participating in the other aspects of Alliant's schemes as described herein. Alliant understands that this "leveraged hire strategy" depends upon the violation of fiduciary and contractual obligations owed by employees to Alliant's competitors. Alliant not only encourages and induces these employees to breach their duties, it assumes responsibility for those breaches by agreeing to indemnify the producers against any claims that might arise from the execution of this unlawful strategy.

67.    Second, at Alliant's direction, the producer agrees to withhold from his or her current employer notice of his or her decision to join Alliant. While still employed by a competitor, the producer operates under the materially false pretense that he or she remains a loyal employee of the competitor, when in fact the producer is acting in Alliant's interests. During this time, the producer assists Alliant's recruitment of other employees of the competitor, including key client service personnel, in violation of the employees' common law and contractual obligations and duties.

68.    Third, Alliant schedules and coordinates the departures of its new recruits from their current employer to maximize harm to the competitor and the benefits of the raid for Alliant. Knowing its conduct is unlawful and likely to be enjoined, Alliant's primary objective is to transfer as much business as possible from the competitor to Alliant before the competitor can secure an injunction. This creates a race: Alliant's ability to poach clients versus the competitor's ability to obtain legal relief. Alliant tips the scales in its favor by orchestrating resignations to occur

"effective immediately," leaving the competitor blindsided, and strategically timing the resignations to provide Alliant with a head start. Rather than scheduling resignations for a Friday afternoon—which would give the competitor "all weekend to prepare litigation strategy before the new hires are able to bring in business"[6]—Alliant schedules resignations for Monday mornings (although it may adjust the timing to exploit specific vulnerabilities in the competitor's leadership),[7] preceded by a weekend of client solicitation, expressly instructing its new hires to "move as much business as possible ***within the first 72 hours of…resignation,*** before a court order c[an] be entered stopping" them.[8] Once the competitor's clients have transitioned to Alliant, any subsequent court order is of little concern to Alliant, which invokes "customer choice" to argue that an injunction should only prohibit future solicitation, and that it should be allowed to continue servicing the unlawfully obtained clients.[9] Through this calculated interplay of immediate resignations, strategic timing, and aggressive client solicitation, Alliant ensures that it secures the clients, business, and confidential information it seeks—knowing that by the time legal consequences arise, the damage will already have been done.

---

[6] *Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, No. 2019-0226-JTL, Redacted Exhibits 1-7 and 10 to Corrected Transmittal Affidavit of Jarrett Horowitz, Ex. 7 (Del. Ch. Apr. 19, 2022).

[7] *See Lockton*, 2019 WL 2536104, at *16 (Del. Ch. June 20, 2019) (noting that Alliant moved the resignation date from a Monday to a Tuesday coincide with the competitor's leadership being out of town at a corporate retreat).

[8] *AssuredPartners Capital, Inc. v. Alliant Ins. Servs., Inc., Mitchell Adamic, Desiree Brewer*, No. 24-cv-398, Affidavit of Michael Harrington (ECF No. 4-1) at ¶ 10 (W.D. Ky. July 5, 2024) (emphasis in original); *see also Lockton*, No. 2019-0226-JTL, Exhibits 11, 14-16, 43, 48-50, 54, 59-60, 62-65, 67-69, 73-75, 77, 80-82 and 86 to the Transmittal Affidavit of Jarrett Horowitz, Ex. 15 (Del. Ch. Ct. Apr. 27, 2022) (group text message from Alliant executive to new hires from a competitor congratulating them on having "established a business in 3 ½ days" and exhorting them to "Let's keep going!!!!!"); *id.* at Ex. 16 (group text message from another Alliant executive to the same group of new hires from a competitor "[t]hank[] them for "helping establish a new office in 3 ½ days" and urging them "Go go go. Call everyone")."

[9] *See Lockton*, 2019 WL 2536104, at *23 (Del. Ch. June 20, 2019).

69.     Fourth, anticipating that Alliant and/or its new hires may be sued by the new hire's former employers for violating their restrictive covenants, Alliant frequently seeks to preempt litigation brought by its raided competitors by arranging for its new hires to initiate legal action seeking judicial declarations that their restrictive covenants with their now-former employers are invalid. Among other things, Alliant selects counsel for its new hires, directs the litigation, and indemnifies its new hires for legal expenses and any settlements or judgments in suits arising from their intentional breaches of their restrictive covenants.

70.     The litigations against Alliant for its unlawful raiding strategy include at least the following: *Acrisure of California v. Alliant Ins. Servs., Inc.*, 25-cv-00702 (W.D. Mich. June 25, 2025); *Marsh USA LLC v. Alliant Ins. Servs., Inc., Glenn Pelletiere, and Colin Horgan*, No. 25-cv-05470 (S.D.N.Y. July 1, 2025); *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Travis Davis, Keegan Richardson, Raiza Robles, and Amanda* Gunn, No. 25-cv-01260 (S.D.N.Y. Feb. 12, 2025); *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc., Johnny Osborne, Margaux Stone, and Rachel Murray*, No. 24-cv-00914 (S.D.N.Y. Dec. 23, 2024); *Willis Towers Watson Midwest, Inc. v. Miller and Alliant Ins. Servs., Inc.*, No. 24-cv-02539 (D. Kan. Nov. 21, 2024); *Willis Towers Watson Northeast, Inc. v. Scott Davis, Erin Schwamb, and Alliant Ins. Servs., Inc.*, No. 24-cv-01816 (D. Conn. Nov. 19, 2024); *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398 (W.D. Ky. July 5, 2024) (including counterclaims *AssuredPartners Cap., Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *NFP Corp. Servs. (SE), Inc. v. Starkey*, No. 24-cv-00796 (D. Del. June 25, 2024); *NFP Prop. & Cas. Servs., Inc. v. Alliant Ins. Servs., Inc.*, No. 24-cv-00789 (C.D. Cal. Apr. 10, 2024); *The Tex. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, No. 2024-11651 (Tex. Dist. Ct. Feb 23, 2024); *USI Ins. Servs. LLC v. Louis Spina and Alliant Ins. Servs., Inc.*, No. 70777/2023 (N.Y. Sup. Ct. Nov. 14, 2023); *Willis Towers Watson Southeast, Inc. v. Alliant Ins.*

*Servs., Inc.*, No. 23-cv-659 (E.D. Va. Oct. 12, 2023); *Lockton Cos., LLC Pac. Series, and Lockton Partners, LLC v. Alliant Ins. Servs., Inc., Barnes, Racunas, and Roderick*, No. 23-cv-00705 (W.D. Mo. Oct. 3, 2023); *Assured Partners of S.C., LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz, Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-04751 (D.S.C. Sept. 22, 2023); *Woodruff-Sawyer & Co. v. Pelissier, Alliant Ins. Servs., Inc., and Does 1-5*, No. 30-2023-01336213 (Cal. July 13, 2023); *Aon PLC v. Alliant Ins. Servs., Inc.*, 23-cv-03044 (N.D. Ill. May 15, 2023); *Armfield Harrison & Thomas, LLP and BRP Colleague, Inc. v. King and Alliant Ins. Servs., Inc.*, No. 23-cv-666 (W.D. Wash. May 8, 2023); *USI Ins. Servs. LLC v. Alliant Ins. Servs., Inc.*, No. 23-cv-00192 (D. Ariz. Jan. 30, 2023); *Lockton Cos., LLC - Pac. Series v. Giblin*, No. 22-CV-00791 (W.D. Mo. Nov. 30, 2022); *McGriff Ins. Servs., Inc.  v. Suplick, Fox, Cook, Gibson, and Alliant Ins. Servs., Inc*, No. 2022-CA-008660-O (Fla. Cir. Ct. Sept. 19, 2022); *Arthur J. Gallagher & Co. v. Alliant Ins. Servs., Inc.*, 22-cv-03931 (N.D. Ill. July 28, 2022); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc., Thomas, Bennett, and Gullet*, No. 22-cv-277 (W.D.N.C. June 21, 2022); *McGriff Ins. Inc. v. Madigan, Gramling, Linde, and Alliant Ins. Servs., Inc.*, No. 22-cv-05080 (W.D. Ark. Apr. 26, 2022); *Aon PLC, Aon Group, Inc., Aon Corp., and Aon Risk Services Companies, Inc. v. Alliant Ins. Servs., Inc., Johnson, Stites, Barlow, Doerfler, Kunstler, and Chan*, No. 21-cv-06871 (N.D. Ill. Dec. 27, 2021); *Arthur J. Gallagher & Co. v. Alliant Ins. Servs., Inc., Bixby, Hinckley, Leavitt, Pester, and Rogers*, No. 2184CV2828 (Mass. Dec. 10, 2021); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc.*, 21-cv-00417 (W.D.N.C. Aug. 12, 2021); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc., Andrew Rader, and Nicole Rioux*, No. 202982-1 (Chan. Ct., Tenn., Aug. 3, 2021); *Aitkin v. USI Ins. Servs., LLC*, No 21-cv-00267 (D. Or. Feb. 18, 2021); *Kibble & Prentice Holding Co. v. Anderson, and Alliant Ins. Servs., Inc.*, No. 82-CV-21-619 (Minn. Dist. Ct. Feb. 19, 2021); *Kibble & Prentice Holding Co., v. Tilleman*

*and Alliant Ins. Servs., Inc.*, No. 21-cv-00083 (D. Idaho Feb. 18, 2021); *AssuredPartners Northeast, LLC v. Stone and Alliant Ins. Servs., Inc.*, 20-cv-05564 (E.D.N.Y Nov. 16, 2020); *The Partners Grp., LTD v. Bonville and Alliant Ins. Servs., Inc.,* No. 20CV34115 (Or. Cir. Ct. Oct. 6, 2020); *Arthur J. Gallagher & Co. v. Alliant Ins. Servs., Inc. and Stone Point Capital*, No. 2020-0780 (Del. Ch. Sept. 14, 2020); *Arthur J. Gallagher & Co. v. Pierce, Albrecht, Conway, Lambourne, Ruemke, Veltman, Burke, Thalachelloor, and Alliant Ins. Servs., Inc.*, No. 47103886-2020 (Tex. Dist. Cit. Aug. 13, 2020); *Arthur J. Gallagher & Co. v. Tarantino, Heater, Machette, Brush, and Alliant Ins. Servs., Inc.*, No. 20-cv-05505 (N.D. Cal.) (Aug. 7, 2020); *Huntington Bancshares Inc. v. Burke and Alliant Ins. Servs., Inc.*, 20-cv-01159 (W.D. Pa. Aug. 3, 2020); *Gallagher Benefit Servs., Inc. v. Ghirardi and Alliant Ins. Servs., Inc.*, No. 50-2020-CA-004646-MB (Fl. Cir. Ct. Apr. 24, 2020); *Assured Partners of Washington, LLC v. Acarregui and Alliant Ins. Servs., Inc.*, No. 20-cv-00290 (W.D. Wash. Feb. 24, 2020); *Marsh USA Inc. v. Vaught, Snelgrove, Dowling, Shahidi, Lu, Turney, Nguyen, and Alliant Ins. Servs., Inc.*, No. 651024/2020 (N.Y. Sup. Ct. Feb. 14, 2020); *Aon Risk Servs. Co. v. Alliant Ins. Servs., Inc., Brusek, Janic Lubas, Ross, Taylor, Vick, and Walsh*, No. 19-cv-07312 (N.D. Ill. Nov. 5, 2019); *USI Ins. Servs. LLC and USI Advantage Corp. v. Banahan and Alliant Ins. Servs., Inc.*, No. 68183/2019 (N.Y. Sup. Ct. Nov. 1, 2019); *JLT Specialty Ins. Servs. Inc. v. Riccio, Walsh, Carroll, Decatur, Franzese, Leto, and Alliant Ins. Servs., Inc.*, No. 652659/2019 (N.Y. Sup. Ct. May 6, 2019); *Mt. W. Series of Lockton Cos., LLC and Lockton Partners, LLC v. Alliant Ins. Servs., Inc.*, 2019-0226-JTL (Del. Ch. Mar. 22, 2019); *Arthur J. Gallagher & Co. v. Kuntz and Alliant Ins. Servs., Inc.*, No. GD-19-02440 (Pa. C.P. Allegheny Cnty. Feb. 8, 2019); *NFP Corp. and Maschino, Hudelson & Associates, L.L.C. v. Ayala, Alliant Ins. Services, Inc. and C.L. Scott Corporate Ins. Services, Inc.*, 2018-0688 (Del. Ch. Sept. 18, 2018); *Corp. Synergies Grp., LLC v. Andrews, Ur, Duffy, and Alliant Ins. Servs., Inc.*, No. 18-

cv-13381 (D.N.J. Aug. 30, 2018); *Marsh USA, Inc. v. Moody, Young, Beacham, O'Connell, and Alliant Ins. Servs., Inc.*, No. 17-651325 (N.Y. Sup. Ct. Aug. 7, 2018); *Willis Ins. Servs. of Ga. v. Alliant Ins. Servs., Inc.*, No. 18-cv-1826 (M.D. Fla. July 25, 2018); *Willis Ins. Servs. of Ga. v. Alliant Ins. Servs., Inc.*, No. 2018cv308132 (Ga. Super. Ct. July 23, 2018); *Willis of Minn. v. Alliant Ins. Servs., Inc.*, No. 27-cv-18-11684 (Minn. Dist. Ct. July 20, 2018); *Arthur J. Gallagher & Co. v. Long and Alliant Ins. Servs., Inc.*, No. 17-cv-12313 (D. Mass. Dec. 13, 2017); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520 (S.D.N.Y. Dec. 5, 2017); *USI Ins. Servs., LLC. v. Zukus and Alliant Ins. Servs., Inc.*, No. 2018-12953 (Pa. C.P. Montgomery Cnty. May 15, 2018); *Arthur J. Gallagher & Co. v. Long and Alliant Ins. Servs., Inc.*, No. 17-cv-12313 (D. Mass. Dec. 13, 2017); *USI Ins. Servs. Nat., Inc. Inc. v. Grassi and Alliant Ins. Servs., Inc.*, 2017-CA-009742-O (Fla. Cir. Ct. Nov. 3, 2017); *USI, Inc. v. Call v. Alliant Ins. Servs., Inc.*, No. BC678226 (Cal. Super. Ct. Oct. 2, 2017); *Cook Maran & Assocs., Inc. v. Scrocca and Alliant Ins. Servs., Inc.*, No. C-209-17 (N.J. Super. Ct. 2017); *Wells Fargo Ins. Servs. USA, Inc. v. Alliant Ins. Servs., Inc.*, No. 2017-0540 (Del. Ch. July 26, 2017); *Ralph Weiner & Assocs., LLC v. Hancock*, No. 2017-CH-06618 (Ill. Cir. Ct. May 9, 2017); *Wells Fargo Ins. Servs. USA, Inc. v. Laman*, No. 502016CA00904MB (Fla. Cir. Ct. April 10, 2017); *The Graham Co. v. Harper, Algeo, Alliant Ins. Servs., Inc.*, No. 170202712 (Pa. C.P. Philadelphia Cnty. Feb. 9, 2017); *Willis of Mass. v. Feinberg and Alliant Ins. Servs.*, No. 1684CV01497 (Mass. Super. Ct. Oct. 3, 2016); *The Hays Group, Inc. v. Peters and Alliant Ins. Servs., Inc.*, No. 0:16-cv-2352 (D. Minn. Oct. 12, 2016); *Willis of Fla. v. Powell, Bolden, and Alliant Ins. Servs., Inc.*, No. 2016-CA-007824 (Fla. Cir. Ct. Aug. 16, 2016); *Marsh USA Inc. and Marsh & McLennan Cos., Inc. v. Schuhriemen*, No. 16-cv-2998 (S.D.N.Y. Apr. 22, 2016); *Aon PLC v. Heffernen and Alliant Ins. Servs., Inc.*, No. 16-cv-1924 (N.D. Ill. Feb. 2, 2016); *Smith Bros. Ins. LLC v. Ellenberg-Gray*, No. CV-15-6060903-S (Conn. Super. Ct. Dec. 7,

2015); *Aon Corp. v. Alliant Ins. Servs. Inc.*, No. 14-650700 (N.Y. Sup. Ct. June 26, 2014); *Regions Ins., Inc. v. Alliant Ins. Servs., Inc.*, No. 13-cv-00667 (S.D. Miss. Oct. 25, 2013); *Anco Ins. Servs. of Hous. v. Barnard*, No. 2011-29054 (Tex. Dist. Ct. May 13, 2011); *Aon Risk Servs. v. Cusack and Alliant Ins. Servs., Inc.*, No. 651673/2011 (N.Y. Sup. Ct. 2011).

71.    Courts have enjoined Alliant's unlawful behavior or otherwise ruled against Alliant in at least the following matters: *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc., Johnny Osborne, Margaux Stone, and Rachel Murray*, No. 24-cv-00914, Op. and Order Granting in Part and Denying in Part Appl. for Prelim. Inj., ECF. No. 31 (S.D.N.Y. Jan. 27, 2025); *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398, TRO, ECF. No. 30 (W.D. Ky. July 12, 2024) (including counterclaims *AssuredPartners Cap., Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398, Mem. and Op., ECF. No. 92 (W.D. Ky. Sept. 13, 2024) (including counterclaims *AssuredPartners Cap., Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398, Consent Prelim. Inj. Order, ECF No. 93 (W.D. Ky. Sept. 13, 2024) (including counterclaims *AssuredPartners Cap., Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *USI Ins. Servs. LLC v. Louis Spina and Alliant Ins. Servs., Inc.*, No. 70777/2023, Order to Show Cause for TRO and Prelim. Inj., NYSCEF Doc. No. 36 (N.Y. Sup. Ct. Nov. 21, 2023); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc.*, No. 23-cv-659, TRO, ECF. No. 46 (E.D. Va. Nov. 8, 2023); *Assured Partners of S.C., LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz, Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-04751, Order, ECF No. 47 (D.S.C. Nov. 8, 2023) (temporary restraining order); *Assured Partners of S.C., LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz, Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-04751, Prelim. Inj. Order, ECF. No. 63 (D.S.C. Dec. 28, 2023); *Assured Partners of S.C., LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz, Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-

04751, Permanent Inj. Order, ECF No. 63 (D.S.C. May 24, 2024); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc., Andrew Rader, and Nicole Rioux*, No. 202982-1, TRO (Chan. Ct., Tenn., Aug. 3, 2021); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc., Thomas, Bennett, and Gullet*, No. 22-cv-277, Prelim. Inj. Order, ECF No. 43 (W.D.N.C. July 7, 2022); *Kibble & Prentice Holding Co. v. Anderson and Alliant Ins. Servs., Inc.*, No. 82-CV-21-619, Order Granting Pl.'s Mot. for Partial Summ. J. (Minn. Dist. Ct. Dec. 28, 2022); *Aitkin v. USI Ins. Servs., LLC*, No 21-cv-00267, Op. & Order, ECF. No. 19 (D. Or. Feb. 26, 2021) (granting temporary restraining order); *Aitkin v. USI Ins. Servs., LLC*, No 21-cv-00267, Op. & Order, ECF. No. 19 (D. Or. May 28, 2021) (granting preliminary injunction); *Kibble & Prentice Holding Co.,v. Tilleman and Alliant Ins. Servs., Inc*., No. 21-cv-00083, Mem. Dec. & Order, ECF No. 82 (D. Idaho December 2, 2022) (granting in part plaintiff's motion for summary judgment); *AssuredPartners Northeast, LLC v. Stone and Alliant Ins. Servs., Inc.*, 20-cv-05564, Order, ECF No. 30 (E.D.N.Y Nov. 24, 2020) (temporary restraining order); *AssuredPartners Northeast, LLC v. Stone*, 20-cv-05564, Agreed Permanent Injunction and Order of Dismissal, ECF No. 35 (E.D.N.Y December 21, 2020); *Huntington Bancshares Inc. v. Burke and Alliant Ins. Servs., Inc.*, 20-cv-01159, Order, ECF No. 15 (W.D. Pa. Aug. 10, 2020) (temporary restraining order); *Huntington Bancshares Inc. v. Burke and Alliant Ins. Servs., Inc.*, 20-cv-01159, Mem. Op., ECF No 60 (W.D. Pa. Oct. 29, 2020) (granting preliminary injunction); *Huntington Bancshares Inc. v. Burke and Alliant Ins. Servs., Inc.*, 20-cv-01159, Order, ECF No 61 (W.D. Pa. Oct. 29, 2020) (preliminary injunction); *Assured Partners of Wash., LLC v. Acarregui, and Alliant Ins. Servs., Inc.*, No. 20-cv-00290, Temporary Restraining Order, ECF No. 15 (W.D. Wash. Feb. 28, 2020); *Aon Risk Servs. Co. v. Alliant Ins. Servs., Inc. Brusek, Janic Lubas, Ross, Taylor, Vick, and Walsh*, No. 19-cv-07312, Temporary Restraining Order, ECF No. 31 (N.D. Ill. Nov. 25, 2019); *Aon Risk Servs. Co. v. Alliant Ins. Servs.,*

*Inc., Brusek, Janic Lubas, Ross, Taylor, Vick, and Walsh*, No. 19-cv-07312, Mem. Op. & Order, ECF No. 32 (N.D. Ill. Nov. 25, 2019); *Mt. W. Series of Lockton Cos., LLC and Lockton Partners, LLC v. Alliant Ins. Servs., Inc.*, No. CV 2019-0226-JTL, 2019 WL 2536104 (Del. Ch. June 20, 2019); *Corp. Synergies Grp., LLC v. Andrews, Ur, Duffy, and Alliant Ins. Servs., Inc.*, No. 18-cv-13381, Order, ECF No. 14 (D.N.J. Sept. 5, 2018) (temporary restraining order); *Corp. Synergies Grp., LLC v. Andrews, Ur, Duffy, and Alliant Ins. Servs., Inc.*, No. 18-cv-13381, Order, ECF No. 14 (D.N.J. Oct. 3, 2018) (preliminary injunction); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520, Order, ECF No. 11 (S.D.N.Y. December 7, 2017) (temporary restraining order); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520, Order to Show Cause for Temporary Restraining Order and Preliminary Injunction, ECF No. 12 (S.D.N.Y. December 7, 2017); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520, Order Granting a Permanent Injunction, ECF No. 32 (S.D.N.Y. February 13, 2018); *USI Ins. Servs. Nat., Inc. Inc. v. Grassi and Alliant Ins. Servs., Inc.*, 2017-CA-009742-O, Order Granting Temporary Injunction (Fla. Cir. Ct. Nov. 28, 2017); *USI Ins. Servs. Nat., Inc. Inc. v. Grassi and Alliant Ins. Servs., Inc.*, 2017-CA-009742-O, Order on Plaintiff's Motion for Summary Judgment on Liability (Fla. Cir. Ct. Aug. 22, 2019); *Cook Maran & Assocs., Inc. v. Scrocca and Alliant Ins. Servs., Inc.*, No. C-209-17 (N.J. Super. Ct., Sept. 12, 2017); *Willis of Fla. v. Powell, Bolden, and Alliant Ins. Servs., Inc.*, No. 2016-CA-007824, Order Partially Granting Motion for Injunction, 2016 WL 8814184 (Fla. Cir. Ct. Aug. 21, 2016); *Marsh USA Inc. and Marsh & McLennan Cos., Inc. v. Robert Schuhriemen*, No. 16-cv-2998, Mem. Order, ECF. No 11 (S.D.N.Y. May 2, 2016) (granting preliminary injunction); *Aon PLC v. Heffernen and Alliant Ins. Servs., Inc.*, No. 16-cv-1924, Order, ECF No. 26 (N.D. Ill. Feb. 5, 2016) (temporary restraining order); *Aon Corp. v. Alliant Ins. Servs. Inc.*, No. 650700/2014, 2014 WL 2990393 (N.Y. Sup. Ct.

June 26, 2014) (preliminary injunction); *Anco Ins. Servs. of Hous. v. Barnard*, No. 2011-29054 (Tex. Dist. Ct. May 13, 2011); *Aon Risk Servs. v. Cusack and Alliant Ins. Servs., Inc.*, No. 651673/2011 (N.Y. Sup. Ct. Sept. 28, 2011) (temporary restraining order); *Aon Risk Servs. v. Cusack and Alliant Ins. Servs., Inc.*, No. 651673/2011, 34 Misc. 3d 1205(A) (N.Y. Sup. Ct. Dec. 20, 2011) (preliminary injunction).

72.     Alliant's unlawful conduct remains ongoing and is likely to persist despite numerous lawsuits, injunctions, and even sanctions orders. This is because Alliant has determined that the financial gains it derives from its illegal practices are greater than it could achieve through lawful competition and outweigh the costs of defending and settling the resulting lawsuits.

### G.    Alliant Recruits Oldenburg, and With His Help, Executes the Playbook on MMA—Again

73.     By 2025, Oldenburg was responsible for managing a book of business for MMA that generated millions of dollars in annually recurring revenue.

74.     The substantial book of business overseen by Oldenburg for MMA made him a prime target of Alliant. Consistent with its calculated strategy of poaching producers who control substantial books of business and immediately transitioning their clients, Alliant set out to recruit Oldenburg not for his skills as a broker, but as a conduit for the immediate conversion of MMA's client relationships and the associated revenue.

75.     Alliant knew full well that Oldenburg was bound by post-employment restrictive covenants with MMA—both as a selling shareholder of PayneWest (the RCA) and as an MMA employee (the NSA)—when it recruited him.

76.     As an initial matter, restrictive covenants like those binding Oldenburg are standard in the insurance brokerage industry. Insurance brokerage firms routinely require employees to agree to client and employee non-solicitation provisions to protect the goodwill, relationships, and

confidential information that define their business. Alliant is no exception. Alliant requires its own employees—including those it poaches from competitors—to sign employment agreements containing restrictive covenants nearly identical to the ones it seeks to disregard here. *See, e.g.*, Alliant Employment Agreement § 9(e), "Covenants by Employee," "Non-Solicitation," attached hereto as **Exhibit F**.

77.     But Alliant not only knows that these covenants are industry standard; it affirmatively requires candidates to disclose them. As part of its regular recruiting practices, Alliant demands that prospective hires provide copies of any existing restrictive covenant agreements, and its standard employment agreement obligates new employees to represent that they have done so. *See* Ex. F at § 12. Indeed, in prior litigation, Alliant's corporate representative admitted at a Rule 30(b)(6) deposition that Alliant's "typical protocol" when recruiting from competitors is to "get from the recruit his or her employment agreements or whatever other restrictions might have existed and have those forwarded on to Alliant Legal."[10] Oldenburg's, McKinney's, Moore's, and Black's NSA, for their part, required them to provide a copy of the NSA to any prospective employer "prior to taking a position with such new employer." (Exs. B-E at § 19).

78.     And in this case, Alliant did not need to rely on general industry knowledge or standard recruiting protocols to understand the scope of Oldenburg's contractual obligations. It had already dealt with those exact agreements just months earlier, when it recruited another MMA producer and former PayneWest shareholder, Travis Davis, who was bound by the same RCA and

---

[10] *Mt. W. Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, No. 2019-0226-JTL, Deposition of Peter Arkley, May 13, 2019, at 153:8-16, 156:7-22, attached as Exhibit 32 to the Transmittal Affidavit and Corrected Transmittal Affidavit of Jarrett W. Horowitz in Support of Plaintiffs' Opening Brief in Support of Their Motion for a Preliminary Injunction (Del. Ch. July 21, 2022).

NSA as Oldenburg. Alliant not only obtained and reviewed Davis's restrictive covenant agreements during that recruitment process—it is now actively litigating over its role in inducing Davis to breach them. *See Marsh & McLennan Agency LLC v. Alliant Insurance Services, Inc.*, No. 25-cv-01260 (S.D.N.Y. Feb. 12, 2025). That lawsuit had been pending for months by the time Alliant recruited Oldenburg, so there can be no question that Alliant was fully aware of the covenants when it went after Oldenburg next.

79.     Aware of the covenants but undeterred by them, Alliant proceeded anyway—because ignoring contractual restrictions is not an oversight in Alliant's model; it is the model. As in countless prior raids, Alliant had no intention of competing fairly by respecting the post-employment covenants it knew bound its new recruit. The only way Oldenburg's hire made business sense for Alliant was if the client relationships he managed for MMA came with him. Alliant's objective was not to acquire talent, but to capture revenue: poach the producer, transfer the book, and do it before MMA could obtain injunctive relief.

80.     To that end, Alliant offered Oldenburg an above-market compensation package that was predicated on him immediately transferring the book of business he managed for MMA to Alliant. Much of that business had been purchased by MMA from PayneWest's shareholders—Oldenburg among them—at significant cost. The rest had been developed under MMA's brand, using its goodwill, investment in business development, and other operational support.

81.     Oldenburg's accepted Alliant's offer of employment—and its condition that he transfer the clients he managed for MMA to Alliant, in breach of his contractual obligations. Rather than disclose his decision to resign, Oldenburg and Alliant conspired to keep him in place on MMA's payroll while covertly coordinating a raid on MMA's clients and employees. Their objective was to execute a plan so precisely timed and carefully concealed that MMA would have

no realistic opportunity to protect its client relationships before they were lost to Alliant's and Oldenburg's unlawful interference.

82.     One of Oldenburg's first tasks after accepting Alliant's offer was to identify the client service team that supported his book of business at MMA. Per Alliant's playbook, hiring the producer is only half the plan; Alliant also recruits the producer's client service staff. That tactic serves a dual purpose: it helps ensure that clients will agree to move their business because assuring them that they will continue to be serviced by the same team reduces concerns about disruption that might otherwise be caused by transitioning to a new brokerage; and it weakens the incumbent broker's ability to retain the clients—since any replacement team would lack institutional knowledge of the accounts.

83.     In keeping with that strategy, Oldenburg identified three specific MMA employees—McKinney, Moore, and Black—to Alliant as the individuals who serviced the clients in his book of business. Out of all MMA employees, including those in Oregon where Oldenburg was based, Alliant targeted and ultimately hired these three at the exact same time—to the day— as Oldenburg. This is no coincidence. Alliant would not have known who they were unless Oldenburg told them. Its decision to extend offers to these particular employees flowed directly from Oldenburg's identification of them as critical to the success of the transition.

84.     But Oldenburg did not just name them—he recruited them. While still employed at MMA, he encouraged McKinney, Moore, and Black to leave with him and join Alliant. On information and belief, he also provided Alliant with confidential and proprietary compensation information for McKinney, Moore, and Black—information to which he only had access by virtue of the senior position of trust and confidence he occupied at MMA—to enable Alliant to craft tailored, above-market offers designed to induce their departure.

85.    Relying on the inside information Oldenburg provided, Alliant did just that—offering McKinney, Moore, and Black enhanced compensation packages, which they accepted.

86.    Alliant's willingness to incur that immediate financial burden was based on Oldenburg's assurances that he would transition his book of business to Alliant, securing an immediate revenue stream sufficient to justify these premium salaries for three new service employees. Hiring McKinney, Moore, and Black immediately, at the same time as Oldenburg, would only make economic sense for Alliant if Oldenburg was bringing revenue with him. McKinney, Moore, and Black were not producers; they were salaried service personnel who did not manage their own books of business and did not generate revenue. From Alliant's perspective, they were pure overhead. Alliant had no independent need for three additional client service employees on the day Oldenburg joined unless it expected him to arrive with his entire MMA book of business and the recurring revenue needed to support their salaries from day one. Hiring three full-time service employees on day one would have made no economic sense unless Alliant was confident that the clients they supported would arrive too. And the only way for that to happen was for Oldenburg to breach his covenants and deliver those relationships to Alliant.

87.    Alliant was not speculating—it was executing a plan. Building a book of business from scratch—limited to new, non-MMA clients—takes time. Cold calls and networking rarely yield quick conversions. Even when prospects take meetings, cultivating the trust and familiarity needed to persuade them to switch brokers is a long, uncertain process. Hiring three new service employees on day one, in anticipation of that kind of slow, speculative revenue growth would have made no financial sense. And there would have been no need to hire these *specific* individuals unless Alliant expected Oldenburg to bring MMA clients who would want continuity in their servicing relationships. In short, the only rational business justification for hiring McKinney,

Moore, and Black on the same day as Oldenburg was that Alliant expected—and planned for—Oldenburg to bring his entire book of revenue-generating MMA clients with him, in breach of his contractual obligations. And Alliant did not just hope that would happen—it placed a significant financial bet on it, committing to three new full-time salaries on day one. The only rational explanation for its up-front investment was its confidence that Oldenburg would bring his MMA book of business with him in violation of his obligations, and that McKinney, Moore, and Black would help secure the transition.

88.     With Oldenburg, McKinney, Moore, and Black all on board, Alliant meticulously timed their resignations to inflict maximum disruption, with the goal of enabling Alliant to capture client relationships before MMA even knows what happened.

89.     On Monday, July 14, 2025, at 6:48 a.m., Oldenburg submitted his resignation to MMA, "effective immediately," followed quickly by McKinney and Moore within a matter of hours. Black, who was on vacation camping that day, followed suit the next day, July 15. All four immediately joined Alliant. Within a mere 24 hours, MMA lost Oldenburg and his entire client service team to Alliant.

90.     That resignation timing and the way it was executed was no accident. This pattern—a producer resigning early on a Monday morning, followed almost immediately by his entire client service team, to join Alliant—has become all too familiar to MMA in the past year. Indeed, this is the third time in one year that MMA had seen this precise signature-Alliant choreography play out.

91.     On Monday, June 24, 2024, MMA producer Travis Davis, based in Bend, Oregon, resigned "effective immediately" at 8:48 a.m.—less than 24 hours after a client told MMA that Davis had solicited them over the weekend. The next day, Davis's primary client service team

member, Keegan Richardson, resigned too, followed quickly by the remaining three members of the team. Davis and his team immediately commenced employment at Alliant. *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc. et al.*, No. 25-cv-01260 (JAV), Complaint, ECF No. 1, ¶¶ 96-97.

92.    Six months later, on Monday, December 16, 2024, MMA producer Johnny Osborne, based in Huntsville, Alabama, sent in his resignation notice, "effective immediately," at 8:00 a.m., after being caught on office surveillance footage removing multiple large boxes from the office over the weekend—boxes that, notably, did not include the highly confidential documents concerning MMA's clients that he had printed—with no business need—in the days before his departure. Osborne's client service team resigned just hours later. Osborne and his team immediately commenced employment at Alliant. *Osborne*, 24-cv-09914 (MKV), ECF No. 16, Declaration of Craig T. Herr, at ¶¶ 23-25, Ex. F (January 2, 2025).

93.    And now, six months after Osborne, Oldenburg has repeated the pattern with his own 6:48 a.m. resignation on a Monday morning, again "effective immediately" and again followed by the resignation of his entire team within 24 hours. His resignation email (sent from his MMA email account) stated that he had left his company-issued computer and phone behind at the office, which necessarily means he entered the office at dawn—or earlier—to do so. On information and belief, Oldenburg timed this visit to ensure the office was empty, and used the opportunity to access, retrieve, and remove confidential and proprietary materials that would aid in servicing and soliciting MMA clients on Alliant's behalf. It is the same playbook Osborne ran six months earlier. Different producers. Different teams. Different states, separated by more than 2,300 miles. Yet somehow, they all three producers chose the same moment to resign: early on a Monday morning, with their client service teams following close behind. A remarkable

coincidence? Hardly. It's a pattern. And, as it turns out, it's a strategy—carefully crafted to give Alliant the upper hand before its competitor even knows what is happening.

94.    Why does Alliant always choreograph its resignations for early Monday morning? Because that precise timing is part of a strategy designed and approved by Alliant's regular outside counsel. In a March 2019 email in connection with another Alliant raid on a competitor, Alliant's outside counsel instructed that the resignations must occur on a Monday morning—not Friday afternoon.[11] The timing, Alliant's counsel explained, was critical: *"If the resignations happen Friday, Lockton will have all weekend to prepare litigation strategy before the new hires are able to bring in business."*[12] Counsel directed Alliant to "call each of the new hires to tell them when to resign" and warned *"we don't want any of these folks resigning earlier than intended."*[13] The message was clear: this was not just about synchronized resignations, but about engineering a surprise ambush timed to give Alliant a head start and deny the competitor any meaningful chance to respond. And it confirms what Alliant always denies: that it is not merely aware of the tortious conduct of its new hires; it is the architect behind it.

95.    In theory, those coordinated resignations could have occurred on any day of the week. But Alliant's lawyers singled out Monday mornings for a reason. Resigning on a Monday "effective immediately" allows employees to spend the weekend soliciting clients while still employed by their current firm—before their employer even knows they are leaving—and then defect on Monday morning with clients in tow, before the prior employer knows to even try to

---

[11] *Lockton.*, No. 2019-0226-JTL, Redacted Exhibits 1-7 and 10 to Corrected Transmittal Affidavit of Jarrett Horowitz, Ex. 7 (Del. Ch. Apr. 19, 2022) (emphasis in original).

[12] *Id.*

[13] *Id.*

seek emergency relief. The goal is to lock in as many client transfers as possible before a court can issue an injunction. As Alliant's counsel explained: *"If the resignations happen Friday, Lockton will have all weekend to prepare litigation strategy before the new hires are able to bring in business."*[14] That one sentence strips away the façade. Alliant is not hoping its new hires will obey the law—it is counting on them to break it and managing the timeline to ensure they succeed.

96.     This is not legal advice designed to ensure compliance; it is legal choreography designed to facilitate the violation and then profit from it, shielding its rewards from judicial redress. By instructing employees to wait until Monday morning to resign "effective immediately," Alliant ensures that they can spend the weekend covertly soliciting clients, undetected and unrestrained—before the employer knows to take legal action. That way, by the time the competitor learns what has happened and seeks an injunction, Alliant has already transitioned the business. And once that's done, Alliant invokes "customer choice" to argue that it should be allowed to keep the ill-gotten clients and that any injunction should be purely prospective. *See Osborne*, No. 24-cv-00914, Order, ECF No. 54, at 2–3 (S.D.N.Y. Apr. 21, 2025) (rejecting Alliant's "customer choice" argument and denying reconsideration of a preliminary injunction barring Alliant from servicing clients that had already moved, explaining that refusing to enforce the non-servicing covenant would create a "major loophole" in MMA's protections); *Mt. W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *23 (Del. Ch. June 20, 2019); *Aon Risk Servs. v. Cusack*, 946 N.Y.S.2d 65, at *22 (N.Y. Sup. Ct. 2011).  In short, the strategy is to unlawfully solicit clients while the employees are still on the competitor's payroll and before the competitor knows to take any protective measures, execute surprise mass

---

[14] *Id.*

resignations on a Monday morning, and then argue that the unlawful conduct—however egregious—should have no remedy once complete. Alliant's strategy creates a race—its ability to poach clients versus the competitor's ability to obtain legal relief. By timing resignations to occur on Monday mornings, preceded by a weekend of client solicitation, Alliant doesn't just tip the scales in its favor; it starts running the race before the competitor even knows a race has begun.

97.    That strategy played out with precision here. On the very morning Oldenburg submitted his surprise resignation from MMA, he filed a declaratory judgment action in Oregon state court seeking to invalidate his restrictive covenants. *See Oldenburg v. Marsh & McLennan Agency LLC*, No. 25CV40606 (Or. Cir. Ct. Multnomah Cnty. July 14, 2025). The lawsuit was filed in breach of the mandatory New York forum selection clause to which Oldenburg had agreed, and it asks the Oregon court to apply Oregon law—even though the governing agreements expressly adopt New York law. The lawsuit also eliminates any conceivable doubt about whether Oldenburg intends to solicit MMA clients in violation of his restrictive covenants.

98.    On information and belief, Alliant is funding and directing Oldenburg's Oregon litigation—further confirming that the litigation was not only expected but pre-planned, and that Oldenburg had been working with Alliant for weeks, if not months, before his resignation to coordinate a legal strategy timed to his departure.

99.    This is not the first time Alliant has orchestrated such a move. In one prior case in which Alliant arranged for new recruits to preemptively file declaratory judgment actions in Colorado, in violation of their contracts' forum selection and governing law clauses, the Delaware Chancery Court rebuked Alliant for its gamesmanship, noting that internal documents produced in discovery revealed that "Alliant never really believed that Colorado law would govern the restrictive covenants…or that the restrictive covenants were invalid, despite taking that position

before three different courts." *Mt. W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *10 n.6 (Del. Ch. June 20, 2019).

> **H.    At Alliant, Oldenburg and Team Continue to Breach Their Contractual Obligations to MMA**

100.    Oldenburg and McKinney, and, on information and belief, Moore and Black, commenced employment at Alliant immediately upon their resignations from MMA.

101.    Barely 24 hours after Oldenburg's surprise resignation, one of his former MMA clients—whose account he had managed as a producer—emailed an Alliant executive to initiate a transfer of business. The timing and phrasing of the message make clear that this was no coincidence: the groundwork had already been laid before Oldenburg walked out the door.

102.    On July 15, 2025, at 11:46 a.m. Pacific time, the president of a long-standing MMA client, which had also been a client of PayneWest pre-acquisition, within Oldenburg's book of business sent an email to Jeff O'Neill, a senior executive at Alliant. The subject line read: "Andy O Transition." The body of the email stated: "Jeff, I'm reaching out to transition our accounts to Alliant. Please let us know how to proceed."



The client mistakenly copied Oldenburg's old MMA email address on the message—an error that revealed what the parties had plainly intended to keep secret.

103.    The content of the email speaks volumes. The client did not introduce himself. He did not mention his company name. He did not say who "Andy O" was. He provided no context whatsoever. Instead, he assumed—correctly—that O'Neill would already know exactly what the message meant, and exactly which accounts were being "transitioned." That level of familiarity is only possible if Oldenburg had already prepared both sides and made the necessary introductions.

104.    Even more telling is the identity of the Alliant recipient. Out of all of Alliant's hundreds, if not thousands, of employees, the client did not email a general account. He emailed O'Neill, a senior Alliant executive located in Spokane, Washington, not even in Oregon. The client knew exactly whom to contact because Oldenburg had already told him. And O'Neill knew exactly what the message meant—because Oldenburg had already set it in motion.

105.    The email provides compelling evidence that Oldenburg had begun soliciting the client while still employed at MMA—conduct that violated his common-law duty of loyalty to

MMA. The client's use of the word "transition"—less than a day after Oldenburg's resignation—signals advance planning. Clients do not initiate account transitions within hours unless they have already been approached, prepped, and encouraged to do so.

106.    Nor does the client reach out to a new broker at a rival firm with a subject line referencing Oldenburg ("Andy O Transition") unless the client has already been told that Oldenburg has landed at Alliant and will be servicing the client's account from there. The natural inference is that Oldenburg had already teed up the move, using his final days at MMA to lay the foundation for a seamless transition in favor of Alliant.

107.    That the email was not sent to a general inbox or sales contact, but to a senior Alliant executive, confirms this was not the product of client initiative or guesswork. It was the result of a plan—executed behind the scenes by Oldenburg and Alliant in accordance with Alliant's well-worn playbook: keep the resignation secret, use the final days at the competitor to solicit clients and staff and prep them for the transition, and execute the handoff immediately after the resignation before the former employer can act.

108.    The only reason MMA discovered this email is that the client accidentally copied Oldenburg's MMA email address—revealing what Alliant and Oldenburg had sought to keep hidden. The episode reflects not only the coordinated nature of the raid, but the urgency with which Oldenburg and Alliant sought to capitalize on MMA's lack of notice by immediately diverting business before MMA could respond or seek injunctive relief.

109.    In the weeks that followed, at least fourteen clients representing more than $600,000 in annual recurring revenue for MMA filed broker-of-record letters transferring their accounts to Alliant. These losses underscore that the "Andy O Transition" email was not an

isolated incident but the first visible crack in a larger, pre-solicited wave of client defections that continues to this day.

110.    The misconduct did not stop there. On August 12, 2025, MMA learned through correspondence with another long-standing client that was departing for Alliant that McKinney herself was managing the client's transition to Alliant. The client provided McKinney's new Alliant email address and identified her as the person "helping us through this process."

111.    This exchange confirms two critical points. First, McKinney is actively servicing a former MMA client from Oldenburg's book of business—precisely the conduct her non-servicing covenant forbids. Second, the communication leaves no doubt that this was not some rogue employee maneuvering behind the scenes. The client plainly understood McKinney to be its designated representative at Alliant, which means both Alliant and the client were fully aware that she had assumed a servicing role in violation of her restrictive covenants.

112.    This episode illustrates the calculated nature of Alliant's scheme: Oldenburg and his team do not merely solicit clients in advance of their resignations, but also arrange for those same team members to appear seamlessly on the Alliant side, servicing the very accounts they are contractually barred from touching. On information and belief, Oldenburg, Moore, and Black are likewise servicing former MMA clients from Oldenburg's book, which they serviced in their final two years at MMA. The result is exactly what the covenants were designed to prevent: a client relationship painstakingly developed at MMA's expense is immediately transferred to Alliant with the same personnel in place, leaving MMA with no opportunity to protect its investment.

**COUNT I**
**Breach of the Acknowledgement and Restrictive Covenant Agreement –**
**Client Non-Solicitation, Non-Acceptance of Business, Non-Servicing**
**(Against Oldenburg)**

113.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 112 above.

114.    Oldenburg, as a shareholder and part-owner of PayneWest, voluntarily entered into the RCA with MMA in connection with MMA's acquisition of PayneWest, including his shares in PayneWest.

115.    The RCA is a valid and binding contract between Oldenburg and MMA, in consideration for which Davis received good and valuable consideration.

116.    Oldenburg breached the RCA by, within five years of the Closing Date of MMA's acquisition of PayneWest, "directly and or indirectly":

a.    "solicit[ing], accept[ing], call[ing] on, divert[ing], tak[ing] away, influenc[ing], induc[ing] or attempt[ing] to do any of the foregoing" with respect to Client Accounts (as defined in the RCA) of PayneWest as of the Closing Date of MMA's acquisition of PayneWest; and

b.    "servic[ing] or accept[ing] insurance agency brokerage business from Client Accounts" (as defined in the RCA) of PayneWest as of the Closing Date of MMA's acquisition of PayneWest.

117.    MMA fully performed its obligations under the RCA.

118.    As a direct and proximate result of Oldenburg's breaches of the RCA, MMA has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. MMA will continue to suffer further harm unless and until Oldenburg is restrained from his current conduct

and compelled to abide by the terms of the RCA.

119.    As a direct and proximate result of Oldenburg's breaches of the RCA, MMA has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

**COUNT II**
**Breach of the Acknowledgement and Restrictive Covenant Agreement –**
**Employee Non-Solicitation**
**(Against Oldenburg)**

120.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 119 above.

121.    Oldenburg, as a shareholder and part-owner of PayneWest, voluntarily entered into the RCA with MMA in connection with MMA's acquisition of PayneWest, including his shares in PayneWest.

122.    The RCA is a valid and binding contract between Oldenburg and MMA, in consideration for which Oldenburg received good and valuable consideration.

123.    The RCA prohibited Oldenburg from, within five years of the Closing Date of MMA's acquisition of PayneWest, "directly or indirectly":

a.    "solict[ing], call[ing] on, divert[ing], influenc[ing], [or] induc[ing]" employees of PayneWest who became employed by MMA "to leave the employ or engagement of [MMA]";

b.    "hir[ing]" employees of PayneWest who became employees of MMA; or

c.    "attempt[ing] to influence or induce" employees of PayneWest who became employees of MMA to end their employment with MMA.

124.    McKinney, Moore, and Black were employed by PayneWest, and became employees of MMA upon the closing of MMA's acquisition of PayneWest.

125.    Oldenburg breached the RCA by, within five years of the Closing Date of MMA's acquisition of PayneWest, "directly or indirectly,"

a.    "solicit[ing], call[ing] on, divert[ing], influenc[ing], [or] induc[ing]" McKinney, Moore, and Black "to leave the employ or engagement of [MMA]";

b.    "hir[ing]" McKinney, Moore, and Black; or

c.    "attempt[ing] to influence or induce" McKinney, Moore, and Black to end their employment with MMA.

126.    MMA fully performed its obligations under the RCA.

127.    As a direct and proximate result of Oldenburg's breaches of the RCA, MMA has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. MMA will continue to suffer further harm unless and until Oldenburg is restrained from his current conduct and compelled to abide by the terms of the RCA.

128.    As a direct and proximate result of Oldenburg's breaches of the RCA, MMA has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

## COUNT III
### Breach of the Non-Solicitation and Confidentiality Agreement –
### Client Non-Solicitation and Non-Servicing
### (Against Oldenburg)

129.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 128 above.

130.    Oldenburg voluntarily executed the Oldenburg NSA with MMA.

131.    The Oldenburg NSA is a valid and binding contract, in consideration for which Oldenburg received good and valuable consideration, including a cash bonus and employment with MMA.

132.    Oldenburg breached the terms of the Oldenburg NSAs by, among other things, directly and/or indirectly:

    a.    soliciting clients of MMA for the purpose of selling or providing products or services of the type sold or provided by Oldenburg while employed by MMA;

    b.    inducing clients and/or prospective clients of MMA to terminate, cancel, not renew, or not place business with MMA;

    c.    performing or supervising the performance of services or the provision of products, of the type sold or provided by Oldenburg while he was employed by MMA, on behalf of clients and/or prospective clients of MMA; and/or

    d.    assisting others to the acts specified above.

133.    MMA fully performed its obligations under the Oldenburg NSA.

134.    As a direct and proximate result of Oldenburg's breaches of the Oldenburg NSA, MMA has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. MMA

will continue to suffer further harm unless and until Oldenburg is restrained from his current conduct and compelled to abide by the terms of the Oldenburg NSA.

135.    As a direct and proximate result of Oldenburg's breaches of the Oldenburg NSA, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

**<u>COUNT IV</u>**
**Breach of the Non-Solicitation and Confidentiality Agreement –**
**Client Non-Servicing**
**(Against McKinney, Moore, and Black)**

136.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 135 above.

137.    McKinney, Moore, and Black each voluntarily executed an NSA with MMA.

138.    The NSAs are valid and binding contracts, in consideration for which McKinney, Moore, and Black received good and valuable consideration, including a cash bonus and employment with MMA.

139.    McKinney, Moore, and Black each breached the terms of their NSAs by, among other things, directly and/or indirectly, performing or supervising the performance of services or the provision of products, of the type sold or provided by McKinney, Moore, and Black while they were employed by MMA, on behalf of clients and/or prospective clients of MMA, and/or assisting others in doing so.

140.    MMA fully performed its obligations under the NSAs.

141.    As a direct and proximate result of McKinney's, Moore's, and Black's breaches of their NSAs, MMA has suffered and will continue to suffer extensive, irreparable injury, loss of

goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. MMA will continue to suffer further harm unless and until McKinney, Moore, and Black are restrained from their current conduct and compelled to abide by the terms of their NSAs.

142.    As a direct and proximate result of Richardson's, McKinney's, Moore's, and Black's breaches of their NSAs, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

## COUNT V
### Breach of the Non-Solicitation and Confidentiality Agreement – Non-Solicitation of Employees
### (Against Oldenburg)

143.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 142 above.

144.    Oldenburg voluntarily executed the Oldenburg NSA with MMA in connection with MMA's acquisition of PayneWest.

145.    The NSA is a valid and binding contract, in consideration for which Oldenburg received good and valuable consideration, including a cash bonus and employment with MMA.

146.    Oldenburg breached the terms of the Oldenburg NSA by, among other things, directly or indirectly, soliciting or otherwise endeavoring to cause employees of MMA with whom Oldenburg, during his final two years at MMA, had come into contact for the purpose of soliciting or servicing business or about whom Oldenburg had obtained Confidential Information and Trade Secrets (as defined in the Oldenburg NSA) to leave employment with MMA.

147.    Specifically, Oldenburg breached the Davis NSA by soliciting or otherwise endeavoring to cause McKinney, Moore and Black to leave employment with MMA. During his

last two years of employment at MMA, Oldenburg repeatedly came into contact with McKinney, Moore, and Black for the purpose of soliciting or servicing business, and also repeatedly obtained confidential information about McKinney, Moore, and Black.

148.    MMA fully performed its obligations under the Oldenburg NSA.

149.    As a direct and proximate result of Oldenburg's breaches of the Oldenburg NSA, MMA has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. MMA will continue to suffer further harm unless and until Oldenburg is restrained from his current conduct and compelled to abide by the terms of the Oldenburg NSA.

150.    As a direct and proximate result of Oldenburg's breaches of the Oldenburg NSA, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

### Count VI
### Breach of Duty of Loyalty
### (Against Oldenburg)

151.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 150 above.

152.    By virtue of Oldenburg's position at MMA, the special relationship of trust and confidence reposed by MMA in him, and the permission afforded him by MMA to its confidential, proprietary and trade secret information, Oldenburg was required to act solely in MMA's interest. Oldenburg also had duties of loyalty and utmost good faith to MMA and was obligated not to compete with MMA while employed by MMA.

153.    Oldenburg breached his duty of loyalty owed to MMA by, among other things:

        a.  concealing from MMA that he had accepted an offer to join Alliant and deceiving MMA into believing that it had his undivided loyalty, including deceiving MMA into permitting him to continue to have access to its clients, employees, and confidential and proprietary information;

        b.  while still employed by MMA, soliciting MMA's clients to move their business from MMA to Alliant; and

        c.  while still employed by MMA, soliciting MMA employees to leave their employment with MMA and join Alliant.

154.    As a direct and proximate result of Oldenburg's breaches of his duty of loyalty, MMA has suffered extensive injury, loss of goodwill, harm to its business, and other damages.

155.    As a direct and proximate result of Oldenburg's breach of his duty of loyalty, MMA already has suffered and will continue to suffer additional damages in an amount that is presently unascertainable, including but not limited to attorneys' fees and costs related to this litigation, as well as lost business, in an amount to be proven at trial.

156.    Oldenburg committed these acts knowingly, willfully and in conscious disregard of MMA's rights. Accordingly, MMA is entitled to recover actual and exemplary damages in an amount to be proven at trial.

## COUNT VII
### Aiding and Abetting Breach of Duty of Loyalty
### (Against Alliant)

157.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 156 above.

158.    Oldenburg owed a duty of loyalty to MMA during his employment with MMA.

159.    Oldenburg's duty of loyalty prohibited him from, among other things, competing with MMA by soliciting MMA clients and employees away to do business with a competitor.

160.    Oldenburg violated his duty of loyalty by soliciting MMA's clients away from MMA to do business with Alliant while Oldenburg was still employed with MMA.

161.    Oldenburg violated his fiduciary duty of loyalty by soliciting MMA's employees away from MMA to join Alliant while Oldenburg was still employed with MMA.

162.    Alliant knowingly participated in Oldenburg's breaches of his duty of loyalty by encouraging and substantially assisting Oldenburg's breaches of his duty of loyalty.

163.    As a direct and proximate result of Alliant's wrongful conduct, MMA has suffered and will continue to suffer extensive injury and harm to its business.

164.    As a direct and proximate result of Alliant's wrongful conduct, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

## COUNT VIII
## Tortious Interference with Contract
### (Against Alliant)

165.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 164 above.

166.    Alliant was aware of the contractual relationship between Oldenburg and MMA, including his contractual obligations to MMA refrain from soliciting or servicing MMA clients and from soliciting employees.

167.    Alliant, improperly and without privilege, interfered in MMA's contracts with Oldenburg by inducing, enticing and directing him to breach his contractual obligations to MMA, including, without limitation, by encouraging and assisting him in the solicitation of MMA's clients to move their business to Alliant, the servicing of MMA clients at Alliant, and the solicitation of MMA employees to leave their employment at MMA and join Alliant.

168.    As alleged above, Oldenburg, at Alliant's inducement and direction, violated the RCA and NSA by, without limitation, violating his client non-solicitation covenants by soliciting MMA clients to move their business from MMA to Alliant and servicing MMA clients at Alliant. Alliant was aware of Oldenburg's contractual obligations but directed him to violate them for Alliant's benefit.

169.    As alleged above, Oldenburg, at Alliant's inducement and direction, violated the RCA and NSA by, without limitation, violating his employee non-solicitation covenants by soliciting MMA employees to leave their employment at MMA and join Alliant. Alliant was aware of Oldenburg's contractual obligations but directed him to violate them for Alliant's benefit.

170.    The foregoing conduct was willful and intentional and has already caused and will continue to cause damage to MMA with respect to its relationships with its clients.

171.    As a direct and proximate result of Alliant's wrongful conduct, MMA has suffered and will continue to suffer extensive injury and harm to its business.

172.    As a direct and proximate result of Alliant's wrongful conduct, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

## COUNT IX
### Tortious Interference with Contract
### (Against Alliant and Oldenburg)

173.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 172 above.

174.    Alliant and Oldenburg were aware of the contractual relationship between McKinney, Moore, and Black, on the one hand, and MMA, on the other hand, including their contractual obligations to MMA refrain from soliciting or servicing MMA clients.

175.    Alliant and Oldenburg, improperly and without privilege, interfered in MMA's contracts with McKinney, Moore, and Black by inducing, enticing and directing them to breach their contractual obligations to MMA, including, without limitation, by encouraging and assisting them in servicing MMA's clients at Alliant.

176.    As alleged above, McKinney, Moore, and Black, at Alliant's and Oldenburg's inducement and direction, violated their NSAs with MMA by, without limitation, violating their client non-servicing covenants by servicing MMA clients at Alliant. Alliant and Oldenburg were aware of McKinney's, Moore's, and Black's contractual obligations, but directed them to violate them for Alliant's benefit.

177.     The foregoing conduct was willful and intentional and has already caused and will continue to cause damage to MMA with respect to its relationships with its clients.

178.     As a direct and proximate result of Alliant's wrongful conduct, MMA has suffered and will continue to suffer extensive injury and harm to its business.

179.     As a direct and proximate result of Alliant's wrongful conduct, MMA has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

## COUNT X
### Tortious Interference with Business Relations
### (Against Alliant and Oldenburg)

180.     MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 179 above.

181.     MMA had ongoing relationships with its clients.

182.     As a Sales Executive at MMA, Oldenburg had influential relationships with MMA clients, which were developed and strengthened over the years by virtue of his access to and knowledge of MMA's confidential and trade secret information, which Oldenburg used to form successful relationships with MMA's clients.

183.     Oldenburg and Alliant have knowledge about MMA's relationships with its clients. Indeed, Oldenburg and Alliant had knowledge of MMA's relationships with the clients for which Oldenburg was responsible at MMA, which Oldenburg, at Alliant's direction and with its assistance and encouragement, improperly solicited away from MMA.

184.    Despite this knowledge, Oldenburg and Alliant have intentionally and improperly interfered with the relationships between MMA and its clients by soliciting MMA's clients to cease their business with MMA and move their business to Alliant.

185.    Oldenburg and Alliant engaged in wrongful conduct in doing so, by (among other things) Oldenburg breaching his contractual and common law duties to MMA, with Alliant's knowledge, assistance, and encouragement. On information and belief, Oldenburg and Alliant further accomplished their wrongful solicitation of the MMA clients for which Oldenburg had been responsible at MMA by assuring the clients that Oldenburg and the same client service team that serviced the client at MMA (McKinney, Moore, and Black) would personally service their account at Alliant, despite Oldenburg's and Alliant's knowledge that McKinney, Moore, and Black were prohibited from doing so per their contracts with MMA.

186.    Oldenburg's and Alliant's conduct extends beyond the boundaries fair competition and has been tortious, in bad faith, dishonest, and designed to harm MMA.

187.    Oldenburg and Alliant were aware that this conduct would disrupt MMA's business relationships and intended this disruption to occur for the benefit of themselves.

188.    As a direct and proximate result of Oldenburg's and Alliant's conduct, MMA has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

## **JURY TRIAL DEMAND**

MMA hereby demands a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure as to all issues or claims for which a jury trial is allowed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff MMA respectfully requests that the Court:

A.  Enter preliminary and permanent injunctive relief enjoining Oldenburg from committing other acts in violation of the RCA, and further extending the length of Oldenburg's restrictions under the RCA by a period equal to the length of time from the date of Oldenburg's first breach of the RCA until the date of this Court's order;

B.  Enter preliminary and permanent injunctive relief enjoining Oldenburg, McKinney, Moore, and Black from committing other acts in violation of each of their NSAs;

C.  Enter judgment awarding MMA direct and consequential damages in an amount to be determined at trial, to compensate MMA for the losses it suffered by reason of Oldenburg's breaches of his duty of loyalty (and Alliant's aiding and abetting of those breaches), Oldenburg's, McKinney's, Moore's and Black's breaches of their contractual obligations to MMA (and Alliant's inducement of those breaches), Alliant's interference in MMA's contractual relationships with Oldenburg, Alliant's and Oldenburg's interference in MMA's contractual relationships with McKinney, Moore, and Black, and Alliant's and Oldenburg's wrongful interference with MMA's business relations with clients;

D.  Enter judgment awarding MMA any compensation amounts paid to Oldenburg during the period of his disloyalty;

E.  Enter judgment awarding MMA punitive damages for Defendants' intentional misconduct and/or gross negligence;

F.  Enter judgment awarding MMA its reasonable costs and attorneys' fees incurred by MMA in connection with the litigation, as expressly provided under the Agreement; and

G.  Grant MMA such other and further relief as the Court deems just and proper.

Dated:  August 21, 2025
        New York, New York

                            EPSTEIN, BECKER & GREEN, P.C.


                            By:      */s/ David W. Garland*
                                   DAVID W. GARLAND
                                   A.  MILLIE WARNER

                            875 Third Avenue
                            New York, New York 10022
                            (212) 351-4500
                            *Attorneys for Plaintiff*
                            *Marsh & McLennan Agency LLC*