**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARSH & McLENNAN AGENCY LLC,

                Plaintiff,

     v.

ALLIANT INSURANCE SERVICES, INC.,
ANDREW OLDENBURG, ELIZABETH
McKINNEY, KIMBERLY MOORE, and
DANIELLE BLACK,

                Defendants.

Case No.: 25-cv-06936

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW
CAUSE FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION,
AND EXPEDITED DISCOVERY**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 2

   A.  MMA and the Insurance Brokerage Industry ................................................ 2

   B.  MMA's Acquisition of PayneWest and Oldenburg's Agreement as a Selling Shareholder 3

   C.  Oldenburg and His Client Service Team Commence Employment at MMA ...................... 5

   D.  Alliant's Unlawful Growth Strategy ................................................ 5

   E.  Alliant Raids MMA's Beaverton, Oregon Office ................................................ 7

ARGUMENT ...................................................................................................................... 10

I.    MMA Is Entitled to a Temporary Restraining Order and Preliminary Injunction ............... 10

   A.  MMA Has Suffered and Will Continue to Suffer Irreparable Harm Absent Injunctive Relief ................................................................................................. 10

   B.  MMA Is Likely to Succeed on the Merits ................................................ 12

      1.  MMA Is Likely to Succeed on the Merits of Its Breach of Contract Claims .............. 13

      2.  MMA Is Likely to Succeed on the Merits of its Tortious Interference Claims ........... 22

   C.  The Balance of the Hardships Overwhelmingly Favors MMA and Granting the Proposed Injunction is Consistent with the Public Interest ................................................ 23

II.    An Injunction Should Issue for Two Years from the Court's Order ................................ 24

III.   MMA Is Entitled to Recover its Attorneys' Fees ......................................................... 24

CONCLUSION ................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aon v. Cusack*,
    946 N.Y.S.2d 65 (N.Y. Sup. 2011) .............................................................................6, 22, 23

*Crye Precision LLC v. Duro Textiles, LLC*,
    2016 WL 1629343 (S.D.N.Y. Apr. 22, 2016), *aff'd*, 689 F. App'x 104 (2d Cir.
    2017) ..........................................................................................................................14

*CSI Grp., LLP v. Harper*,
    153 A.D.3d 1314, 61 N.Y.S.3d 592 (3d Dep't 2017) ............................................13

*Design Strategies, Inc. v. Davis*,
    384 F. Supp. 2d 649 (S.D.N.Y. 2005), *aff'd sub nom. Design Strategy v.
    Davis*, 469 F.3d 284 (2d Cir. 2006) ......................................................................13

*FTI Consulting, Inc. v. PriceWaterhouseCoopers, LLP*,
    8 A.D.3d 145, 779 N.Y.S2d 56 (1st Dep't 2004) ..................................................14

*Hadari v. Leshchinsky*,
    242 A.D.2d 557, 662 N.Y.S.2d 85 (2d Dep't 1997) ..............................................14

*Hay Grp., Inc. v. Nadel*,
    170 A.D.2d 398, 566 N.Y.S.2d 616 (1st Dep't 1991) ...........................................11

*IDG USA, LLC v. Schupp*,
    416 F. App'x 86 (2d Cir. 2011) ..............................................................................11

*Int'l Dairy Foods Ass'n v. Amestoy*,
    92 F.3d 67 (2d Cir. 1996).......................................................................................13

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
    443 F. Supp. 3d 303 (E.D.N.Y. 2020) ..............................................................13, 14

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004)................................................................15, 17

*Kelly v. Evolution Mkts., Inc.*,
    626 F. Supp. 2d 364 (S.D.N.Y. 2009).....................................................................23

*Kraft Agency v. Delmonico*,
    110 A.D.2d 177, 494 N.Y.S.2d 77 (4th Dep't 1985).............................................14

*Malcolm Pirnie, Inc. v. Werthman*,
    280 A.D.2d 934, 720 N.Y.S.2d 863 (4th Dep't 2001) ...........................................18

*Manhattan Real Estate Equities Grp. LLC v. Pine Equity, NY, Inc.*,
  16 A.D.3d 292, 2005 N.Y. Slip Op. 02397 (1st Dep't 2005) ..................................................11

*Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc.*,
  2025 WL 304500 (S.D.N.Y. Jan. 27, 2025) .....................................1, 7, 11, 12, 15, 16, 17, 19

*Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc.*,
  No. 24-cv-00914, Order, ECF No. 54 (S.D.N.Y. Apr. 21, 2025) ......................................6, 17

*Marsh USA Inc. v. Karasaki*,
  2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008) .................................................15, 16, 17, 18, 24

*Marsh USA Inc. v. Schuhriemen*,
  183 F. Supp. 3d 529 (S.D.N.Y. 2016).......................................................................12, 17, 18

*MasterCard Int'l Inc. v. Nike, Inc.*,
  164 F. Supp. 3d 592 (S.D.N.Y. 2016)......................................................................................18

*Mercer Health & Benefits LLC v. DiGregorio*,
  307 F. Supp. 3d 326 (S.D.N.Y. 2018).......................................................................16, 18, 19

*Mohawk Maint. Co. v. Kessler*,
  52 N.Y.2d 276, 437 N.Y.S.2d 646 (1981) ..............................................................................13

*Mt. W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*,
  2019 WL 2536104 (Del. Ch. June 20, 2019) ........................................................................6, 7

*N.Y. Real Estate Inst., Inc. v Edelman*,
  42 A.D.3d 321, 839 N.Y.S.2d 488 (1st Dep't 2007) ..............................................................24

*OTG Mgmt., LLC v. Konstantinidis*,
  40 Misc. 3d 617, 967 N.Y.S.2d 823 (N.Y. Sup. Ct. 2013) ....................................................18

*Purchasing Assocs., Inc. v. Weitz*,
  13 N.Y.2d 267, 246 N.Y.S.2d 600 (1963) .......................................................................13, 14

*Renaissance Nutrition, Inc. v. Jarrett*,
  2012 WL 42171 (W.D.N.Y. Jan. 9, 2012)..............................................................................15

*Shearson Lehman Bros. Holdings v. Schmertzler*,
  116 A.D.2d 216, 500 N.Y.S.2d 512 (1st Dep't 1986) ...........................................................13

*Silipos, Inc. v. Bickel*,
  2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006)..........................................................................15

*Spinal Dimensions, Inc. v. Chepenuk*,
  16 Misc. 3d 1121(A), 847 N.Y.S.2d 905, 2007 WL 2296503 (N.Y. Sup. 2007) ..................16

*Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*,
  73 F. Supp. 3d 209 (S.D.NY. 2014)..................................................................19

*USI Ins. Servs. LLC v. Miner*,
  801 F. Supp. 2d 175 (S.D.N.Y. 2011)..........................................................16, 18

*Verizon Commc'ns, Inc. v. Pizzirani*,
  462 F. Supp. 2d 648 (E.D. Pa. 2006) ............................................................19

*Williams v, City of New York*,
  2018 WL 1785486 (E.D.N.Y. Apr. 13, 2018) ................................................12

*Willis of Fla., Inc. v. Powell, Jr.*,
  2016 WL 8814184 (Fla. Cir. Ct. Sept. 21, 2016)......................................18, 21

*Willis of New York, Inc. v. DeFelice*,
  299 A.D.2d 240, 750 N.Y.S.2d 39 (1st Dep't 2002) ......................................23

*Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc.*,
  No. 22-cv-00277, ECF No. 43 (W.D.N.C. July 7, 2022) ...............................20

*Yunnan Design, Inc. v. Chaindottz Enters., Inc.*,
  1999 WL 1075942 (S.D.N.Y. Nov. 29, 1999), *aff'd*, 4 F. App'x 48 (2d Cir.
  2001) ..............................................................................................................13

## PRELIMINARY STATEMENT

This case is not an isolated dispute over one departing employee. It is the third act in a year-long series of coordinated raids—each choreographed by Defendant Alliant Insurance Services, Inc. ("Alliant"), each executed according to the same script, and each designed to gut client relationships of Marsh & McLennan Agency LLC ("MMA") before it can seek relief.

In June 2024, Alliant lured MMA producer Travis Davis to resign "effective immediately" on a Monday morning, after he spent the preceding weekend soliciting clients. His client service team followed within a day, and more than 30 MMA clients were gone within weeks. MMA filed suit in this Court. *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc. et al.*, No. 25-cv-01260 (JAV) (S.D.N.Y. Feb. 12, 2025) ("*Davis*"). Six months later, in December 2024, Alliant repeated the maneuver with MMA producer Johnny Osborne—again a Monday morning resignation "effective immediately," again the simultaneous loss of his entire service team, again the immediate transfer of dozens of MMA clients. One month later, this Court enjoined Alliant's misconduct, finding MMA's restrictive covenants enforceable and the harm it suffered by virtue of Alliant's misdeeds irreparable. *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc.*, 2025 WL 304500, *5 (S.D.N.Y. Jan. 27, 2025) ("*Osborne*").

Now, just months after stipulating to a permanent injunction in *Osborne*, Alliant has struck again. This time, its target was Defendant Andrew Oldenburg—a former owner of PayneWest Insurance, Inc. ("PayneWest") who sold his equity, goodwill, and promises to MMA in exchange for substantial consideration. Alliant knew that Oldenburg was bound by sale-of-business restrictive covenants, as well as restrictive covenants to which he agreed to in the context of his employment with MMA. It also knew from its earlier recruitment of Davis—like Oldenburg, a former PayneWest shareholder, bound by the same sale-of-business and MMA employment restrictive covenants as Oldenburg—and the ensuing litigation, exactly what those covenants said.

Undeterred, Alliant offered Oldenburg a lucrative compensation package on the condition that he deliver his MMA clients and service team to Alliant immediately, in deliberate breach of his contractual obligations to MMA.

Oldenburg accepted—and, just like Davis and Osborne before him, spent his final weeks at MMA embedded and outwardly loyal, while secretly recruiting his service team, soliciting MMA clients, and timing his resignation for maximum damage. At 6:48 a.m. on Monday, July 14, 2025, he walked out for good. By the next day, his entire team was gone, all four were at Alliant, and MMA clients were already corresponding with Alliant about "transitioning" their business— proof that the solicitation had already happened.

Alliant's "Monday morning raid" strategy is no accident. Its own counsel has instructed that resignations must happen early on Mondays—never Fridays—to give recruits the weekend to solicit clients while still on the competitor's payroll, then defect before the competitor even knows a race has begun. That race is not for fair competition. It is a sprint to lock in ill-gotten clients before a court can stop them, and to then invoke "customer choice" as a shield.

This Court has already halted this exact playbook just months ago. Without immediate injunctive relief, MMA will again lose not just clients, but the goodwill and competitive advantage it paid millions to acquire.

## STATEMENT OF FACTS

### A.    MMA and the Insurance Brokerage Industry

MMA is an insurance brokerage and risk management firm. Theriault Decl. at ¶ 3.[1] At MMA, Sales Executives, also known as producers, are primarily responsible for developing and maintaining client relationships. (*Id.*; Compl. ¶¶31-32). They assume the lead, client-facing role

---

[1] References to the accompanying Declaration of Mark Theriault are designated as ("Theriault Decl. ¶ __)."

and oversee other members of their client-service teams. (Theriault Decl. at ¶ 5). To develop successful Producers and client-service teams, MMA invests considerable resources to help its employees gain expertise in handling specific client needs, selling and placing insurance, managing claims, and understanding clients' historical and current insurance requirements. (*Id.* at ¶ 6).

### B.    MMA's Acquisition of PayneWest and Oldenburg's Agreement as a Selling Shareholder

Oldenburg is more than a former Sales Executive and employee of MMA. (*Id.* at ¶ 8). He is also a former owner of PayneWest, a Montana-based insurance brokerage firm with offices across the Pacific Northwest. (*Id.*). As a Sales Executive in PayneWest's Beaverton, Oregon office, Oldenburg built a substantial book of business and oversaw a dedicated team responsible for day-to-day servicing of his client accounts. (*Id.* at ¶9). His role included developing new client relationships, maintaining and expanding existing ones, and supervising the day-to-day servicing of those accounts by a team of client service employees, comprised of Elizabeth McKinney, Kimberly Moore, and Danielle Black.[2] (*Id.*).

In 2021, MMA acquired PayneWest to expand its national footprint in the Pacific Northwest and gain access to PayneWest's established client base, industry expertise, and goodwill. (*Id.* at ¶ 10). As part of that acquisition, MMA agreed to purchase Oldenburg's ownership interest in PayneWest, along with the goodwill, client relationships, and enterprise value that he and other PayneWest principals had built over years in the industry. (*Id.*).

A significant part of the transaction's value lay not in PayneWest's tangible assets, but in the client relationships and reputation cultivated by its producers, including Oldenburg. (*Id.* at ¶ 11). To protect that investment, MMA required each PayneWest shareholder to enter into an

---

[2] Oldenburg, McKinney, Moore, and Black are referred to collectively herein as the "Individual Defendants."

Acknowledgment and Restrictive Covenant Agreement ("RCA") as a condition of the sale. (*Id.*). These covenants were essential: without them, the very individuals whose client relationships formed the core of the purchase could have immediately diverted that business to a competitor, stripping MMA of the benefit of its bargain. (*Id.*). Accordingly, the purchase agreement made MMA's acquisition of PayneWest expressly contingent on every shareholder, including Oldenburg, executing the RCA. (*Id.*).

On March 10, 2021, PayneWest circulated a letter to all shareholders, including Oldenburg, enclosing the RCA and making clear that each selling shareholder's signature was a prerequisite to the transaction. (*Id.* at ¶ 12). MMA closed on the acquisition on April 1, 2021 (the "Closing Date"). (*Id.* at ¶ 13).

In connection with the closing, Oldenburg executed his RCA and received substantial consideration for the sale of his ownership interest in PayneWest. (*Id.* at ¶ 14, Ex. A). In doing so, he expressly acknowledged value of the goodwill and client relationships being transferred to MMA and agreed to reasonable restrictions designed to protect MMA's investment. *(Id.* at ¶ 15). Unlike a standard post-employment agreement, Oldenburg's restrictive covenants were part of the consideration for the corporate acquisition itself. (*Id.*). MMA paid substantial sums to acquire PayneWest and the goodwill Oldenburg helped build, and these covenants were designed to ensure that MMA would receive the full value of its investment—by protecting it from immediate competition from the very individuals who had just profited from the sale. (*Id.*).

To that end, the RCA imposed post-closing restrictive covenants specifically crafted to safeguard MMA's investment. (*Id.* at ¶ 16). Those covenants include five-year restrictions, running from the April 1, 2021 Closing Date, on soliciting, servicing, or accepting business from PayneWest's clients and prospective clients, as well as on soliciting or hiring PayneWest

employees who became MMA employees upon the sale. (*Id.*). These restrictions remain in force through April 1, 2026, and the agreement further provides that the restricted period is tolled during any litigation arising from a breach and runs from the date of first breach. (*Id.*).

### C. Oldenburg and His Client Service Team Commence Employment at MMA

In connection with its acquisition of PayneWest, MMA offered employment to PayneWest employees. (*Id.* at ¶ 17). Before commencing employment at MMA, Oldenburg and the members of his client service team at PayneWest (McKinney, Moore, and Black) each executed a Non-Solicitation and Confidentiality Agreement ("NSA") with MMA.[3] (*Id.* & Exs. B-E). In these agreements, they agreed to:

- not "directly or indirectly, use, disseminate or disclose to any other person, organization or entity Confidential Information or Trade Secrets" while employed by MMA "and for so long thereafter as the pertinent information or documentation remains confidential";

- not, directly or indirectly, solicit or service MMA clients or prospective clients "with which…[they] had contact or about whom…[they] obtained Confidential Information or Trade Secrets during the last two (2) years of his or her employment with…[MMA]," for two years post-employment;

- not, "directly or indirectly, solicit, or endeavor to cause any employee of [MMA] with whom Employee, during the last two (2) years of his or her employment with…[MMA], came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets to leave employment with [MMA]," for two years post-employment.

(Theriault Decl. at ¶ 18 & Exs. B-E at §§ 1(b), 2, 5). These types of restrictive covenants are common in the industry. Indeed, Alliant requires its employees to agree to nearly identical restrictive covenants. (Compl. ¶ 76 & Ex. F at § 9(e)).

### D. Alliant's Unlawful Growth Strategy

Alliant, a direct competitor of MMA (Theriault Decl. at ¶ 4), has built its business not on

---

[3] Oldenburg's, Moore's, McKinney's, and Black's Marsh & McLennan Agency LLC Non-Solicitation and Confidentiality Agreements with MMA are each referred to herein as an "NSA" and collectively as the "NSAs."

superior service, but on stealing from its rivals. (Compl. at ¶¶ 8, 63-64). Through its so-called

"leveraged hire" and "team lift strategy," Alliant grows its business by enticing producers

managing large client books at competitors to join Alliant and bring their former employers'

clients, service teams, and confidential information with them, in violation of their restrictive

covenants and fiduciary duties. (Compl. ¶¶ 8, 63-69). Alliant executes its unlawful strategy

according to a well-honed methodology that has come to be known in courts nationwide as the

"playbook." (*Id.*). Time and again, Alliant's raids follow the same basic pattern, including:

1. **Targeting Producers**: Alliant identifies a producer at a competitor who is perceived to be valuable to client relationships, and offers substantial financial incentives to join Alliant, on the condition that the producer violate his or her contractual obligations to his or her current employer by poaching the employer's clients and client service teams. (*Id.* at ¶ 66).

2. **Concealing Intent and Recruiting Client-Service Teams**: After agreeing to join Alliant, the producer withholds notice of his or her resignation, and, while still employed at Alliant's competitor, assists Alliant in recruiting other employees, including key client service personnel. (*Id.* at ¶ 67).

3. **Strategically Timed Resignations Without Notice**: Alliant schedules and coordinates the departures of its new recruits from their current employer to maximize harm to the competitor and the benefits of the raid for Alliant. Alliant instructs the new hires to resign "effective immediately" on a designated date (typically, a Monday morning preceded by a weekend of aggressive client solicitation),[4] with the goal of "mov[ing] as much business as possible ***within the first 72 hours***, before a court order c[an] be entered stopping" them.[5] (*Id.* at ¶ 68).

---

[4] *Mt. W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, No. 2019-0226-JTL, Transmittal Aff. of Jarrett Horowitz, Ex. 7 (Del. Ch. Apr. 19, 2022).

[5] *AssuredPartners Capital, Inc. v. Alliant Ins. Servs., Inc.*, No. 24-cv-398, Aff. of Michael Harrington, ECF No. 4-1 at ¶ 10 (W.D. Ky. July 5, 2024). Once the clients have transitioned to Alliant, any subsequent court order is of little concern to Alliant, which invokes "customer choice" to argue that it should be allowed to continue servicing the unlawfully obtained clients and any injunction should only prohibit future solicitation. *See Osborne*, No. 24-cv-00914, Order, ECF No. 54, at 2–3 (S.D.N.Y. Apr. 21, 2025) (rejecting Alliant's "customer choice" argument and denying reconsideration of a preliminary injunction barring Alliant from servicing clients that had already moved, explaining that refusing to enforce the non-servicing covenant would create a "major loophole" in MMA's protections); *Mt. W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *23 (Del. Ch. June 20, 2019); *Aon v. Cusack*, 946 N.Y.S.2d 65, at *22 (N.Y. Sup. 2011). Alliant's strategy creates a race—its ability to poach clients versus the competitor's ability to obtain legal relief. By timing resignations to occur on Monday mornings, preceded by a weekend of client solicitation, Alliant doesn't just tip the scales in its favor; it starts running the race before the competitor even knows a race has begun.

4. **Concealing Evidence**: Alliant, in collaboration with its counsel, actively works to hide its unlawful activities, including through "extensive efforts to avoid creating an evidentiary record of its activities" (even destroying evidence when necessary), creating "a façade of compliance measures" (including a "sham" job application process to hide colleague solicitation), and "conceal[ing] evidence" during the ensuing litigation through "facially inadequate privilege log[s]" and "lawyer-drafted" affidavits containing averments that are so blatantly "untrue" one court called them "difficult to stomach."[6]

In fact, MMA itself has been the target of Alliant's playbook—now three times in the past year—each time experiencing the same calculated sequence of steps designed to strip away producers, their teams, and their clients before MMA could respond:

- **The Davis Raid (June 2024):** On Monday, June 24, 2024, MMA producer Travis Davis, also a former PayneWest shareholder, resigned "effective immediately" at 8:48 a.m.—less than 24 hours after a client alerted MMA that Davis had solicited its business over the weekend. By the next day, his lead client service team member had resigned and joined Alliant, followed soon by the rest of his client service team. Ultimately, more than 30 MMA clients moved their business to Alliant due to Davis's unlawful solicitation in breach of his covenants. *Davis*, No. 25-cv-01260 (JAV), Compl., ECF No. 1, ¶¶ 95-105, 115, 117, 118-27.

- **The Osborne Raid (December 2024):** On Monday, December 16, 2024, MMA producer Johnny Osborne resigned "effective immediately" at 8:00 a.m., just hours after weekend surveillance footage captured him removing multiple large boxes from MMA's offices. His entire client service team resigned the same day and joined Alliant. Within a week, multiple clients had moved to Alliant; that number later rose to 38. This Court granted a sweeping preliminary injunction in *Osborne*, finding MMA's restrictive covenants enforceable and the harm irreparable. *Osborne*, 2025 WL 304500, at *5.

### E.    Alliant Raids MMA's Beaverton, Oregon Office

By 2025, Andrew Oldenburg was responsible for managing a multimillion-dollar book of annually recurring revenue for MMA. (Theriault Decl. ¶ 19). That made him an obvious target for Alliant—and Alliant's objective was clear from the start: it was not looking to compete for Oldenburg's talent; it wanted the MMA clients he managed. (Compl. ¶¶ 12, 72). The goal was to

---

[6] *Mt. W. Series of Lockton Cos.*, 2019 WL 2536104, at *2, *15 & n.16, *17-*18, *22.

bypass the hard work of building a book of business and instead obtain immediate access to MMA's client relationships by inducing Oldenburg to breach his restrictive covenants. (*Id.*).

To secure that result, Alliant offered Oldenburg a lucrative, above-market compensation package—one that only made economic sense if Oldenburg brought MMA's clients with him. (*Id.* ¶ 79). And that was the plan. The offer was predicated on him immediately transferring his MMA book to Alliant, and Oldenburg accepted the offer knowing full well that Alliant expected an immediate and complete transfer of his MMA book. (*Id.* ¶¶ 79-81). But rather than disclose to MMA that he had agreed to join Alliant and planned to resign, he concealed his intentions. (*Id.* ¶ 81). Alliant and Oldenburg conspired for him to remain embedded at MMA, drawing a paycheck while secretly coordinating with Alliant to orchestrate a raid. (*Id.*).

One of Oldenburg's first tasks after accepting Alliant's offer was to identify for Alliant the MMA client service employees who supported his book of business: McKinney, Moore, and Black. (*Id.* ¶¶ 82-83). Following Alliant's standard playbook, Oldenburg did not merely name them—he actively recruited them. (*Id.* ¶ 84). While still employed by MMA, he encouraged each to join him at Alliant and, on information and belief, supplied Alliant with their confidential compensation information so it could tailor offers designed to lure them away. (*Id.*).

Alliant extended offers to all three, and each accepted. (*Id.* ¶ 85). These were not producers with independent books of business. (*Id.* ¶ 86). They were client service personnel (Theriault Decl. ¶¶ 9, 17)—only valuable to Alliant if Oldenburg brought his clients along. (Compl. ¶ 86). Alliant's decision to onboard three non-revenue-generating employees on the same day as Oldenburg made no financial sense unless Alliant was confident that Oldenburg was bringing his MMA clients with him. (*Id.*). And that was the plan. Alliant was not speculating; it was investing. (*Id.* ¶ 87). The

compensation offered to McKinney, Moore, and Black reflected Alliant's expectation of immediate client transitions and revenue capture. (*Id.*).

With Oldenburg and his team in place, Alliant executed the playbook with precision. On Monday, July 14, 2025, at 6:48 a.m., Oldenburg submitted his resignation "effective immediately." (Theriault Decl. ¶ 20, Ex. F). McKinney and Moore resigned within hours. (*Id.* ¶ 24). Black resigned the next day. (*Id.*). All four commenced employment at Alliant immediately. Within 24 hours, MMA had lost not just a producer, but an entire client-facing unit—challenging its ability to service dozens of key client relationships.

The same day as his surprise resignation, Oldenburg filed a declaratory judgment action in Oregon state court against MMA, seeking to invalidate the restrictive covenants in his agreements. *See Oldenburg v. Marsh & McLennan Agency LLC*, No. 25CV40606 (Or. Cir. Ct. Multnomah Cnty. July 14, 2025). The filing was made notwithstanding his agreements' mandatory New York forum selection clause and express adoption of New York law. The only conceivable purpose of such a lawsuit was to clear the way for Oldenburg to solicit MMA clients in violation of his contractual obligations; if he had no intention of soliciting clients, there would have been no need to seek judicial invalidation of those restrictions. (Compl. ¶ 97).

Less than twenty-four hours later, that intent was on full display. At 11:46 a.m. Pacific time on July 15, 2025, the president of a long-standing MMA client within Oldenburg's book of business emailed Jeff O'Neill, a senior executive at Alliant, with the subject line "Andy O Transition" and the message: "Jeff, I'm reaching out to transition our accounts to Alliant. Please let us know how to proceed." (Theriault Decl. ¶ 25, Ex. G). Inadvertently, the client also copied Oldenburg's former MMA email address—pulling back the curtain on a prearranged handoff. The message contained no explanation of who "Andy O" was, no company name, and no context at

all—clear evidence that the parties had already been introduced and briefed on the plan. This timing and familiarity are precisely what one would expect given the lawsuit Oldenburg had filed the day before: both confirm that solicitation had already occurred while he was still at MMA and that the transfer of client relationships was coordinated in advance.

In the weeks that followed, at least fifteen clients formerly serviced by Oldenburg at MMA—representing more than $600,000 in annually recurring revenue to MMA—submitted broker-of-record letters transferring their accounts from MMA to Alliant. (Theriault Decl. ¶ 26). A combination of Oldenburg and McKinney, Moore and/or Black had provided services to these fifteen clients at MMA. (*Id.*).

The misconduct did not stop there. On August 12, 2025, MMA learned through correspondence with another long-standing client that was departing for Alliant that McKinney herself was managing the client's transition to Alliant. (*Id.* ¶ 27, Ex. H). The client provided McKinney's new Alliant email address and identified her as the person "helping us through this process" on behalf of Alliant. (*Id.*).

## ARGUMENT

### I.    MMA Is Entitled to a Temporary Restraining Order and Preliminary Injunction

#### A.    MMA Has Suffered and Will Continue to Suffer Irreparable Harm Absent Injunctive Relief

The restrictive covenants in the RCA arise from—and are integral to—MMA's purchase of PayneWest, including Oldenburg's equity interest, the transfer of PayneWest's goodwill, and the substantial consideration MMA paid for that goodwill. (*See supra*, at pp. 3-4). This is not a post-employment covenant; it is a bargained-for protection of the very asset MMA acquired. New York law recognizes that in these circumstances, when a seller breaches a restrictive covenant executed in connection with the sale of a business, the buyer's injury is presumed to be irreparable.

*See, e.g.*, *Manhattan Real Estate Equities Grp. LLC v. Pine Equity, NY, Inc.*, 16 A.D.3d 292, 2005 N.Y. Slip Op. 02397 (1st Dep't 2005) ("We note as well that irreparable injury [of the buyer of a business] is presumed from the breach of a noncompetition agreement entered into to protect a buyer's purchase of a business and accompanying goodwill."); *Hay Grp., Inc. v. Nadel*, 170 A.D.2d 398, 399, 566 N.Y.S.2d 616 (1st Dep't 1991) ("Further, as the claim is based on the sale of a business and accompanying good will, irreparable injuries [to the buyer] were established without the necessity of showing actual loss of customers.") (citation omitted).

While MMA need not prove irreparable harm in this context, the circumstances here satisfy the Second Circuit's standard in any event: "absent…injunction," injury to MMA is "likely," and that "injury cannot be adequately remedied with money damages." *IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011).

"It is well established in the Second Circuit that a loss of client relationships and customer goodwill that results from the breach of a restrictive covenant generally constitutes irreparable harm." *Osborne*, 2025 WL 304500, at *5. That is exactly the harm unfolding here. Oldenburg's departure—coupled with the simultaneous loss of his entire client service team—has already fractured MMA's client relationships and goodwill. Fifteen clients are gone, and others are under active solicitation. (Theriault Decl. ¶ 26). Those relationships, built over years of trust and service, cannot be replaced; their loss will inevitably cascade absent injunctive relief.

Indeed, just months ago, this Court found that MMA had "clearly shown" irreparable harm in nearly identical circumstances—another Alliant-orchestrated raid on MMA, involving the immediate loss of a producer managing a book of business "worth well over a million dollars in annually-renewing revenue," the simultaneous defection of his client service team, and the rapid solicitation of MMA clients in violation of his restrictive covenants. *Osborne*, 2025 WL 304500.

The Court emphasized that such losses are "difficult or impossible to quantify and compensate" because "it is very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Id.* (quoting *Ticor*, 173 F.3d at 69). The Court also recognized—just as here—that contractual provisions designating breaches of restrictive covenants as irreparable harm weighed in favor of injunctive relief. *Id.* (citing *Marsh USA Inc. v. Schuriemen*, 183 F. Supp. 3d 529, 536 n.7 (S.D.N.Y. 2016)). There is no reason to deviate from that conclusion here. The facts are materially the same; the result should be too.

That earlier raid also demonstrates, in concrete terms, what will happen in the absence of an injunction. By the time MMA filed its complaint in that case on December 23, 2024, multiple clients had left for Alliant. *Osborne*, No. 24-CV-9914-MKV, ECF No. 16, ¶ 35. Nine days later—when MMA filed its motion for a temporary restraining order and preliminary injunction—the number of lost clients had risen. *Id.* And in the short window between that filing and the Court's January 7, 2025 hearing on the motion, Alliant managed to take even more. *Osborne*, No. 24-cv-9914 (MKV), ECF No. 26, at 13:3–4; *see also Osborne*, 2025 WL 304500, at \*1. The tide stopped only when the Court issued a temporary restraining order that day. *See Osborne*, No. 24-cv-9914 (MKV), ECF No. 24. Filing the complaint did not stop the solicitations. Filing the TRO motion did not stop them. Only the TRO itself did.

### B.    MMA Is Likely to Succeed on the Merits

As MMA seeks "prohibitory" injunctive relief that does not require a change to the *status quo*, MMA must only demonstrate "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Williams v, City of New York*, 2018 WL 1785486, at \*7 n.17 (E.D.N.Y.

Apr. 13, 2018) (quoting *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 70 (2d Cir. 1996)). MMA

meets, and easily exceeds, that bar.[7]

### 1.    MMA Is Likely to Succeed on the Merits of Its Breach of Contract Claims

#### (a)    The Restrictive Covenants Are Valid and Enforceable

##### (i)    The Restrictive Covenants in the RCA Are Valid and Enforceable

Oldenburg's restrictive covenants in the RCA are not ordinary post-employment restraints.

They were entered into as an express condition of MMA's acquisition of PayneWest and in direct

connection with the sale of Oldenburg's equity interest, the transfer of PayneWest's goodwill, and

MMA's payment of substantial consideration for that goodwill. (*See supra*, at pp. 3-4). As such,

they are evaluated under the more liberal "sale of business" standard—not the stricter rule

applicable to employee agreements. *Purchasing Assocs., Inc. v. Weitz*, 13 N.Y.2d 267, 271–72,

246 N.Y.S.2d 600 (1963); *CSI Grp., LLP v. Harper*, 153 A.D.3d 1314, 1316, 61 N.Y.S.3d 592,

596 (3d Dep't 2017); *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 336–38

(E.D.N.Y. 2020).

New York law has long recognized that "a buyer of a business should be permitted to

restrict his seller's freedom of trade so as to prevent the latter from recapturing and utilizing, by

his competition, the goodwill of the very business which he transferred for value." *Purchasing

Assocs.*, 13 N.Y.2d at 271; *see also Shearson Lehman Bros. Holdings v. Schmertzler*, 116 A.D.2d

---

[7] To obtain injunctive relief, the movant need only establish a likelihood of success on one of its claims. *Yunnan Design, Inc. v. Chaindottz Enters., Inc.*, 1999 WL 1075942, at *5 (S.D.N.Y. Nov. 29, 1999), *aff'd*, 4 F. App'x 48 (2d Cir. 2001). Regardless, MMA is likely to succeed on the merits of all its claims, including breach of fiduciary duty. Oldenburg's pre-resignation conduct in acting to advance Alliant's interests by misappropriating confidential information and soliciting clients and colleagues breached his fiduciary duties. *See Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 661 (S.D.N.Y. 2005), *aff'd sub nom. Design Strategy v. Davis*, 469 F.3d 284 (2d Cir. 2006).

216, 224, 500 N.Y.S.2d 512, 517 (1st Dep't 1986).[8] A covenant given in connection with such a sale will be enforced so long as it is "not more extensive, in terms of time and space, than is reasonably necessary to the buyer for the protection of his legitimate interest in the enjoyment of the asset bought." *Purchasing Assocs.*, 13 N.Y.2d at 272; *Crye Precision LLC v. Duro Textiles, LLC*, 2016 WL 1629343, at *5 (S.D.N.Y. Apr. 22, 2016), *aff'd*, 689 F. App'x 104 (2d Cir. 2017).

The RCA easily satisfies that standard. It imposes a five-year restricted period—running through April 1, 2026—measured from the Closing Date of the PayneWest acquisition, with the period extended for any litigation arising from a breach. (Theriault Decl. ¶¶ 13, 16 & Ex. A). It restricts Oldenburg only from PayneWest clients and employees as defined in the RCA—*i.e.*, the very relationships MMA purchased. (Theriault Decl. ¶ 16, Ex. A). The covenants prohibit Oldenburg from soliciting, servicing, or accepting business from those clients; from soliciting or hiring PayneWest employees who became MMA employees; and from otherwise diverting or undermining those relationships. (*Id.*). Far from an overbroad restraint, these provisions are narrowly tailored to prevent the very harm that would eviscerate MMA's bargained-for goodwill.

Courts applying the sale-of-business standard have routinely enforced similar restrictions. *See CSI Group*, 153 A.D.3d at 1316–17 (upholding non-solicitation covenant where seller transferred goodwill); *Intertek Testing Servs.*, 443 F. Supp. 3d at 336–38 (upholding five-year non-compete and client non-solicitation covenants in purchase agreement as reasonable and necessary to protect goodwill acquired in sale of business); *FTI Consulting, Inc. v. PriceWaterhouseCoopers, LLP*, 8 A.D.3d 145, 145-46, 779 N.Y.S2d 56 (1st Dep't 2004) (three-year non-compete executed in conjunction with an acquisition enforceable); *Hadari v. Leshchinsky*, 242 A.D.2d 557, 557-58,

---

[8] Indeed, the sale of a business carries with it an implied covenant that the seller will not depreciate the goodwill conveyed by soliciting or servicing former customers. *Mohawk Maint. Co. v. Kessler*, 52 N.Y.2d 276, 284–85, 437 N.Y.S.2d 646 (1981). New York law governs the RCA. (Theriault Decl. Ex. A at § 10(c)).

662 N.Y.S.2d 85 (2d Dep't 1997) (five-year non-compete in connection with acquisition enforceable); *Kraft Agency v. Delmonico*, 110 A.D.2d 177, 182–83, 494 N.Y.S.2d 77 (4th Dep't 1985) (same).

At bottom, MMA paid Oldenburg substantial consideration for his equity and the goodwill he helped create; he cannot now leverage those same relationships to compete against MMA without destroying the value of its purchase. Under settled New York law, the RCA covenants are valid and enforceable.

### (ii)    The Restrictive Covenants in the NSA Are Valid and Enforceable

Restrictive covenants are valid and enforceable under New York law (which governs the NSAs, *see* Theriault Decl. Exs. A-E at § 15) if they "(1) protect[] the employer's legitimate interests; (2) [are] reasonable in time and geographic scope; (3) do[] not impose undue hardship on the employee; and (4) do[] not harm the public interest." *Silipos, Inc. v. Bickel*, 2006 WL 2265055, at *3 (S.D.N.Y. Aug. 8, 2006). The restrictions in the NSAs here meet all these criteria. In fact, just months ago, this Court examined these *exact same* covenants in *Osborne* and held them enforceable under the controlling *BDO Seidman* standard, finding them narrowly tailored, reasonable in duration, and necessary to protect MMA's legitimate interests in its core business assets. *Osborne*, 2025 WL 304500, at *2-3, 6-7.

### a.    The Restrictive Covenants in the NSAs Are Supported by Legitimate Business Interests

MMA invested significant resources to enable Oldenburg to develop client relationships, including funding his salary and a support staff integral to client servicing. New York law recognizes an employer's legitimate interest in safeguarding client relationships developed at their expense. *See Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 536 (S.D.N.Y. 2004) (employer has legitimate interest in protecting client relationships developed with

its support, including by the support of other employees); *Marsh USA Inc. v. Karasaki*, 2008 WL 4778239, at *17 (S.D.N.Y. Oct. 31, 2008) (enforcing non-solicitation covenant protecting client relationships formed with employer's assistance); *Renaissance Nutrition, Inc. v. Jarrett*, 2012 WL 42171, at *4 (W.D.N.Y. Jan. 9, 2012) (enforcing non-solicitation covenant where employer "supported [employees] in developing client relationships"); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 350 (S.D.N.Y. 2018); *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 187-88 (S.D.N.Y. 2011).[9] That principle applies with particular force in the insurance brokerage industry, where client relationships and the teams who service them are the core of the business. *See, e.g., DiGregorio*, 307 F. Supp. 3d at 350; *Miner*, 801 F. Supp. 2d at 188; *Karasaki*, 2008 WL 4778239, at *17.[10]

This Court has already applied that principle to the exact same restrictive covenants and the exact same form of NSA at issue here. In *Osborne*, the Court held that MMA "undeniably has a legitimate interest" in protecting "client relationships and goodwill" and, relatedly, "in limiting the solicitation of its employees to depart for its direct competitors." 2025 WL 304500, at *7. The same reasoning applies here. Oldenburg, like Osborne, had direct, trusted relationships with MMA clients and worked closely with a dedicated client-service team. The non-solicitation covenants in his agreements protect both categories of relationships: the clients MMA paid to acquire and supported through its resources, and the employees whose departure would undermine MMA's ability to retain those clients. This is precisely the harm the Court recognized in *Osborne*, and precisely the harm MMA faces again now.

---

[9] New York courts enforce restrictive covenants to protect client relationships "(e)ven where . . . there is no showing that a former employee has obtained a competitive advantage through the misappropriation of confidential customer information or that the employee possessed unique or extraordinary abilities." *Spinal Dimensions, Inc. v. Chepenuk*, 16 Misc. 3d 1121(A), 847 N.Y.S.2d 905, 2007 WL 2296503, at *5 (N.Y. Sup. 2007).
[10] Alliant can hardly deny that client non-solicitation restrictive covenants serve a legitimate interest in protecting client relationships, as it imposes similar restrictions on its employees. (*See* Compl. ¶ 76, Ex. F, § 9(e)(i)).

   **(iii)**  **The Restrictive Covenants in the NSAs Are Reasonable in Time and Scope**

  The client non-solicitation and non-servicing covenants are narrowly tailored to apply only to clients with whom the Individual Defendants had contact or about whom they obtained confidential information during their last two years at MMA, and they last for just two years post-employment. (Theriault Decl. ¶¶ 17-18, Exs. B-E). In *Osborne*, this Court upheld this *exact* provision—holding it "is not overbroad," is of a reasonable duration, and "fits comfortably within MMA's legitimate business interest in preventing 'competitive use, for a time, of [client] information or relationships which…the employee acquired in the course of the employment.'" 2025 WL 304500, at *7 (quoting *BDO Seidman*, 93 N.Y.2d at 391).

  The Court also squarely rejected Alliant's argument that the non-servicing covenant should not be enforced because it would burden clients who had chosen to move their business. *Id.* at *9. "[N]umerous courts," including the New York Court of Appeals in *BDO Seidman*, have upheld such covenants "so long as they are reasonable in scope." *Id.* (citing *Karasaki*, 2008 WL 4778239, at 18; *Johnson Controls*, 323 F. Supp. 2d at 539; *Schuhriemen*, 183 F. Supp. 3d at 537). As the *Osborne* Court explained, refusing to enforce the non-servicing provision "would create a major loophole in MMA's ability to protect the interests that *BDO Seidman* recognizes as legitimate." 2025 WL 304500, at *9. Accordingly, the Court not only enforced the non-servicing covenant against the individual defendants, but also against Alliant itself, requiring Alliant to cease servicing clients it had unlawfully moved. *Id.* at *9-10; *see also Osborne*, No. 24-cv-00914, Order, ECF No. 54, pp. 2-3 (S.D.N.Y. Apr. 21, 2025) (denying defendants' motion for reconsideration of preliminary injunction barring Alliant and the individual defendants from servicing the 38 clients that had already transferred to Alliant, rejecting the claim that such relief "would inequitably

burden clients" and finding that refusing to enforce the non-servicing covenant would create a "major loophole" in MMA's protections).

That conclusion accords with the consistent view of New York courts that two-year non-solicitation covenants are reasonable in both duration and scope, particularly where, as here, they are client-based and employee-based. *See Miner*, 801 F. Supp. 2d at 188 (upholding two-year restriction as reasonable and collecting cases); *MasterCard Int'l Inc. v. Nike, Inc*., 164 F. Supp. 3d 592, 601-03 (S.D.N.Y. 2016); *Malcolm Pirnie, Inc. v. Werthman*, 280 A.D.2d 934, 935, 720 N.Y.2d 863 (4th Dep't 2001). That is, they prohibit only the solicitation or servicing of clients with whom the Individual Defendants had contact with or about which they obtained confidential information during their last two years of employment. *See, e.g.*, *DiGregorlo*, 307 F. Supp. 3d at 334 (enforcing similar customer non-solicitation covenant); *Karasaki*, 2008 WL 4778239, at *3 (same).[11] Alliant itself imposes the same two-year restrictions on its own employees, foreclosing any credible challenge to their reasonableness here. (Compl. ¶ 76, Ex. F at § 9(e)(i)(B)).

### (iv)    The Restrictive Covenants Do Not Unduly Burden the Individual Defendants or Harm the Public

New York courts have recognized that the restrictions imposed by non-solicitation provisions are "'inherently more reasonable and less restrictive' than noncompete clauses." *OTG Mgmt., LLC v. Konstantinidis*, 40 Misc. 3d 617, 621-22, 967 N.Y.S.2d 823 (N.Y. Sup. Ct. 2013). Here, the client non-solicitation and non-servicing covenants do not prevent the Individual Defendants from earning a living through employment with Alliant, nor do they unduly burden

---

[11] *See also Schuhriemen*, 183 F. Supp. 3d at 536-37 (enforcing customer non-solicitation and non-servicing covenants); *Miner*, 801 F. Supp. 2d at 188, 192-93 (noting reasonableness of client-based restrictive covenants prohibiting solicitation, acceptance and servicing of business); *Willis of Fla., Inc. v. Powell, Jr.*, 2016 WL 8814184, at *4 (Fla. Cir. Ct. Sept. 21, 2016) (holding that non-acceptance of business restriction was necessary to "prevent…'piracy' of [employer's] customers, which it has a right to prevent," because violations of client non-solicitation covenant are "easy to conceal" by "unscrupulous departing employees").

the Individual Defendants while doing so. *See, e.g., Chernoff Diamond*, 234 A.D.2d at 202 ("There is no reason to suppose that [a client non-solicitation] limitation will prevent defendant from pursuing his livelihood or that it will have the effect of precluding him from operating a successful insurance agency."); *DiGregorio*, 307 F. Supp. 3d at 351 (no "undue hardship where a restrictive covenant merely prohibits…soliciting his former employer's clients").[12]

Nor are the restrictive covenants injurious to the public. They do not impede MMA's competitors from offering services to the public.  They simply prohibit the Individual Defendants, who developed industry relationships and knowledge of confidential information during their service to MMA, from "free-riding" on MMA's efforts by immediately soliciting and servicing clients they handled at MMA. As the Court explained in *Osborne*, enforcing the non-servicing covenant "serves MMA's legitimate interest in protecting against defendants' competitive use of MMA's client relationships, prior investment in its employees, and confidential information." 2025 WL 304500, at *9. Far from harming the public, "[i]f anything, the public interest would be advanced by an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements." *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014).[13]

### (b)    The Individual Defendants Breached Their NSAs

For at least three reasons, MMA is likely to establish that the Individual Defendants breached their NSAs.

---

[12] The Individual Defendants themselves recognized this to be true: they each acknowledged in entering into the NSAs that such restrictions do "not prevent [them] from obtaining gainful employment in [their] field of expertise" and do not "cause [them] undue hardship." (Theriault Decl. Exs. B-E at § 9).

[13] Restrictive covenants like those at issue here also "serve an important public policy function by encouraging employers to make significant investments in training key employees and permitting employers to share confidential information with employees, which encourages the free exchange of ideas" for the public's ultimate benefit. *Verizon Commc'ns, Inc. v. Pizzirani*, 462 F. Supp. 2d 648, 662 (E.D. Pa. 2006) (applying NY law).

*First*, MMA is likely to succeed on the merits of its claims that Oldenburg is breaching his client non-solicitation covenants (Counts I & III). Oldenburg signaled his intention to ignore his client non-solicitation covenant the moment he filed a declaratory judgment action in Oregon state court—contrary to the forum selection clauses in his agreements—seeking to invalidate his restrictive covenants. *See Oldenburg v. Marsh & McLennan Agency LLC*, No. 25CV40606 (Or. Cir. Ct. Multnomah Cnty. July 14, 2025). The only plausible purpose of Oldenburg's filing was to free himself to solicit MMA clients. There would be no reason to seek such relief unless he intended to engage in conduct prohibited by those covenants.

And the evidence confirms that that was not only Oldenburg's intent, but exactly what he has already done. On July 15, 2025—less than twenty-four hours after Oldenburg's resignation—a long-standing MMA client within his book of business inadvertently pulled back the curtain. At 11:46 a.m. Pacific time, the client's president emailed Jeff O'Neill, a senior executive at Alliant, with the subject line "Andy O Transition" and the request: "Jeff, I'm reaching out to transition our accounts to Alliant. Please let us know how to proceed." (Theriault Decl. Ex. G). The client inadvertently copied Oldenburg's former MMA email address—revealing that Oldenburg had already made the introduction and that the transfer was prearranged. The absence of any company name or explanation in the message, and the decision to contact a senior Alliant executive in Spokane, Washington rather than a general sales address, only makes sense if Oldenburg had personally directed the client where to go.

The timing alone is powerful circumstantial evidence. Clients do not decide to "transition" their business to a competitor within hours of a producer's resignation unless the groundwork was laid in advance. Courts consistently recognize that such immediate client moves are sufficient to infer solicitation and justify injunctive relief, even absent direct proof. *See, e.g.*, *Willis Towers*

*Watson Southeast, Inc. v. Alliant Ins. Servs., Inc.*, No. 22-cv-00277, ECF No. 43 at 14 (W.D.N.C. July 7, 2022) (finding the transfer of clients to Alliant within days of producer's resignation "particularly compelling" circumstantial evidence of covenant violations); *Willis of Florida, Inc.*, 2016 WL 8814184, at *4 (three client transfers within three days was "sufficient evidence of solicitation" because such conduct is "easy to conceal" by "unscrupulous departing employees").

Given Alliant's well-documented practice of orchestrating coordinated client moves through departing producers, the suggestion that Oldenburg's resignation, his Oregon lawsuit, and the almost immediate client transfers are unrelated is implausible. MMA's direct evidence of solicitation only confirms what the circumstantial record already makes undeniable: Oldenburg breached his non-solicitation covenants, and Alliant actively facilitated those breaches to misappropriate MMA's hard-earned client relationships.

*Second*, MMA is likely to succeed on the merits of its claim that the Individual Defendants are breaching their covenant not to provide services to MMA clients (Count III). The only reason for Alliant to hire Oldenburg's client service team members, McKinney, Moore, and Black, is for them to service the clients Alliant expected Oldenburg to bring to Alliant—the same clients they serviced at MMA. It is unreasonable to assume clients in Oldenburg's book of business have transferred to Alliant and McKinney, Moore, and Black are not servicing them, under Oldenburg's supervision.

Indeed, the evidence now confirms the opposite. On August 12, 2025, in correspondence with a long-standing MMA client about its transition to Alliant, the client identified McKinney as the person at Alliant "helping us through this process" and provided McKinney's Alliant email address. (Theriault Decl. Ex. H). That communication confirms two critical points: McKinney is actively servicing a former MMA client from Oldenburg's book of business—conduct squarely

barred by her restrictive covenants—and both Alliant and the client recognize her as the designated representative managing the transition. This episode lays bare the calculated nature of Alliant's scheme. Oldenburg and his team do not merely solicit clients in advance of their resignations; they arrange for those same team members to appear seamlessly on the Alliant side, servicing the very accounts they are contractually barred from touching. The result is precisely what the covenants were designed to prevent: a client relationship cultivated at MMA's expense is immediately transferred to Alliant, intact and with the same personnel in place, leaving MMA stripped of the benefit of its investment.

*Third*, MMA is likely to succeed on its claim that Oldenburg breached his employee non-solicitation covenant by directly or indirectly soliciting McKinney, Moore, and Black (Counts II & V). It is no coincidence that all of the members of Oldenburg's client service team resigned simultaneously with Oldenburg to join the same competitor. This alone is sufficient at this stage to demonstrate a likelihood of success.

### 2.    MMA Is Likely to Succeed on the Merits of its Tortious Interference Claims

MMA is likely to succeed on the merits of its tortious interference claims. The elements of a tortious interference with contract claim (Counts VIII and IX) are: "(1) the existence of a valid contract...; (2) the defendant's knowledge of that contract; (3) the defendant's intentional interference with that contract; and (4) resulting breach and damages." *Aon Risk Servs. v. Cusack*, 946 N.Y.S.2d 65, at *19 (N.Y. Sup. 2011). Here, Alliant knew that the Individual Defendants had contracts with MMA containing restrictive covenants. (*See* Compl. ¶¶ 75-78, 166, 174). Nonetheless, as part of its unlawful business plan, Alliant induced Oldenburg with a significant compensation offer to furnish it with confidential information and solicit MMA clients and employees, in knowing breach of Oldenburg's restrictive covenants. Once Alliant improperly

induced Oldenburg to breach his agreement, Oldenburg and Alliant interfered with McKinney's, Moore's, and Back's NSAs by inducing them to service former MMA clients at Alliant, in knowing breach of their NSAs. These actions have caused MMA significant damage.

The elements of a tortious interference with business relations claim (Count X) are: "(1) [the plaintiff had] a reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the expectation; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship, and (4) damage to the plaintiff resulting from the defendant's interference." *Aon*, 946 N.Y.S.2d at *19. Here, MMA has business relationships with its clients, which it reasonably expects to continue, with which Alliant and Oldenburg have interfered by soliciting those clients, through Oldenburg, in violation of his contractual restrictions for the purpose of converting those clients into clients of Alliant. At least 15 of MMA's clients have already terminated their relationship with MMA based on this tortious conduct, causing MMA significant damage. (Theriault Decl. at ¶ 26).

### C. The Balance of the Hardships Overwhelmingly Favors MMA and Granting the Proposed Injunction is Consistent with the Public Interest

The balance of hardships overwhelmingly favors MMA. MMA risks irreparable harm from the loss of client relationships, customer goodwill, and confidential information. The Individual Defendants, by contrast, will not be unduly burdened by adhering to the restrictions to which they agreed in the NSAs. The restrictive covenants do not preclude the Individual Defendants from working at Alliant and earning a living. *See Willis of New York, Inc. v. DeFelice*, 299 A.D.2d 240, 242, 750 N.Y.S.2d 39 (1st Dep't 2002). An injunction would preserve the status quo by preventing the Individual Defendants from soliciting or servicing clients and soliciting certain employees or using MMA's confidential information. *Kelly v. Evolution Mkts., Inc.*, 626 F. Supp. 2d 364, 376 (S.D.N.Y. 2009) (balance of hardships tilts against employee where he "is free to begin

employment…and his livelihood is not jeopardized by this injunction"). Granting an injunction would also be in the public interest.

## II.    An Injunction Should Issue for Two Years from the Court's Order

The Individual Defendants agreed in their NSAs that the duration of their restrictions would be "extended for periods equal to the duration of Employee's violation thereof." (Theriault Decl. Exs. B-E at § 10); *see also N.Y. Real Estate Inst., Inc. v Edelman*, 42 A.D.3d 321, 322, 839 N.Y.S.2d 488 (1st Dep't 2007). *Karasaki*, 2008 WL 4778239, at *21. Considering their continuing breaches, an injunction should issue compelling adherence to the restrictions here for two years from the date of the Court's order.

## III.    MMA Is Entitled to Recover its Attorneys' Fees

The NSAs entitle MMA to recovery of attorneys' fees incurred enforcing its provisions. (Theriault Decl. Exs. B-E at § 10). This Court has found that a substantially similar provision made it "unmistakably clear" that "Marsh would be entitled to the recovery of [its] attorneys' fees." *Karasaki*, 2008 WL 4778239, at *21. So too here.

<u>**CONCLUSION**</u>

For the foregoing reasons, MMA respectfully requests that the Court grant its motion and enter a Temporary Restraining Order as set forth in its Order to Show Cause and Preliminary Injunction.

Dated: August 29, 2025
       New York, New York

                              EPSTEIN, BECKER & GREEN, P.C.

                              By:    _/s/ David W. Garland_
                                     David W. Garland
                                     A.  Millie Warner


                              875 Third Avenue
                              New York, New York 10022
                              (212) 351-4500

                              *Attorneys for Plaintiff Marsh & McLennan
                              Agency LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that Plaintiff's Memorandum of Law in Support of Order to Show Cause for Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery complies with the 8,750-word limit set forth in Local Civil Rule 7.1 and in Judge Abrams's Individual Rules & Practices in Civil Cases § 4.A. This computer-generated document was prepared using Microsoft Word, and based on Microsoft Word's word-count function, this document totals 7,881 words, exclusive of the caption, tables of contents and authorities, signature block, and certificate, but is inclusive of footnotes.

Dated: August 29, 2025

*/s/ David W. Garland*
David W. Garland