UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARSH & McLENNAN AGENCY LLC,

                    Plaintiff,

        v.

ALLIANT INSURANCE SERVICES, INC.;
ANDREW OLDENBURG; ELIZABETH
McKINNEY; KIMBERLY MOORE; and
DANIELLE BLACK,

                    Defendants.

25-CV-6936 (RA)

<u>OPINION AND ORDER</u>

---

RONNIE ABRAMS, United States District Judge:

       On August 21, 2025, Plaintiff Marsh & McLennan Agency LLC ("MMA") filed this action against Defendants Alliant Insurance Services, Inc. ("Alliant"), Andrew Oldenburg, Elizabeth McKinney, Kimberly Moore and Danielle Black (collectively the "Individual Defendants"), asserting that Defendants improperly solicited MMA's clients and employees in violation of agreements that the Individual Defendants had signed with MMA. Now before the Court is MMA's Application for a Temporary Restraining Order ("TRO"), a Preliminary Injunction and Expedited Discovery. Dkt. No. 18 (the "Application"). For the reasons that follow, MMA's application for a preliminary injunction is granted in part and denied in part as to Alliant, Oldenburg and McKinney. The Application is denied in its entirety as to Moore and Black.[1] MMA's application for a TRO is denied as moot and its application for expedited discovery is denied without prejudice.

---

[1] Although the Application does not address MMA's request for relief as to McKinney, Moore and Black, MMA's proposed order seeks an injunction against all of the Individual Defendants. Dkt. No. 16 (Proposed Order). The Court therefore construes the Application to seek an injunction as to all Individual Defendants.

## BACKGROUND & FINDINGS OF FACT

Having considered the parties' submissions, the Court makes the following findings of fact and conclusions of law pursuant to Rules 52(a) and 65 of the Federal Rules of Civil Procedure. *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence.").

MMA has accused Alliant of engaging in a series of poaching "raids" of MMA's employees and clients. Dkt. No. 1 ("Complaint" or "Compl."), ¶ 79. According to MMA, Alliant's conduct violates departing MMA employees' agreements with MMA. Both firms are direct competitors in the insurance brokerage and risk management industry. The Individual Defendants make up a client service team that recently moved from MMA to Alliant, after which many of their clients followed. The question at the heart of this case is whether the Individual Defendants' agreements with MMA bar them and Alliant from soliciting, accepting and/or servicing the Individual Defendants' MMA clients in their new roles at Alliant.

Alliant's so-called "raids" have led to a number of lawsuits by MMA against Alliant, including recent cases in this District. Application at 5–7. In *Marsh & McLennan Agency LLC v. Alliant Insurance Services, Inc.*, 2025 WL 304500, at *5 (S.D.N.Y. Jan. 27, 2025) ("*Osborne*"), Judge Vyskocil enjoined Alliant from servicing certain former MMA clients who a former MMA employee took with him to Alliant. And in *Marsh & McLennan Agency LLC v. Alliant Insurance Services, Inc. et al.*, 2025 WL 2916153 (S.D.N.Y. Oct. 14, 2025) ("*Davis*"), MMA sued for conduct similar to that at issue in this case, involving a nearly identical restrictive covenant. *Davis* is still pending before the Court, although on October 14, 2025 Judge Vargas issued an order

dismissing Alliant as a Defendant due to lack of personal jurisdiction.  *Davis*, 2025 WL 2916153, at *12.

Defendant Oldenburg is a "producer"—an insurance sales executive who manages client relationships and maintains a book of business—servicing clients in Oregon, now as an Alliant employee.  Dkt. No. 17 (Theriault Decl.), ¶ 9; Dkt. No. 26 ("Oldenburg Decl.").  Oldenburg used to work for and own a small portion of PayneWest, a regional insurance broker in the Pacific Northwest.  Oldenburg Decl., ¶ 8; Theriault Decl., ¶¶ 8–9.  In 2021, MMA acquired PayneWest.  *Id.*, ¶ 1.  As part of that purchase, Oldenburg agreed to work for MMA and to sell MMA his PayneWest shares.  *Id.*, ¶¶ 10–16.  Coinciding with the purchase and the beginning of his employment at MMA, Oldenburg signed an Acknowledgement and Restrictive Covenant Agreement ("RCA"), which included certain restrictive covenants that limit Oldenburg's professional activities in the event he was to leave MMA.  *Id.*  The RCA runs for five years from MMA's acquisition of PayneWest, expiring on April 1, 2026.  *Id.*, ¶ 16.

The RCA included a provision that Oldenburg would not "solicit, accept, call on, divert, take away, influence, induce or attempt to do any of the foregoing with respect to the Active Prospective Clients of [PayneWest] as of the Closing Date (wherever located) and the Client Accounts of [PayneWest]," nor "service or accept insurance agency brokerage business from any Client Account or Active Prospective Clients of [PayneWest]."  Dkt. No. 17-1 (RCA), ¶ 3(a).  The RCA defines "Active Prospective Clients" to include "any [client], within the twenty-four (24) months prior to [the PayneWest sale] (i) who or which had been identified with reasonable particularity by [PayneWest] in the Books and Records of [PayneWest] as a possible Client or customer . . . or (ii) to whom or which [PayneWest] had communicated in the business records of [PayneWest] . . . with respect to the provision of any services that [PayneWest] provides."  *Id.*,

¶ 9(a).  Oldenburg also agreed not to "solicit, call on, divert, influence, induce or attempt to do any of the foregoing with respect to any of the employees . . . of [PayneWest]"—essentially, a promise not to hire employees away from MMA.  *Id.*, ¶ 3(a).

As part of the PayneWest acquisition, Oldenburg's client service team, which includes Defendants McKinney, Moore and Black, moved from PayneWest to MMA.  Dkt. No. 30 ("McKinney Decl."), ¶ 4; Dkt. No. 31 ("Moore Decl."), ¶ 4; Dkt. No. 32 ("Black Decl."), ¶ 4.  At the beginning of their employment with MMA, all four of the Individual Defendants signed Non-Solicitation Agreements ("NSAs"), which included additional restrictions on their ability to solicit and serve MMA clients and employees.  Theriault Decl., ¶ 17.  The NSAs, which are identical to each other apart from the employee signatory, prohibit the Individual Defendants from "performing [insurance] services" for MMA clients in their new roles at Alliant, as well as for MMA's prospective clients whom the Individual Defendants solicited while employed by MMA:

> Employee covenants and agrees that in the event of separation from employment with the Employer [MMA], whether such separation is voluntary or involuntary, Employee will not, for a period of two (2) years following such separation, directly or indirectly: (i) solicit clients or prospective clients of the Company [MMA] for the purpose of selling or providing consulting services or projects, or selling products, of the type sold or provided by Employee while employed by the Company; (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company, (iii) perform or supervise the provision or performance of services or projects or provision of products of the type sold or provided by Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company, or (iv) assist others to do the acts specified in Sections 1(b)(i)-(iii).  For the avoidance of doubt, the restriction set forth in this Section 1 applies to those clients or prospective clients of the Company, including its predecessor, [PayneWest], and with which Employee had contact or about whom Employee obtained Confidential Information and Trade Secrets during the last two (2) years of his or her employment with the Company.  For the purposes of this Section 1, the term "contact" means interaction between Employee and the client which takes place to further the business relationship, or making (or assisting or supervising the performance or provision of) sales to or performing or providing (or assisting or supervising the performance or provision of) services, products or projects for the client on behalf of the Company.  For purposes of this Section 1, the term "contact" with respect to a "prospective" client means interaction between Employee and a potential client of the

Company which takes place to obtain the business of the potential client on behalf of the Company.

Dkt. No. 17-2 ("Oldenburg NSA" or "NSA"), ¶ 1(b).

The NSAs also prohibit signing employees from "solicit[ing] or endeavor[ing] to cause any employee of [MMA]" with whom the employee worked at MMA "to leave employment with the Company":

> Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, Employee has and will come into contact with and acquire Confidential Information and Trade Secrets regarding the Company's other employees. Accordingly, both during employment with the Company and for a period of two (2) years thereafter, Employee shall not, either on Employee's own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, solicit, or endeavor to cause any employee of the Company with whom Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets to leave employment with the Company.

*Id.*, ¶ 2. The NSA restrictions run for two years after a signing employee leaves MMA. Theriault Decl., ¶ 18.[2]

On July 14 of this year, Oldenburg resigned from MMA. Dkt. No. 17-6 ("Oldenburg Resignation Email"). On the same day, he filed a declaratory judgment action in Oregon state court, seeking to have the restrictive covenants in his RCA and NSA declared unenforceable. Oldenburg Decl., ¶ 7. Within a day, McKinney, Moore and Black also resigned from MMA. Theriault Decl., ¶ 24. Within the next two days, Oldenburg, McKinney, Moore and Black had all begun or obtained employment at Alliant. *Id.*

After the Individual Defendants moved from MMA to Alliant, a number of their former clients at MMA quickly began to transition business to Alliant. On July 15, Paul Del Vecchio, the president of a longtime Oldenburg client, emailed Jeff O'Neill, an Alliant executive who works

---

[2] While the enforceability of the RCA and NSAs is in dispute, the terms and plain meaning of the agreements are not.

with Oldenburg in his new role, to "transition [Del Vecchio's] accounts to Alliant." Dkt. No. 28-1 ("Del Vecchio Email"). Del Vecchio copied Oldenburg's MMA email account on the email to O'Neill. *Id.* Another of Oldenburg's former clients, Fred Martin, reached out to Oldenburg about transferring his company's account from MMA to Alliant. Dkt. No. 27 ("Martin Decl."), ¶ 4. Although Martin asserts that Oldenburg did not directly solicit his business on behalf of Alliant, Oldenburg did tell Martin that he should reach out to O'Neill. *Id.* After speaking with O'Neill, Martin then moved his business from MMA to Alliant. *Id.* And on August 12, another client of Oldenburg's at MMA contacted MMA to ask MMA for assistance in transferring its account over to Alliant. Dkt. No. 17-8 ("Aug. 12, 2025 McKinney email"). The client stated that McKinney, a member of Oldenburg's client service team who moved with him to Alliant, was "helping us through this process" and asked that MMA "work with her on what we need to do" to transfer the account. *Id.* All told, at least fifteen of Oldenburg's clients at MMA have now departed for Alliant, including one New York-based client (the "lost clients"). Theriault Decl., ¶ 26. The clients who have moved to Alliant thus far allegedly represent "more than $600,000 in annually recurring revenue," Application at 10, approximately one-third the nearly $2 million in annual revenue that Oldenburg's book provided for MMA. Theriault Decl., ¶ 19.

MMA alleges that Defendants have solicited the Individual Defendants' former MMA clients. Oldenburg, O'Neill and certain of Alliant's new clients deny that Oldenburg (or, for that matter, Alliant) actively solicited any of Oldenburg's former MMA clients. Dkt. No. 25 ("Opp'n") at 5. There is no dispute, however, as to whether Alliant accepted these new clients. *Id.*; Dkt. No. 29 ("O'Neill Decl."), ¶¶ 11–12. Nor do any of the Individual Defendants deny that Oldenburg in particular, and Alliant more generally, are actively servicing the contested clients.

On August 21, MMA filed this action, alleging that Oldenburg violated the RCA and NSA by soliciting and servicing MMA clients and hiring MMA's employees. MMA also brought breach of contract claims against McKinney, Moore and Black for servicing their former MMA clients at Alliant. An additional claim against Oldenburg alleges breach of the duty of loyalty, and one against Alliant alleges aiding and abetting that alleged breach.[3] Finally, MMA alleges tortious interference with contract and business relations claims against both Alliant and Oldenburg.

On August 22, the day after MMA filed this lawsuit and the day on which Defendants were served, McKinney sent a second email to a former MMA client that had moved to Alliant, assisting that client with its move. Dkt. No. 24-1 ("Suppl. Theriault Decl."); Dkt. No. 24-2 (Aug. 22, 2025 McKinney Email). MMA argues that this email shows that McKinney, along with the other Defendants, is actively servicing her former MMA clients in violation of her NSA, which Defendants do not deny.

On August 29, MMA filed the Application, seeking to enjoin Defendants from soliciting MMA's clients and interfering with their business. Defendants opposed, urging the Court to abstain from deciding MMA's motion for emergency relief because this case was the second filed of two federal suits concerning substantially similar subject matter. On September 18, 2025, the Court stayed this case pending the District of Oregon's ruling on a motion to transfer venue in the case Oldenburg filed there against MMA.[4] Dkt. No. 45. On October 6, 2025, the District of Oregon granted MMA's motion to transfer venue in the Oregon action to this Court. *Oldenburg v. Marsh & McLennan Agency LLC*, No. 3:25-CV-01459 (D. Or. Oct. 6, 2025). On October 8, 2025, this Court lifted the stay and subsequently held an oral argument to consider the Application on its merits.

---

[3] The Application does not rely upon either of these claims.
[4] In the Oregon case, Oldenburg is the plaintiff, and MMA the defendant.

## LEGAL STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).[5]  To obtain a preliminary injunction, a party must demonstrate: "(1) a likelihood of success on the merits . . . ; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in [the requesting party's] favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).  "In the Second Circuit, the same legal standard governs the issuance of preliminary injunctions and [TROs]." *Mahmood v. Nielsen*, 312 F. Supp. 3d 417, 421 (S.D.N.Y. 2018).

"[A] district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct." *City of New York v. Mickalis Pawn Shop, LLC.*, 645 F.3d 114, 144 (2d Cir. 2011).  Nevertheless, it is "the essence of equity jurisdiction" "to grant relief no broader than necessary to cure the effects of the harm caused by the violation." *Id.*  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," and a "party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made" at a preliminary injunction hearing are "not binding at a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Under Federal Rule of Civil Procedure 26(d)(1), "a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)" except "when authorized . . . by court order." Fed. R. Civ. P. 26(d)(1).  "The decision to grant or deny expedited discovery, like

---

[5] All quotations omit internal quotation marks, alterations and citations unless otherwise noted.

other aspects of discovery management, is committed to the court's discretion." *Miah v. Morgan Stanley & Co. Int'l PLC*, 2025 WL 1385189, at *2 (S.D.N.Y. May 6, 2025).

For the reasons that follow, the Court finds that MMA has satisfied its burden for a preliminary injunction as to some, but not all, of the relief it seeks. It has not yet done so with respect to its application for expedited discovery.

## DISCUSSION

The Court first considers Defendants' argument that it may not exercise personal jurisdiction over Alliant, and concludes that it may exercise such jurisdiction. It next considers MMA's Application for injunctive relief and finds that injunctive relief is justified to prevent Defendants from soliciting and accepting Oldenburg's MMA clients, but not from servicing them. Finally, the Court holds that MMA has yet to meet its burden for expedited discovery.

## I.    Personal Jurisdiction

Although personal jurisdiction over the Individual Defendants is not in dispute,[6] Defendants argue that the Court may not exercise personal jurisdiction over Alliant in this case. "[S]ubject to limitations imposed by the United States Constitution, [courts] look to the law of the forum state to determine whether a federal district court has personal jurisdiction over a foreign corporation." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016). As with natural persons, "a court may exercise two types of personal jurisdiction over a corporate defendant properly served with process—specific and general." *Anderjaska v. Bank of Am., N.A.*, 2021 WL 877558, at *1 (S.D.N.Y. Mar. 9, 2021); Opp'n at 6–8. "Whether specific or general, however, the

---

[6] Each of the Individual Defendants signed agreements with uncontested New York forum selection clauses, RCA, ¶ 10(c); Oldenburg NSA, ¶ 15, and is thus subject to personal jurisdiction. "Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006); *see also Nat'l Union Fire Ins. Co. of Pitt., Pa. v. Wynn Las Vegas, LLC*, 509 F. Supp. 3d 38, 48 (S.D.N.Y. 2020) ("Where an agreement contains a valid and enforceable forum selection clause, . . . it is not necessary to analyze jurisdiction under New York's long-arm statute or federal constitutional requirements of due process."). Here, the Individual Defendants all signed agreements with forum selection clauses, thus consenting to jurisdiction.

exercise of personal jurisdiction over a defendant is informed and limited by the U.S. Constitution's guarantee of due process, which requires that any jurisdictional exercise be consistent with traditional notions of fair play and substantial justice." *Brown*, 814 F.3d at 625.

Defendants first argue that Alliant is not subject to general jurisdiction. On this, the Court agrees. Alliant—a California corporation with its principal place of business in California—is not "at home" in New York, a constitutional requirement under the Due Process Clause for general jurisdiction. *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 405–06 (2017). Alliant's six New York offices, which MMA does not allege are involved in this dispute, are insufficient for the Court to establish general jurisdiction. *Id.* at 414. ("[I]n-state business . . . does not suffice to permit the assertion of general jurisdiction over claims . . . that are unrelated to any activity occurring in [the state].").

MMA asserts that this Court has personal jurisdiction over Alliant under a "closely related" theory, because the Individual Defendants consented to this Court's jurisdiction in the RCA and NSAs, and Alliant was aware of that consent when it hired the Individual Defendants. Dkt. No. 39 ("Reply") at 2. For the "closely related" doctrine to apply, Alliant must have been either a "successor-in-interest" or an "alter ego" to the Individual Defendants. *Davis*, 2025 WL 2916153, at *7. That is not the case here. MMA does not present evidence that Alliant was "in concert with the signator[ies]" at the time the Individual Defendants signed the RCA and NSAs, and therefore Alliant should not be subject to personal jurisdiction on the basis of the forum selection clauses in those agreements. *Seagrape Invs. LLC v. Tuzman*, 2024 WL 4337448, at *7 (S.D.N.Y. Sept. 26, 2024). As the *Davis* court held: "[Alliant] played no part in the transactions that led to the executions of the NSAs. It has not otherwise indicated an intent to be bound by the terms of the NSAs. Alliant does not stand in privity with the Individual Defendants merely because it now

employees them.  It thus would not have been reasonably foreseeable to Alliant that it would have been subject to the forum selection clauses contained in the NSAs."  *Davis*, 2025 WL 2916153, at *7.

The Court may, however, exercise specific personal jurisdiction over Alliant for purposes of this matter.  "Specific jurisdiction is available when the cause of action sued upon arises out of the defendant's activities in a state."  *Anderjaska v. Bank of Am., N.A.*, 2021 WL 877558, at *1.  MMA has presented sufficient evidence to establish that Alliant engaged in purposeful, forum-directed conduct: MMA's employee asserts in a declaration—and Defendants do not appear to dispute—that one of the clients who moved from Alliant to MMA is New York-based.  Reply at 4; Theriault Decl., ¶ 26.  The intentional acceptance and servicing of a New York client is forum-directed conduct and is sufficient for this Court to exercise specific personal jurisdiction over Alliant under the Constitution.  *See Guerrero v. Ogawa USA Inc.*, 2023 WL 4187561, at *6 (S.D.N.Y. June 26, 2023) ("'[P]urposeful availment of the benefits of transacting business in New York' . . . suffices for personal jurisdiction under . . . the due process clause.") (*quoting Chloe v. Queen Bee of Beverly Hills*, LLC, 616 F.3d 158, 171 (2d Cir. 2010)).

Although the *Davis* court found that it lacked specific personal jurisdiction over Alliant because MMA did not allege sufficient New York-directed conduct on Alliant's part, here the underlying facts are tied to New York.  The *Davis* complaint, by contrast, was "devoid of any allegations of conduct Alliant directed towards New York that caused [MMA's] injury, either under a 'but for' or proximate cause standard.  All of the alleged conduct, as it pertains to Alliant, took place in Oregon."  *Davis*, 2025 WL 2916153, at *5.  In this case, MMA has provided clear evidence of New York-directed conduct: the alleged poaching of a New York client from MMA

to Alliant.  This is sufficient New York-directed conduct to warrant personal jurisdiction over

Alliant.

At oral argument, Defendants argued for the first time that Alliant's New York conduct,

even if sufficient for personal jurisdiction under the Due Process Clause, does not satisfy the

requirements of New York's long-arm statute.  "It is well-settled," however, "that a party cannot

raise new arguments during oral argument."  *Geller Biopharm, Inc. v. Amunix Pharm., Inc.*, 2021

WL 415015, at *6 n.1 (S.D.N.Y. Sept. 13, 2021).  Even if Defendants had raised the argument

earlier the Court would find it unpersuasive.

The long arm statute states, in relevant part:

> **Personal jurisdiction by acts of non-domiciliaries.** (a) Acts which are the basis of
> jurisdiction. As to a cause of action arising from any of the acts enumerated in this section,
> a court may exercise personal jurisdiction over any non-domiciliary, or his executor or
> administrator, who in person or through an agent:
> 1. transacts any business within the state or contracts anywhere to supply goods or services
> in the state; or
> 2. commits a tortious act within the state, except as to a cause of action for defamation of
> character arising from the act; or
> 3. commits a tortious act without the state causing injury to person or property within the
> state, except as to a cause of action for defamation of character arising from the act, if he
>     (i) regularly does or solicits business, or engages in any other persistent course of
> conduct, or derives substantial revenue from goods used or consumed or services rendered,
> in the state, or
>     (ii) expects or should reasonably expect the act to have consequences in the state
> and derives substantial revenue from interstate or international commerce[.]

N.Y. C.P.L.R. § 302.  Jurisdiction is satisfied under any of the three subparts. Jurisdiction exists

under § 302(a)(1) if there is an "'articulable nexus' or 'substantial relationship' between the

business transaction and the claim asserted."  *Licci v. Lebanese Canadian Bank,* 20 N.Y.3d 327,

339 (N.Y. 2012).  There is an "articulable nexus" between Alliant's business transaction—the

provision of insurance services to a New York-based entity—and the claim asserted against

Alliant, which is sufficient for jurisdiction under § 302(a)(1).  Jurisdiction also exists under

§ 302(a)(2), "notwithstanding that a majority of the [misconduct] alleged by the plaintiff" occurred

out of state. *WCVAWCK-Doe v. Boys & Girls Club of Greenwich, Inc.*, 188 N.Y.S.3d 98, 104 (2d Dep't 2023). Alliant's likely tortious interference in MMA's business relationship with a New York-based client satisfies the requirements of § 302(a)(2). Finally, jurisdiction exists as well under § 302(a)(3), as Defendants likely committed a tortious act that caused MMA, a New York corporation, to lose profits in New York.

## II.    Preliminary Injunction and Temporary Restraining Order

Having established that it has personal jurisdiction over all Defendants, the Court turns to the showing required for MMA to obtain a preliminary injunction. MMA seeks an injunction prohibiting Defendants from soliciting, accepting, and servicing MMA clients subject to the restrictions of the RCA and NSAs. Defendants argue that MMA has not met its burden for preliminary injunctive relief as to any of Defendants. The Court disagrees, concluding that MMA has met its burden of obtaining limited injunctive relief prohibiting Alliant, Oldenburg and McKinney from further soliciting and accepting Oldenburg and McKinney's former MMA clients, but not their continued servicing of already-lost clients. In particular, the Court holds that MMA has established it is likely to succeed on the merits of at least some of its claims against Alliant, Oldenburg and McKinney, though not as to Black and Moore. While aspects of the RCA's broad restrictions on solicitation and acceptance of any PayneWest prospective clients are likely unenforceable, the other restrictive covenants in the RCA, as well as all of the restrictive covenants in the NSAs, are likely enforceable. Upon review of the evidence, MMA has established that an injunction barring Alliant from further soliciting and accepting Oldenburg's former MMA clients is warranted. The Court will not, however, enjoin Alliant's continued servicing of allegedly

misbegotten clients who have already moved their business to Alliant.  Finally, the balance of the equities and the public interest both favor the limited preliminary injunction imposed in this order.[7]

### A. Likelihood of Success on the Merits

MMA brings a breach of contract claim against McKinney, Moore and Black, for their alleged violation of their respective NSAs.  Compl., Count IV.  MMA also brings breach of contract claims against Oldenburg for his alleged violation of the RCA and NSA's restrictive covenants.  *Id.*, Counts I–III, V.  Finally, MMA brings claims against both Alliant and Oldenburg for tortious interference with contract and business relations.  *Id.*, Counts VII–X.  "Where a plaintiff seeks a preliminary injunction and asserts multiple claims upon which the relief may be granted, the plaintiff need only establish a likelihood of success on the merits on one of the claims."  *Eve of Milady v. Impression Bridal, Inc.*, 957 F. Supp. 484, 487 (S.D.N.Y. 1997).  Because MMA seeks an injunction against multiple Defendants, however, MMA must satisfy its burden as to each Defendant to obtain an injunction against that Defendant.  *See, e.g.*, *Isaacs v. Trustees of Dartmouth Coll.*, 2017 WL 4119611, at *4 (D.N.H. Sept. 14, 2017) (finding no support for the notion that "in a multi-defendant case involving multiple causes of action, a likelihood of success on the merits of a claim asserting one cause of action against defendant A entitles a plaintiff to injunctive relief from Defendant B, against whom he has asserted an entirely different cause of action").

### 1. Breach of Contract Claims Under the NSAs Against Individual Defendants

MMA asserts a breach of contract claim against each of the Individual Defendants, arguing that the Individual Defendants breached the NSAs by soliciting, accepting and servicing their

---

[7] Because MMA seeks a preliminary injunction solely on its breach of contract and tortious interference claims, the Court does not address the likelihood of success on the merits of its remaining claims.  *See* Compl., Count VI (breach of the duty of loyalty, against Oldenburg); *id.*, Count VII (aiding and abetting breach of the duty of loyalty, against Alliant).

former MMA clients after beginning their employment at Alliant.  Defendants make two arguments in response on behalf of the Individual Defendants: first, as a factual matter, there is insufficient evidence that the Individual Defendants solicited their NSA clients; and, second, the restrictions in the NSAs are unenforceable under Oregon law, which Defendants argue should apply to this matter.  The Court is unpersuaded by Defendants' arguments, and concludes that MMA is likely to succeed on the merits of its breach of contract claims under the NSAs against Oldenburg and McKinney, but not on its breach of contract claims against Black or Moore.

Before turning to enforceability, the Court first finds that MMA has shown that Oldenburg and McKinney have breached the express terms of the NSAs.  There is sufficient evidence that Oldenburg solicited, accepted, and is servicing his former MMA clients at Alliant, in violation of the non-solicit, acceptance, and service restrictions.  Oldenburg claims he did not solicit clients and instead, directed them to another Alliant executive, O'Neill, who then signed those clients up for Alliant's services.  But as other courts have recognized in cases involving Alliant, "an indirect, but still unmistakable, way of asking for . . . business" still constitutes solicitation.  *Willis of Fla., Inc. v. Powell, Jr.*, 2016 WL 8814184, at *2 (Fla. Cir. Ct. Sep. 21, 2016).  Indeed, the NSA itself specifies that it bars "indirect" solicitation.  Oldenburg NSA, ¶ 1(b).  There is also sufficient evidence that McKinney violated her NSA, which precludes servicing of restricted clients (i.e., MMA clients whom Oldenburg's client service team served while at MMA).  Indeed, MMA has put forth evidence to show, and Defendants do not contest, that McKinney is "helping [a restricted client] through this process" of transitioning business to Alliant.  Aug. 12, 2025 McKinney Email.

MMA, however, has not yet established a likelihood of success on the merits as to Black or Moore.  MMA has presented no evidence that either Black or Moore is engaged in servicing or soliciting their former MMA clients in their new roles at Alliant.  This does not mean that these

Defendants are not subject to their NSAs.  But MMA has yet to meet its burden for injunctive relief as to them.

Having established that Oldenburg and McKinney likely breached the terms of their NSAs, the Court next turns to enforceability.  This requires a determination of which state's substantive law should govern MMA's breach of contract actions.  Both agreements are clear that New York law should apply to any dispute involving their terms.  The NSAs provide that they "shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of laws provisions." Oldenburg NSA, ¶ 15.  Likewise, the RCA states it "shall be governed by, and construed in accordance with, the Laws of the State of New York applicable to contracts executed in and to be performed in that state without giving effect to any choice or conflict of law provision or rule that would cause the application of the Law of any jurisdiction other than the State of New York."  RCA, ¶ 10(c).

Despite provisions in the NSAs and the RCA stating that New York law shall apply to the agreements, Defendants urge this Court to look past those provisions and instead apply Oregon law to the contract enforceability question.  Under Oregon law, Defendants argue, the agreements' choice of law clauses are invalid.  Opp'n at 2, n.5.  As an initial matter, New York law governs the applicability of the governing law provisions themselves.[8]  "[W]here the parties have agreed that a particular state's law will govern their dispute, 'New York law gives full effect to the parties' choice-of-law provisions.'"  *Dins v. Nationstar Mortg., LLC*, 2017 WL 570941, at *3 (S.D.N.Y. Feb. 13, 2017).  Since the NSAs contain clear statements that the agreements "shall be governed

---

[8] The Court begins its analysis by determining which state's choice of law rules apply to the question of whether the choice-of-law clauses are themselves applicable.  Because this matter is in a proper forum, the choice-of-law rules of this forum—New York law—apply to this threshold question.  *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, 2022 WL 1997207, at *14 (S.D.N.Y. June 6, 2022) ("The validity of a contractual choice-of-law provision is decided . . . under the relevant forum's choice-of-law rules governing the effectiveness of such clauses."); *see also Fin. One Pub. Co. v. Lehman Bros.*, 414 F.3d 325, 333 (2d Cir. 2005).

by, and construed in accordance with, the laws of the State of New York," Oldenburg NSA, ¶ 15, New York substantive law applies and controls the validity of the agreements' restrictions.

Applying New York law, the Court now assesses the agreements' validity. Although non-competition covenants are "strong[ly] disfavor[ed] . . . in employment contracts" under New York law, *Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085, 1099 (2d Cir. 1992), New York courts routinely find non-solicitation provisions similar to those in the NSAs to be reasonably enforceable, *see, e.g.*, *Osborne*, 2025 WL 304500, at *7 (collecting cases and finding employment agreement enforceable). The reasoning in *Osborne* is instructive. *Osborne* reviewed nearly identical agreements between MMA and its former employees and found them to be enforceable. *Osborne*, 2025 WL 304500, at *10. In so doing, it relied on the "landmark case on point," *id.* at *6, *BDO Seidman v. Hershberg*, 93 N.Y.2d 382 (N.Y. 1999). In *BDO Seidman*, the New York Court of Appeals established the "prevailing standard of reasonableness" under New York law to determine the validity of restrictive covenants in employment agreements. 93 N.Y.2d 382, 389 (N.Y. 1999). Specifically, "[a] restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Id.* at 388–89. "[T]he application of the test of reasonableness of employee restrictive covenants focuses on the particular facts and circumstances giving context to the agreement." *Id.* at 390. Here, as in *Osborne*, the NSAs do not contain a blanket non-compete clause. Furthermore, MMA "has a legitimate business interest to prevent competitive use, for a time, of information or relationships which pertain peculiarly to [MMA] and which the [Individual Defendants] acquired in the course of the employment." *Osborne*, 2025 WL 304500, at *6.

To be sure, restrictive covenants must be reasonable in geographic area and time—agreements with limited geographic and temporal scope are more likely to be enforceable. *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 349 (S.D.N.Y. 2018). Although the NSAs do not place any geographic limits on the restrictions, the absence of such limits does not automatically render them unenforceable, and Defendants do not "raise any objection to the Agreements' geographical reach." *Mercer Health & Benefits LLC*, 307 F. Supp 3d at 349. Furthermore, the two-year limit on client contact imposed by the NSAs—both retrospective and prospective—is routinely found to be reasonable under New York law. *Osborne*, 2025 WL 304500, at *7 (citing cases); *Mercer Health & Benefits LLC*, 307 F. Supp. 3d at 349; *Willis of N.Y., Inc. v. DeFelice*, 750 N.Y.S.2d 39, 42 (1st Dep't 2002).

Defendants lastly argue that the fact that the NSAs apply to prospective clients renders them unenforceable. Opp'n at 14. But as the *Osborne* court noted, the NSAs' prospective reach is cabined to prospective clients "with whom the employee came into contact" during employment at MMA or about whom the employee obtained "Confidential Information and Trade Secrets," a narrower category than MMA's whole client pool. *Osborne*, 2025 WL 304500, at *7; Oldenburg NSA, ¶ 1(b). Because the NSAs' prospective reach is not overbroad, the NSAs are enforceable.

Accordingly, MMA is likely to succeed on the merits of its breach of contract claims against Oldenburg and McKinney under the NSAs, but not against Moore and Black.

### 2. MMA's Claims Under the RCA Against Oldenburg

MMA next argues that the RCA should apply in full force against Oldenburg. Alliant responds that the RCA is unenforceable in full, or, at the least, that its restrictions on the solicitation of prospective clients are overbroad. The RCA's prospective client language is significantly broader than that in the NSAs, which applies only to prospective clients with whom the Individual

Defendants came into contact or about whom they obtained confidential information. The RCA, on the other hand, prohibits Oldenburg from soliciting or servicing "any Person, or a group of Persons, within the twenty-four (24) months prior to Closing (i) who or which had been identified with reasonable particularity by [PayneWest] in the Books and Records of [PayneWest] as a possible Client or customer associated with the Business, or (ii) to whom or which [PayneWest] had communicated in the business records of [PayneWest], in writing or otherwise, with respect to the provision of any services that [PayneWest] provide[s] in the conduct of the Business." RCA, ¶ 9(a).

The parties dispute whether Oldenburg, the only Defendant who signed the RCA, should be classified as a former owner of PayneWest, or instead as a mere employee, as restrictive covenants on employees receive more scrutiny under New York law. In signing the RCA, Oldenburg acknowledges ownership of shares of PayneWest, albeit only a 0.28% interest. Oldenburg Decl. ¶ 8. But Oldenburg was also, per his declaration, an employee of PayneWest. The Court thus analyzes the RCA consistent with *BDO Seidman*, which provides the test, under New York law, for determining the validity and enforceability of employee restrictive covenants. As noted above, "the application of the test of reasonableness of employee restrictive covenants focuses on the particular facts and circumstances giving context to the agreement." *BDO Seidman*, 93 N.Y.2d at 390. And since Oldenburg was both a shareholder and an employee, any restrictive covenant must also be reasonable as to "time and space." *Shearson Lehman Bros. Holdings v. Schmertzler*, 116 A.D.2d 216, 223 (1st Dep't 1986) (establishing the standard for review under New York law of restrictive covenants on shareholder-employees).

Consistent with *BDO Seidman*, the Court concludes that the RCA's restrictions on Oldenburg's solicitation of *prospective* clients are overbroad, unreasonable and unenforceable.

These apply to former PayneWest clients "irrespective of whether [Oldenburg] ever provided services for them while employed there." *Fullman v. R & G Brenner Income Tax Consultants*, 897 N.Y.S.2d 669 (N.Y. Sup. Ct. 2009). If a potential client whom Oldenburg did not solicit was on a PayneWest 'target' list in 2021, it would be unreasonable to now prohibit him from doing so. Otherwise, Oldenburg would be prohibited from soliciting a prospective client with whom he had no contact and about whom he had no confidential information, merely because another PayneWest employee happened to contemplate soliciting the same prospective client in 2021. Such a restriction would be "unreasonably burdensome" to Oldenburg. *BDO Seidman*, 93 N.Y.2d at 389.

Defendants argue that because some portion of the RCA is unenforceable, no portion of it is enforceable. The Court disagrees, finding that partial enforcement of the RCA's valid provisions is appropriate. "If the employer demonstrates an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct, but has in good faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing, partial enforcement may be justified." *BDO Seidman*, 93 N.Y. 2d at 394.

MMA has established that the RCA's restrictions regarding actual PayneWest clients are reasonable, even under *BDO Seidman*'s stricter employee-focused analysis. It was reasonable for MMA to make it a condition of both the purchase of PayneWest and of employment that Oldenburg not "solicit, accept, call on, divert, take away, influence, induce or . . . service" the "Client Accounts" for which MMA compensated him. RCA, ¶ 3. As MMA correctly states, these restrictions were "narrow mechanism[s] to prevent the seller"—PayneWest and Oldenburg— "from reclaiming the goodwill he monetized." Reply at 9. The Court is persuaded that MMA needed assurances that PayneWest's actual clients would remain with MMA as part of the MMA-

PayneWest acquisition. Otherwise, MMA would be "deprived of the full benefit of [its] bargain" in acquiring PayneWest, which included the purchase of the "good will of [PayneWest's] customers." *FTI Consulting, Inc. v. Graves*, 2007 WL 2192200 at *4 (S.D.N.Y. July 31, 2007); *see also BDO Seidman*, 82 N.Y. 2d at 392 (recognizing that employers have a "legitimate business interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created . . . at the employer's expense, to the employer's competitive detriment"). The RCA's restrictions as to Oldenburg's actual clients and employees at PayneWest and MMA are reasonable for the same reasons as the NSA restrictions. The Court will thus enforce the RCA, albeit in part.

It is true, as the court noted in *BDO Seidman*, that a covenant is unreasonable if it restricts a former employee's contact with personal pre-existing clients who "came to the firm solely to avail themselves of his services and only as a result of his own independent recruitment efforts, which [the firm] neither subsidized nor otherwise financially supported." *BDO Seidman*, 93 N.Y. 2d at 393. But here, Oldenburg's PayneWest clients did not come to him *personally*—they came to PayneWest, which employed Oldenburg and thus supported Oldenburg's efforts to recruit those clients.

The temporal restrictions in the RCA are also reasonable. They are set to expire in less than six months, after which point Oldenburg will be free to solicit and service clients who do not otherwise run afoul of his NSA. Oldenburg, in his declaration, claims that he signed the RCA to avoid being "fired." Oldenburg Decl., ¶ 10. But "[t]he fact that a restrictive covenant agreement is a condition of future employment with a given company does not automatically render such an agreement coercive and unenforceable." *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 223 (S.D.N.Y. 2013) (citing cases).

### 3.  MMA's Claims of Tortious Interference Against Alliant[9]

MMA next argues that it is likely to succeed on its tortious interference claims against Alliant, asserting that Alliant knew the Individual Defendants had restrictive covenants in place prohibiting them from soliciting their former MMA clients.  Application at 11.  Defendants respond that MMA's tortious interference with contract claim is unlikely to succeed because Alliant did not knowingly solicit the violation of a valid contractual agreement.  Opp'n at 21.  Defendants further argue that MMA's tortious interference with business relations claim is unlikely to succeed because MMA has not shown that it "would have obtained [an] economic advantage but for the defendant's interference."  *Id.*  The Court agrees in part, concluding that MMA is likely to succeed on its tortious interference with contract claim against Alliant, but not in its tortious interference with business relations claim.

To prevail on a tortious interference with contract claim, MMA must show: "(1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of a third-party's breach of that contract without justification and (4) damages."  *Nagan Const., Inc. v. Monsignor McClancy Mem'l High Sch.*, 986 N.Y.S.2d 532, 533 (2d Dep't 2014).  "In order to meet the second element of a tortious interference with contract claim, it is not sufficient for a plaintiff to show that a defendant has constructive knowledge of a contract; rather, there must be evidence of actual knowledge."  *Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC*, 2016 WL 5414979, at *4 (S.D.N.Y. Mar. 18, 2016).  "A plaintiff need not show actual malice to prove a claim of

---

[9] Because the Court finds that MMA is likely to succeed on the merits of its breach of contract claims against Oldenburg, it need not consider MMA's tort claims against him at this stage.  *Eve of Milady v. Impression Bridal, Inc.*, 957 F. Supp. 484, 487 (S.D.N.Y. 1997) ("Where a plaintiff seeks a preliminary injunction and asserts multiple claims upon which the relief may be granted, the plaintiff need only establish a likelihood of success on the merits on one of the claims.").

tortious interference with existing contract." *Aon Risk Servs. v. Cusack*, 2011 WL 6955890, at \*19 (N.Y. Sup. Ct. 2011).

MMA has satisfied its obligation of establishing that the RCA and NSAs were valid contracts between it and the Individual Defendants, for the reasons stated above. Although MMA has alleged that Alliant had actual knowledge of the agreements' terms, MMA has not yet provided evidence of such actual knowledge. And while MMA has put forth sufficient evidence for a finding of constructive knowledge, such a showing is insufficient for tortious interference under New York law. *Wellington Shields & Co. LLC*, 2016 WL 5414979, at \*4. On a preliminary injunction motion, however, the party seeking relief is not "required to prove [its] case in full." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The Court finds that MMA has met its burden of establishing that there is a strong likelihood that MMA will eventually be able to prove Alliant had actual knowledge of the Individual Defendants' agreements.

The strongest circumstantial evidence supporting a finding that Alliant had knowledge of the RCA and the NSAs is Alliant's knowledge of and involvement with two prior cases in this District involving the same underlying contractual terms. In the *Davis* case, Alliant was aware of the terms of an RCA signed by another former PayneWest shareholder no later than February 2025. *Davis*, 2025 WL 2916153, at \*2. And through the *Osborne* case, Alliant became aware of the terms of MMA's standard NSA no later than December 2024. Because those cases involved different former MMA employees, Alliant's knowledge of the agreements' terms does not amount to *actual* knowledge that the Individual Defendants had identical obligations in this case. But Alliant is a sophisticated entity with a careful strategy in place for reviewing its external hires, which is enough to show that MMA is likely to be successful on the merits on this element. *See, e.g.*, Dkt. No. 42-3 ("March 5, 2019 email with counsel").

There is, in any event, other evidence of Alliant's knowledge. Although none of it is sufficient to establish actual knowledge, cumulatively it supports a finding that MMA is likely to establish actual knowledge of the agreements. In particular:

- O'Neill, an Alliant executive, was aware that Oldenburg had some sort of non-solicitation agreement in place with MMA. When clients reached out to Oldenburg after his move to MMA, Oldenburg "was instructed in such cases to advise the client that he had *an agreement and he could not solicit their business*." O'Neill Decl., ¶ 11 (emphasis added). O'Neill would then handle the client's transition. *Id.* It is not clear from his declaration if O'Neill knew that the RCA also precluded Oldenburg from *accepting* or *servicing* his former clients.

- Alliant's prospective employee agreement, which Oldenburg signed in April 2025, does not require disclosure to Alliant of any non-solicitation agreements an employee might have. Dkt. No. 29-1 (Alliant employee departure protocols). But it does instruct new employees to follow any agreements in place with their prior employer. *Id.*

- Oldenburg filed a lawsuit in Oregon on the very day that he joined Alliant, July 15, 2025, seeking to have his MMA restrictive covenants declared invalid. MMA has not provided evidence that Alliant was aware of that lawsuit when Alliant solicited and accepted Oldenburg's clients and employees; however, it seems exceedingly likely that Alliant would have been aware of the Oregon action.

- On August 12, 2025, nearly a month after Oldenburg filed his lawsuit and began working at Alliant, an Oldenburg-MMA client alerted MMA that it was moving its business to Alliant. Aug. 12, 2025 McKinney email. This shows Alliant was likely aware of the RCA and NSA, via Oldenburg's lawsuit, while it serviced an Oldenburg-MMA client.

As to procurement of breach, MMA has met its burden. Because the RCA and NSAs are valid under New York law, Oldenburg and McKinney's breach of those agreements was unjustified. Oldenburg and McKinney breached their agreements with MMA while working for Alliant. And MMA alleges it has suffered damages as a result, in the amount of at least $600,000 in annual revenue.

To obtain a preliminary injunction, MMA need not show that it is *certain* to succeed on the merits. "A plaintiff who seeks a preliminary injunction that will alter the status quo must demonstrate a substantial likelihood of success on the merits." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). There is sufficient evidence in the record, described

above, to find a "substantial likelihood" of success as to MMA's tortious interference with contract claim against Alliant.

MMA has not, however, shown that it is likely to succeed on the merits as to tortious interference with business relations. Specifically, it has failed to establish that it would have "obtained [an] economic advantage *but for* the defendant's interference." *Marsh USA, Inc. v. Alliant Ins. Servs., Inc.,* 2015 WL 6499525, at *6 (N.Y. Sup. Ct. 2015)*. Defendants' affidavits establish that some of Oldenburg's clients were unhappy at MMA and those clients may have left MMA with Oldenburg's departure, regardless of his destination. And unlike in *Osborne*, there is insufficient evidence here of subversion—for example, there is no evidence that Oldenburg removed confidential client documents and took them to Alliant, as was the case there. Nonetheless, "[w]here a plaintiff seeks a preliminary injunction and asserts multiple claims upon which the relief may be granted, the plaintiff need only establish a likelihood of success on the merits on one of the claims." *Eve of Milady*, 957 F. Supp. at 487.

### B. Irreparable Injury and Scope of Injunction

To obtain a preliminary injunction, MMA must also demonstrate that each component of the injunctive relief it seeks would serve to prevent irreparable injury. MMA seeks an order barring Defendants from hiring away any other MMA employees and soliciting or accepting further business from MMA clients in violation of the agreements. The Court concludes that these are irreparable injuries that would be prevented by an injunction. MMA's request to bar Defendants' servicing of clients already lost to MMA in breach of the agreements, however, fails, as this harm would not be remedied with an injunction.

As an initial matter, Defendants dispute that MMA has suffered any irreparable injury because MMA did not immediately file suit and seek an injunction upon Oldenburg's departure. Opp'n at 24. The Court disagrees. The forty-five-day delay between Oldenburg's departure and

the filing of the Application does not invalidate MMA's entitlement to emergency relief. This appears to have been a fluid situation, with MMA losing clients day-by-day. Reply at 7. And Defendants' cases on delay point to far different circumstances, where parties waited several months to file for preliminary injunctive relief. *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 145 (2d Cir. 2005) (five-month delay); *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985) (three-month delay). Furthermore, MMA continued to lose clients throughout August, so its harm did not accrue immediately with Oldenburg's departure. *See, e.g.*, Aug. 12, 2025 McKinney email. Accordingly, MMA's delay, to the extent there was a cognizable one, does not preclude its argument that it has suffered irreparable harm.

The Court next turns to MMA's asserted harm, which MMA describes as "the loss of client relationships and customer goodwill that results from the breach of a restrictive covenant." Application at 11 (noting the harm described in *Osborne* and arguing that it is "exactly the harm unfolding here"). The first question is whether Alliant's prospective solicitation or acceptance of Oldenburg's former clients or MMA employees subject to the RCA and NSAs would constitute irreparable injury. The Court concludes that such conduct does qualify as irreparable harm. "It is well established in the Second Circuit that the loss of client relationships and customer goodwill that results from the breach of a non-compete clause generally constitutes irreparable harm." *Osborne*, 2025 WL 304500, at *5; *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,* 323 F.Supp.2d 525, 532 (S.D.N.Y. 2004) (collecting cases). Absent an order that Alliant cease accepting MMA clients in violation of the RCA and NSAs, MMA may continue to lose more of Oldenburg's former clients, along with their goodwill and relationships. The loss of these clients would be irreparable because it would be "difficult or impossible to quantify and compensate for

further losses of client relationships and customer goodwill resulting from the alleged breaches in . . . this case." *Osborne*, 2025 WL 304500, at *5.

The more difficult question is whether Alliant's continued servicing of the fifteen former MMA clients that Alliant has already solicited and/or accepted, in likely violation of the RCA and NSAs, warrants the issuance of an injunction. MMA makes two arguments as to why an injunction as to servicing would address its irreparable harm. First, it argues that the breach of a non-servicing provision constitutes irreparable harm as a matter of established law. Second, it contends that unless the Court enjoins Alliant's wrongful servicing of former MMA clients, Alliant will be incentivized to continue its alleged long-standing pattern of raiding rival insurance brokers. An anti-servicing injunction, however, would not remedy MMA's stated harm.

"It is true, of course, that lost client relationships and lost goodwill that result from the breach of a non-competition agreement may constitute irreparable harm." *West Publ'g Corp. v. Coiteux*, 2017 WL 4339486, *3 (S.D.N.Y. 2017) (Rakoff. J.). As the Second Circuit has noted, "New York cases in the covenant-not-to-compete context apparently assume an irreparable injury to plaintiff." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999). But these New York cases do not dictate that the Court must issue an anti-servicing injunction in this particular case. Nor does the Court fundamentally depart from these cases: the majority of these cases are focused on prospective client solicitation—*i.e.*, stopping a former employee from *soliciting* clients from their former employer, something the Court does today with this order—or on clients transferred via the sale of a business. Application at 10–11. As discussed above, the prospective loss of clients can constitute irreparable injury. Nonetheless, the question is whether the continued servicing of those lost clients warrants an injunction. "When considering irreparable harm, the injunction must address the injury alleged to be irreparable—the Court should not grant the

27

injunction if it would not so prevent that injury." *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 606–07 (S.D.N.Y. 2014) (declining to issue an injunction where a plaintiff "may" have shown a "harm" but an "injunction [would] not lead to . . . Plaintiff's benefit").

The Second Circuit's opinion in *Buckingham Corp. v. Karp*, 762 F.2d 257 (2d Cir. 1985) is instructive. In *Buckingham Corp.*, the defendant, a former employee of the plaintiff company, left to start his own business, taking several clients with him. The Second Circuit held that it was improper for the district court to enjoin the defendant from doing business with the plaintiff's already-departed clients because "[t]he linchpin of [a preliminary injunction] is that threatened irreparable harm will be prevented by that injunction" and the plaintiff had not shown its lost clients would return upon the issuance of such an injunction. *Buckingham Corp.*, 762 F.2d at 262. While *Buckingham Corp.* is highly relevant to the Court's discussion of already-lost clients, it does not limit the Court's prospective relief regarding future solicitation and acceptance. Unlike this case, where MMA seeks a prospective non-solicitation and non-acceptance injunction, there is no indication that the *Buckingham Corp.* plaintiff sought any sort of non-solicitation injunction for clients that it had yet to lose. *See generally Buckingham Corp.*, 762 F.2d at 257.

Similarly, in this case, an anti-servicing injunction could not "be thought likely to bring the [lost clients] back to [MMA]." *Id.* at 261. Nor is there any indication that MMA's lost clients would return to MMA upon the issuance of an anti-servicing injunction. *See id.* (finding persuasive "sworn statements [of former clients] that they would" not "return" upon the issuance of an anti-solicitation injunction). The Del Vecchio declaration, for instance, indicates that at least one of the lost clients would not move its business back. Dkt. No. 28 ("Del Vecchio Decl."). Nor is it clear that MMA would regain any lost "goodwill" via an order that would stop its former clients from choosing their new insurer. *See West Publ'g Corp.*, 2017 WL 4339486, at *3.

This is not to say that courts never enjoin a party in Defendants' shoes from servicing wrongfully gotten clients. In *Velo-Bind, Inc. v. Scheck*, for instance, the court reasoned that "[b]y siphoning off plaintiff's carefully gleaned customers, defendants subject plaintiff to a definite possibility of irreparable harm, which increases as long as it continues unrestrained. What is at stake here is plaintiff's good will built up over the years, which is not, contrary to defendant's assertion, monetarily ascertainable." 485 F. Supp. 102, 109 (S.D.N.Y. 1979). And in enjoining further servicing of lost clients, the *Osborne* court ruled that MMA had shown it was "likely to suffer irreparable harm in the form of lost clients and customer goodwill in the absence of a preliminary injunction." 2025 WL 304500, at *5.

Nonetheless, *Velo-Blind, Inc.* and *Osborne* are distinguishable on this issue. In both cases, the plaintiffs established that their former employees were wrongfully making use of trade secrets or proprietary information, so an injunction served to prevent the aggrieved party from suffering further loss, in the form of exploitation of its irreplaceable data. In other words, the continued servicing of misbegotten clients was itself injurious because it involved the use of MMA's proprietary information. Here, by contrast, no similar evidence has been presented to date.

In urging an injunction with respect to soliciting, accepting and servicing clients, MMA has emphasized that Alliant has engaged in a pattern of tortious interference with MMA: moving clients over quickly, before MMA (or other rival insurers) even have a chance to file for an injunction. By the time Alliant's rivals get to court, MMA says, the harm is already done. Alliant's alleged strategy and pattern of conduct, if proven, may indeed be intentional, tortious and even malicious. But this alone is not the basis for injunctive relief. There are other mechanisms by which the judicial system deters egregious conduct, and MMA might pursue certain of those mechanisms at subsequent stages of this case. For instance, MMA has brought claims against

Alliant for tortious interference with contract.  In the context of a claim for "tortious interference with contract under New York law, an injured party can recover punitive damages when the tortious act complained of involved a wanton or reckless disregard of the plaintiff's rights." *RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.*, 692 F. Supp. 3d 135, 156 (S.D.N.Y. 2023). "Punitive damages are aimed at the . . . purposes of deterrence and retribution." *State Farm. Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408–09 (2003).  Preliminary injunctive relief is not.

MMA further argues that the loss of client relationships "will inevitably cascade absent injunctive relief."  Application at 11.  But the clients have already left MMA.  Importantly, it is not clear from the existing record that an injunction ordering those clients' new insurer to stop servicing those clients—an extraordinary remedy—would not ameliorate MMA's harm.  MMA is understandably concerned with "stop[ping]" the "tide" of lost Oldenburg clients.  Application at 12.  This Order—which prevents Alliant from soliciting or accepting more of Oldenburg's MMA clients—should stop that tide.  At oral argument, MMA's counsel echoed the *Osborne* court, arguing that an injunction is warranted as to those clients that have already moved to Alliant because to allow Alliant to continue to reap the improperly gotten gains of lost clients would create a "major loophole" in the agreements and "reward" tortious conduct.  *Osborne*, 2025 WL 304500, at *8.  While that may be true, an injunction is not the proper legal tool to deter such tortious conduct.

### D. Balance of Hardships and the Public Interest

Next, the Court finds that the balance of hardships and the public interest favor the limited injunction the Court issues today.  As to the solicitation and acceptance components of the agreements, the balance of the equities tips in MMA's favor.  The solicitation and acceptance covenants do not preclude the Individual Defendants from working at Alliant and earning a living, as Oldenburg acknowledged that his hiring at Alliant was not contingent on bringing clients with

him.  Oldenburg Decl., ¶ 11 ("At no time did Alliant make it a condition of my employment or my compensation that I deliver my MMA clients or my service team—let alone 'immediately.'"); *see also Willis of N.Y., Inc. v. DeFelice*, 299 A.D.2d 240, 242 (1st Dep't 2002).  And because the non-solicitation and non-acceptance requirements will not extend to *all* of MMA's prospective clients, it is limited in nature.  If the non-solicitation and non-acceptance provisions were not enforced, MMA, meanwhile, would stand to lose the remaining benefits of its acquisition of PayneWest, in the form of both clients and goodwill.  Finally, Oldenburg and Alliant are not forever precluded from soliciting Oldenburg's MMA clients.  At the expiration of the RCA and NSA restrictions, they will again be able to solicit and accept the clients in dispute.

In deciding whether to grant a preliminary injunction, a court must also "ensure that the public interest would not be disserved by the issuance of a preliminary injunction."  *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).  The Court agrees with MMA that "the public interest would be advanced by an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements."  *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.NY. 2014).  This interest, however, must be balanced against the freedom of choice of non-party clients regarding whom they work with.  The Court is hesitant to keep non-parties from working with the insurance broker of their choosing absent a compelling legal basis.  Del Vecchio, an Oldenburg client, echoes this sentiment in his declaration: "We should be allowed to continue to do business with professionals of our choice and not be left to the vagaries of the marketplace to find other professionals."  Del Vecchio Decl., ¶7.  And under New York law, "greater protection is accorded an interest in an existing contract"—such as Del Vecchio's—"(as to which respect for individual contract rights outweighs the public benefit to be derived from unfettered competition) than to the less substantive, more speculative interest in a prospective relationship."  *White Plains Coat & Apron Co. v. Cintas Corp.*, 8. N.Y.3d 422, 425

(2007). The Court's injunction will thus bar further solicitation and acceptance of additional clients, but will not disturb insurance coverage for those clients who have already moved from MMA to Alliant, including Del Vecchio's company.

### III. Expedited Discovery

Finally, the Court considers MMA's application for expedited discovery. "When considering whether to grant a motion for expedited discovery prior to a Rule 26(f) conference, courts apply a 'flexible standard of reasonableness and good cause.'" *Strike 3 Holdings, LLC v. Doe*, 329 F.R.D. 518, 520 (S.D.N.Y. 2019) (quoting *Digital Sin, Inc. v. Does 1-176*, 279 F.R.D. 239, 241 (S.D.N.Y. 2012)). Defendants rely on the *Notaro* test, a stricter standard for evaluating requests for expedited discovery sometimes employed in this Circuit. *See* Opp'n at 27 (citing *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982)). On balance, however, courts in this Circuit more often follow the more liberal test articulated in *Strike 3 Holdings, LLC.*

Even under this more liberal standard, MMA has not yet articulated how its ongoing harm—the loss of clients and employees, along with goodwill—justifies its need for expedited discovery. Nor did MMA identify the specific discovery it seeks. After Defendants noted this deficiency in their opposition, MMA, in its reply, lays out several categories of expedited discovery it seeks. Reply at 24. But "new arguments may not be made in a reply brief." *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999). The motion for expedited discovery is therefore denied, albeit without prejudice and with the recognition that MMA's request can be raised again during the course of discovery.

### CONCLUSION

For these reasons, the Court grants in part and denies in part MMA's motion for a preliminary injunction as to Alliant, Oldenburg and McKinney. Alliant, Oldenburg and McKinney are enjoined from soliciting or accepting business from clients covered by the RCA

and NSAs, as well as prospective clients covered by the NSAs, that have not already moved their business to Alliant.  They are not, however, enjoined from continuing to service clients that have already moved their business to Alliant.  The Court denies without prejudice the Application as to Black and Moore.  The Court further denies without prejudice MMA's request for expedited discovery.

The application for a temporary restraining order is denied as moot, in light of the issuance of the partial preliminary injunction.  Finally, MMA's request for attorneys' fees is denied without prejudice.

SO ORDERED.

Dated:  December 1, 2025
         New York, New York

_____
Ronnie Abrams
United States District Judge